# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| BARBARA COOPER,<br><br>              Plaintiff,<br><br>       v.<br><br>MILLIMAN, INC.,<br><br>              Defendant. | **Civil Action No.:** 2:23-CV-00028-JES-NPM<br><br><br>**PLAINTIFF BARBARA COOPER'S MOTION TO EXCLUDE OPINION EVIDENCE FROM REBECCA KUEHN** |

Pursuant to Federal Rule of Evidence 104(a), Plaintiff Barbara Cooper ("Plaintiff"), by and through undersigned counsel, respectfully moves to exclude all opinion evidence offered by Defendant Milliman, Inc.'s proffered expert, Rebecca Kuehn, as outside the scope of Fed. R. Evid. 702. In support, Plaintiff incorporates the Memorandum below.

## I.       INTRODUCTION

Plaintiff alleges that Defendant Milliman, Inc. ("Milliman") violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA") in two ways: first, when it issued a report about her medical and prescription history that mixed her with another individual; and second, when it issued a second report wherein Milliman reinserted information it had previously deleted after purportedly reinvestigating Plaintiff's dispute. Milliman principally attributes its repeated errors to a "glitch"

with the software that matches information about consumer identity with medical record information.[1]

Milliman proffers Rebecca Kuehn as an expert witness. Kuehn opines that Milliman's procedures for its initial reporting and its reinvestigation were reasonable because they conform to industry standards. But Kuehn's opinion evidence is inadmissible for several reasons. First, she admits that consumer reporting procedures and industry standards vary depending upon the subject matter of the report, and she admits that she has no experience in the reporting of consumer medical information. She also admits that she does not know **anything** about the software that supposedly prevented Milliman from preventing the reinsertion of inaccurate information in the second report Milliman published about Plaintiff. To compensate for her lack of knowledge and experience in medical record reporting, she relies heavily on hearsay statements made during her interview of one of Milliman's corporate representatives, Joel Strassburg; but she takes those statements at face value and never makes any independent assessment of them.

In the end, her opinion amounts to nothing more than a collection of bare legal conclusions that are stamped on Milliman's preferred version of the facts. This kind of expert opinion is not reliable or admissible under the standards set by the Federal

---

[1] Plaintiff disputes that this was merely a "glitch." *See*, Plaintiff's Motion for Partial Summary Judgment, filed concurrently herewith.

Rules of Evidence, and her opinion evidence should be excluded.

## II.    <u>FACTUAL BACKGROUND</u>

### A.    *Plaintiff's Claims*

In connection with Plaintiff's application for supplemental health insurance, Milliman issued a report about Plaintiff that mixed another individual's medical history and prescription records into the consumer report purportedly about Plaintiff. Complaint [Dkt. 1] at ¶¶ 18-35. Specifically, the inaccurate information was comprised of **more than twelve hundred** entries that did not belong to plaintiff, including: more than eight hundred and fifty entries for medical care, conditions, and treatment that Plaintiff had never had; three hundred and sixty prescriptions for medications used to treat serious illnesses, which Plaintiff had never taken or needed; and the names of more than twenty physicians from whom Plaintiff had never sought treatment. *Id*. at ¶¶ 27, 29, 33. Plaintiff disputed the inaccurate information; and, after reinvestigating her dispute, Milliman deleted the more than twelve hundred inaccurate entries from Plaintiff's report. *Id*. at ¶¶ 37-66.

However, Milliman's revisions did not solve its problem of mixing the prescription records into Plaintiff's file. When Plaintiff completed a later application for insurance, Milliman issued a new report about Plaintiff and reinserted the prescription medication information for the other individual. Complaint [Dkt. 1] at ¶¶ 69-90. Milliman's second report included the same information it had previously

deleted in response to Plaintiff's dispute, albeit with a different fill date. *Id*. at ¶¶ 83-88.

Plaintiff has alleged that Milliman violated 15 U.S.C. § 1681e(b) when it published its initial report because it failed to follow reasonable procedures to assure maximum possible accuracy. Complaint [Dkt. 1] at ¶¶ 129-36. Plaintiff has also alleged that Milliman violated 15 U.S.C. § 1681i(a) when it failed to prevent the reinsertion of the previously deleted disputed information in a subsequent report about Plaintiff. *Id*. at ¶¶ 137-50.

B.    *Kuehn's Opinion*

Kuehn is an attorney who practices in the field of "consumer financial services and consumer protection matters." Exhibit 1, Kuehn Report at p. 1. Milliman retained Kuehn to offer her opinion about whether Milliman adopted reasonable procedures for ensuring compliance with the FCRA. *Id*. More specifically, Kuehn assessed the reasonableness of procedures that Milliman followed to meet two of the FCRA's requirements: (1) "to assure maximum possible accuracy" in its reporting, as required by 15 U.S.C. § 1681e(b); and (2) "prevent the reinsertion of disputed information" as required by 15 U.S.C. § 1681i. *Id*.

Kuehn's purported expertise pertains to industry standards for the policies and procedures that consumer reporting agencies use to compile reports and to conduct reinvestigations of their reporting after consumer disputes. She asserts that she is "an

expert in the policies, procedures, and practices that consumer reporting agencies ("CRAs") use to ensure compliance with the FCRA. Exhibit 1, Kuehn Report at p. 1. According to Kuehn, she developed this expertise by advising CRAs and others about the development of FCRA-compliant procedures and through her five years of experience working at the Federal Trade Commission ("FTC"). *Id*.

Kuehn acknowledges she has no experience or training that relates to the reporting of consumer medical information. *See* Exhibit 1, Kuehn Report at pp. 1-4 (summarizing her "Expert Qualifications"); Kuehn CV (attached as Exhibit C to Kuehn Report); *see also*; Exhibit 2, Deposition of Rebecca Kuehn at pp. 13:13-18:1. Kuehn notes that, most recently, she has worked as both inside and outside counsel to CRAs and other entities, especially with respect to tenant screening and credit report reselling. *See* Exhibit 1, Kuehn Report at pp. 1-3. She also has served as an assistant director in the FTC's Division of Privacy and Identity protection; and before that position, she provided litigation and counseling services to CRAs and other vendors who reported public record information. *Id*. She has also worked with overseas financial institutions on developing international standards for credit reporting. *Id*. But she does not identify *any* experience that is specifically relevant to assuring FCRA compliance in the procedures for the reporting and/or reinvestigation of consumer medical information. *See id*. Kuehn testified that she has worked with CRAs and/or the resellers of consumer information "in both the

auto and mortgage space, entities that deal with small-dollar payment history, entities that deal with fraud-related information, that deal with payment-related information, as well as employment screeners and tenant screeners." Exhibit 2, Kuehn Dep. at p. 13:19-24. Moreover, she does not assert that she has ever held any position in which she would have had direct experience with Milliman's practices and procedures for reporting consumer medical information. *See id*. at p. 13:13-18:1.

In forming her opinions for this case, Kuehn relied upon two principal sources of information about Milliman's practices and procedures for both its initial reporting and its reinvestigation of consumer disputes. First, she relied upon documents produced by both parties in this case, which include factual information about Milliman's reporting about Plaintiff. *See* Exhibit 1, Materials Considered and/or Relied Upon (attached as Exhibit A to Kuehn Report). Second, she relied extensively on her interview with Joel Strassburg for information about the nature of Milliman's practices and procedures. *See* Exhibit 1, Kuehn Report, pp. 9-16. Strassburg is Milliman's Director of Operations, and Milliman named him as one of its corporate representatives for the purposes of Fed. R. Civ. P. 30(b)(6). Although Plaintiff's counsel deposed Strassburg, Kuehn prepared her report *before* that deposition and relied entirely upon her interview with Strassburg when preparing her report. *See* Exhibit 1, Materials Considered and/or Relied Upon (attached as Exhibit A to Kuehn Report).. Kuehn testified that, after the completion of her report,

she reviewed deposition testimony from both of Milliman's corporate representatives, Strassburg and Angela Bolduc, but Kuehn asserted that her opinions did not change after reviewing that deposition testimony. Exhibit 2, Kuehn Dep. at pp. 70:24-71:4. Kuehn's understanding of Milliman's procedures formed the premise for the two opinions that she offers in her report. These opinions were all framed as rebuttals of specific opinions offered by Plaintiff's expert, Evan Hendricks.

Kuehn's first opinion is that Milliman's process for matching consumer records is consistent with industry standards. Exhibit 1, Kuehn Report at pp. 13-15. Kuehn noted that, when preparing its reports about Plaintiff, Milliman relied on a database of medical records maintained by Anthem, Inc. ("Anthem") and that, when establishing its criteria for identifying relevant information, Milliman assesses Anthem's system for identity matching and then relies upon the data provided by Anthem without performing any cross-checking to assure that such data only relates to the specific individual about whom Milliman is reporting. *Id*. at p. 13. Kuehn opines that this approach is consistent with industry standards for assuring accuracy. *Id*. at pp. 13-14. The reality is that Kuehn has no foundation whatsoever to opine about what the relevant industry standards actually are. Kuehn concedes that reporting practices and standards vary depending on the kind of consumer information that is being reported. Exhibit 2, Kuehn Dep. at 31:24-32:1. In other

words, the practices and standards that are appropriate in consumer reporting may vary from those that are appropriate in employment background screening, tenant screening, etc. As noted above, Kuehn has no experience, training, or expertise that relates to the consumer reporting of medical information. Consequently, Kuehn's opinion that Milliman's approach is consistent with industry standards – standards which Kuehn does not even go so far as to identify – is an opinion for which she lacks any basis to offer.

Despite her failure to specifically identify relevant industry standards, she disagrees with Hendricks' opinion that those standards required Milliman to perform its own identity verification process on Anthem's data by cross-checking that data against other information that Milliman had about Plaintiff. Exhibit 1, at p. 14. Kuehn took this position despite the fact that, during Milliman's reinvestigation, Anthem informed it that Plaintiff's Social Security number and zip code did not match those of the other Barbara Cooper. *Id*. at pp. 13-14. In Kuehn's view, Milliman's process for verifying the reliability of Anthem's database was enough to meet vague, unnamed "industry standards" for assuring accuracy, even though Milliman did not conduct its own cross-checking or otherwise review the information coming from Anthem. *Id*. at pp. 14-15. In this connection, Kuehn noted that, in other areas of consumer reporting, such as employment background screening or education verification, consumer reporting agencies ("CRAs") like

Milliman frequently rely upon data supplied by other sources without performing their own independent cross-checking. *Id*. at p. 15.

Kuehn's second opinion was that Milliman had a reasonable procedure for assuring that inaccurate information would not reappear in a consumer's report after that information had been removed as part of a reinvestigation. Exhibit 1, Kuehn Report at pp. 15-16. Information from Kuehn's Strassburg interview was crucial to her opinion about the reasonableness of Milliman's reinvestigation procedures. Indeed, Kuehn's opinion depended **entirely** upon Strassburg's description of Milliman's procedures, and, by her own admission, Kuehn had no experience or training that would have permitted her to make an independent assessment of Strassburg's description. *See id*. at pp. 11-12 (citing the Strassburg interview as the sole or primary source in eleven footnotes).

According to Kuehn's understanding of her interview with Strassburg, a computer software "glitch" explained why Milliman continued to mix Plaintiff's medical and prescription history with information from the other individual, even after it discovered the mixed-file problem. Exclusively citing her interview with Strassburg, Kuehn reported that, when it conducted its reinvestigation, Milliman used two software functions to keep its report about Plaintiff free from any information about the other Barbara Cooper: a "record level block," and "health insurance identifier ('HII') or batch block[]." Exhibit 1, Kuehn Report at p. 11.

The first type, record-level blocking, focuses on specific items of information, such as an individual prescription record or medical treatment claim. *Id*. The second type, as Kuehn explained it – again relying exclusively on her Strassburg interview – "HII blocking is used to prevent records from being returned about an identified consumer when it appears that the consumer's information is being linked to a different consumer. Milliman uses this blocking if it suspects the health records of two consumers will continue to mix in subsequent reports." *Id*.

Kuehn also relied entirely upon her interview with Strassburg to shape her opinion that Milliman's reinvestigation procedures were reasonable, even though they failed to prevent the reinsertion of previously deleted information in Plaintiff's second report. As Kuehn understands it, Milliman continued to mix information about Plaintiff and the other individual because a "system software change" impaired Milliman's ability to effectively implement HII blocking. Exhibit 1, Kuehn Report at p. 12. Citing **only** her interview with Strassburg, Kuehn explained, for the purposes of HII blocking, "a health insurance identifier" involves a unique 32-character "HII number." *See id*. When Milliman initially published Plaintiff's report, it used partial or "truncated" HII numbers. But, during the middle of its reinvestigation, the software relied upon complete, 32-character HII numbers. *See id*. As Kuehn put it:

> As Milliman later discovered (after Plaintiff filed her suit in January 2023), the change in the software to use full HII numbers (instead of

truncated numbers) did not account for prior blocks for comparison purposes so the system did not know to compare the truncated HII numbers with the full 32-character HII numbers.

*Id*. Accordingly, after Milliman identified its mixed-file problem with Plaintiff's initial report, its procedures made it possible to exclude the specific entries that were inaccurately included in that initial report, but those procedures did not – and indeed, by definition **could not** – prevent the mix from occurring again in Milliman's subsequent reporting about Plaintiff. In Kuehn's view, Strassburg's account of Milliman's software problem explains why prescriptions for the other Barbara Cooper turned up in Plaintiff's reports even after Milliman's reinvestigation. *See*, *id*.

Kuehn opines that Milliman's persistent mixed-file problem does not reflect an unreasonable reinvestigation procedure because the revised report was inaccurate in a slightly different way than the initial report. Exhibit 1, Kuehn Report at pp. 15-16. Kuehn observes that the revised report did not include the exact prescription refill dates that had been included in the initial report because Milliman's record level blocking worked as intended. *See*, *id*. She emphasizes that the inaccurate information in the post-investigation report involved prescriptions issued to the other individual on different dates than the prescriptions inaccurately included in the initial report. *See*, *id*. Kuehn concludes that this slightly different inaccuracy occurred only

because of the "then unknown" problem with the software for HII blocking[2]. *Id*. at

p. 16. But Kuehn admits that she is not a "software expert" and that she has no

specific knowledge about how the software at issue actually works or how its

problems might have been uncovered earlier. *See* Exhibit 2, Kuehn Dep. at 69:16-

20. Kuehn insists that there was nothing unreasonable about the fact that Milliman

failed to detect this software problem until sometime after Plaintiff filed her lawsuit.

*Id*. In addition, she opines that Milliman acted in accordance with industry standards

when it corrected the software problem that affected its HII blocking after it had

failed to detect that problem during its reinvestigation. Exhibit 1, Kuehn Report at

p. 16.

## III.   <u>LEGAL STANDARD</u>

Expert opinions are admissible evidence when they provide a reliable source

of specialized or technical knowledge that will assist the jury in its fact-finding role.

Rule 702, Federal Rules of Evidence, provides as follows:

> If scientific, technical or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training
> or education, may testify thereto in the form of an opinion or otherwise.

---

[2] Plaintiff contests that this is "new information" and that the purposed "glitch" was "unknown" or unforeseeable to Milliman. See, Plaintiff's Motion for Partial Summary Judgment filed concurrently herewith.

Rule 702 imposes a special gate-keeping obligation upon the Court to ensure that any proffered expert testimony is both "reliable" and "relevant." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

> "A trial court, in determining the admissibility of expert testimony under Rule 702, must conduct "a rigorous three-part inquiry," considering whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Cook ex Rel. Tessier v. Sheriff Monroe Cnty,* 402 F.3d 1092, 1107 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998))).

"The proponent of the expert testimony carries a substantial burden under Rule 702." *Cook ex Rel. Tessier*, 402 F.3d at 1107. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*,184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n. 10); *see also Frazier*, 387 F.3d at 1260 ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion…"); *McCorvey v. Baxter Healthcare Corp.*,298 F.3d 1253, 1257 (11th Cir. 2002) (same).

IV.  **ARGUMENT**

    **A.**    **Kuehn is not qualified to be an expert in this case and her opinion about the reasonableness of Milliman's procedures is unreliable because she lacks any knowledge about or experience with the reporting of consumer medical information, and her opinion improperly functions as a conduit for Strassburg's hearsay statements.**

Under the principles established in *Daubert* and the Federal Rules of Evidence, an expert's qualifications and the reliability of her opinion evidence involve "two separate questions." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021). But both questions implicate the expert's familiarity with the specific subject matter of her opinions. In this case, Kuehn is unqualified, and her opinion is unreliable because she has no knowledge, training, or experience that is relevant to the reporting of medical information, and her opinion depends entirely upon hearsay statements from one of Milliman's corporate representatives, Joel Strassburg, even though she lacks any knowledge or experience that would be necessary to make an independent judgment about Strassburg's account of the facts.

"A witness is qualified as an expert if [s]he is the type of person who should be testifying on the matter at hand." *Moore*, 995 F.3d at 852 (emphasis omitted). As the Eleventh Circuit has noted, "the plain language of Rule 702 makes this clear: expert status may be based on 'knowledge, skill, experience, training, or education.'" *Id.* at 851 (quoting Fed. R. Evid. 702) (emphasis omitted)

Although the reliability of an expert's opinion is an analytically separate inquiry, there are some limited connections between qualifications and reliability. In determining reliability, the court's primary focus must be on the expert's methodology or technique. *Moore*, 995 F.3d at 852. "An expert opinion is reliable if it was arrived at through, among other things, a scientifically valid methodology." *Id*. (emphasis omitted). But an expert's qualifications "may bear on the reliability of [her] proffered testimony," especially when they demonstrate that the expert is familiar with relevant methodologies and techniques. *Id*. (internal quotation marks and citations omitted).

A proffered expert opinion does not reflect a reliable method or technique when the opinion involves blind reliance upon or the wholesale adoption of information that the purported expert is not qualified to assess and when the adopted information cannot itself be admitted into evidence. *See*, *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000); *see also*, *In re TMI Litigation*, 193 F.3d 613, 715 (3d Cir. 1999). Although the Federal Rules of Evidence permit an expert to base her opinion on facts or data that is hearsay or otherwise inadmissible, they also impose strict limitations on an expert's reliance upon hearsay statements. *See*, Fed. R. Evid. 703. When an expert grounds her opinions in information that could not be admitted as evidence, she must demonstrate that she is familiar with the methods and reasons underlying that information and that she made

an independent assessment of the reliability of that information. *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 608 n. 75 (N.D. Fla. 2009).

In this case, Kuehn is unqualified to opine on Milliman's procedures because she has no knowledge, training or experience in the reporting of consumer medical information. Kuehn admits that the techniques, methods, and procedures for consumer reporting vary across different subject matter areas. As Kuehn put it, the reasonableness of the procedures for matching consumer identities to consumer information "really depends on the nature of the data being matched and what other elements of information that a consumer reporting agency has." Exhibit 2, Kuehn Dep. at pp. 31:24-32:1. But she has no experience or training of her own regarding the reporting of consumer medical information. Kuehn's report makes it clear that she has never had anything to do with such reporting and – other than the information from Milliman, which Kuehn has accepted at face value – no knowledge of how this type of reporting actually works. Exhibit 1, Kuehn Report at pp. 1-4.

Kuehn also lacks any first-hand knowledge of Milliman's policies and procedures. Kuehn notes that, in its initial reporting about a consumer, Milliman's procedure for matching consumer identity and data involves an integration of its own software protocols for identity matching with those of its data supplier – in this case, Anthem; but Kuehn admits that she knows nothing about how Milliman's identity matching protocols intersect with Anthem's, even though she asserted that it was

important to understand how Milliman's matching process intersected with Anthem's. Exhibit 2, Kuehn Dep. at p. 21:21-24. Moreover, she also admits that she does not know how identity matching works. *See*, *id*. at p. 69:16-20. Given her lack of knowledge or experience about the unique problems of reporting consumer medical information, Kuehn lacks the qualifications required to make her "the type of person who should be testifying on the matter at hand." *Moore*, 995 F.3d at 852.

Kuehn's complete lack of familiarity with the reporting of consumer medical information directly implicates the reliability of her opinions, especially with respect to her understanding of the relevant methodologies and techniques in that field. Kuehn recognizes that this case turns on the reliability of Milliman's techniques for using software to match consumer identity to medical records, and that monitoring the accuracy of that software matching is crucial to determining the reasonableness of Milliman's procedures, but she admits that she knows nothing about that software, and she simply takes Strassburg's account of Milliman's procedures at face value. As she put it, "[a]gain, I'm not a software expert, so I don't know what kind of monitoring that would involve, but I do know that they watch their dispute data to see if there are issues popping up, and this issue was identified through a dispute." Exhibit 2, Kuehn Dep. at pp. 69:16-20. Similarly, Kuehn knows that Milliman worked with Anthem to assess the reliability of Anthem's data, but she does not know how that assessment process worked or the specific criteria that Milliman used

to conclude that Anthem's data was reliable and that it did not require cross-checking or other kinds of independent verification. *Id*. at pp. 35:18-37:7. Kuehn also admitted that she did not know whether it would raise a red flag if a consumer's medical history information included records of treatment in two different states at locations that were 500 miles apart. *Id*. at p. 49:2-13.

Lacking any knowledge of her own about crucial methods for accurately reporting medical information, the substance of Kuehn's opinions amounts to a repackaging of what she learned from Strassburg when she interviewed him. *See*, *e.g.*, Exhibit 1, Kuehn Report at pp. 9-12 (citing interview). In short, Kuehn's report is effectively an expert report from Milliman with Kuehn's stamp of approval placed on Milliman's opinions. For example, with respect to Milliman's initial reporting, she opines that it was reasonable for Milliman to conclude that Anthem's data was reliable and to regurgitate Anthem's data without conducting its own independent verification. *Id*. at pp. 13-15. But she admits that Strassburg did not tell her how Milliman concluded that Anthem's data did not require verification. Exhibit 2, Kuehn Dep. at pp. 35:18-37:7. Apparently, Strassburg also did not tell Kuehn that Milliman did not even know where Anthem obtained its data. *Id*. at pp. 70:24-71:4.

The reliability of Kuehn's second opinion is similarly undermined by her lack of background knowledge and complete reliance upon Strassburg's version of the facts. When discussing Milliman's failure to properly apply HII blocking after

Plaintiff's dispute and its reinvestigation, Kuehn takes Strassburg at his word that this failure was entirely attributable to a software problem that was "then unknown." Exhibit 1, Kuehn Report at p. 16. On the basis of Strassburg's characterization of the software problem, Kuehn opines that Milliman's reinvestigation procedures were reasonable, even though those procedures were ineffective in revealing the software problem or recognizing that Milliman was still including information about the other individual in its subsequent report about Plaintiff. In this respect, Kuehn does not function as an expert who has independent judgment; her report is merely a conduit by which Milliman can "expert wash" its own factual theories, giving them an unwarranted and legally impermissible imprimatur of expert credibility.

Although experts are permitted to use hearsay information when they form their opinions, such use is inappropriate where the expert lacks any specific experience or training about the subject matter of the information. *Hendrix*, 255 F.R.D. at 608 n. 75. Because she has no knowledge or training of her own regarding the reporting of medical information, Kuehn cannot make an independent assessment of the information she received from Strassburg. This means that, for the most part, her opinions consist of her own uninformed assent to Strassburg's account of Milliman's policies and procedures. An expert opinion is unreliable when it simply reiterates someone else's facts and/or opinions.

**B. Kuehn's opinions are inadmissible because they include bare legal conclusions about the ultimate issues in the case.**

The Court has the exclusive authority to decide all legal questions. "'Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.'" *Cordoves v. Miami-Dade Cty*., 104 F. Supp. 3d 1350, 1364-65 (S.D. Fla. 2015) (quoting *Burkhart v. Washington Metro. Area Transit Auth*., 112 F.3d 1207, 1212 (1997)); *see also Konikov v. Orange Cty., Fla*., 290 F. Supp. 2d 1315, 1318 (M.D. Fla. 2003). Consequently, "[a]n expert may not . . . merely tell the jury what result to reach. A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co*., 898 F.2d 1537, 1541 (11th Cir. 1990). It is the judge, not an expert, who "decides the content of the law, and instructs members of the jury on the applicability of the law to the facts of the case." *Konikov*, 290 F. Supp. 2d at 1318.

An expert offers impermissible legal opinions when she testifies "as to h[er] opinion regarding ultimate legal conclusions." *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009). An expert opinion involves an impermissible legal conclusion if it "'tracks the language of the applicable statute' or uses a term 'that has a specialized legal meaning.'" *Cordoves*, 104 F. Supp. 3d at 1365 (quoting *Burkhart*, 112 F.3d at 1212). Although Fed. R. Evid. 704 permits an expert to opine on matters related to the ultimate factual issue in a case, "[a]n expert may not, however, merely tell the jury what result to reach." *Montgomery*, 898 F.2d at 1541

(discussing the committee notes to Rule 704). Consequently, expert opinion evidence is inadmissible when it purports to apply legal standards to evidence or to describe the legal implications of conduct in terms of the applicable statute. *Montgomery*, 898 F.2d at 1541.

Because she lacks any relevant background or experience regarding the reporting of consumer medical information, and because she has no basis for making an independent assessment of the information provided to her by Strassburg, both of her opinions amount to nothing more than bare legal conclusions pasted on to Strassburg's hearsay statements. As noted above, Kuehn has no knowledge or training regarding the procedures for reporting medical information, and everything she knows about Milliman's procedures came from her interview with Strassburg. Kuehn purports to draw conclusions about Milliman's conformity with industry standards, but she never identifies the specific standards to which she refers, and she has no knowledge or experience that would inform her about the relevant standards for the reporting of consumer medical information. Consequently, her opinion consists of making a conclusion about the ultimate facts in the case on the basis of the information from Strassburg, which she uncritically accepted. In this respect, her opinion involves applying crucial terms from the statutory text to hearsay evidence, and such an approach to forming an opinion impermissibly intrudes on both the roles of the jury and the court.

Kuehn's opinions about ultimate facts would be especially prejudicial in this case because she is an attorney and a former official with the FTC. *See*, Exhibit 1, Kuehn Report at pp. 1-4. Because of this experience, a jury could – and likely would – view her opinion as an authoritative statement about what the FCRA requires and might adopt Kuehn's opinion out of deference to her apparent authority. Simply stated, Kuehn's lack of relevant knowledge and experience, her complete reliance upon hearsay information, and her superficially impressive credentials all combine to create an improper risk that a jury would rely on her unreliable opinions.

### C.     Kuehn's opinion is inadmissible because it will confuse the jury about the facts that are relevant to applying the controlling legal standards.

An expert's opinion is unreliable and will not help the jury if it is belied by the evidence. The Supreme Court has held that "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also Ferguson v. Bombardier Servs. Corp.*, 244 Fed Appx. 944, 949 (11th Cir. 2007) (holding that an expert's testimony was properly excluded because it was predicated on an assumption that was belied by the evidence).

Apart from the other problems with Kuehn's opinion evidence, her opinion about Milliman's reinvestigation procedures could mislead the jury about what the relevant facts are and about how the law applies to them. Kuehn recognizes that Milliman's reinvestigation procedures failed to solve Milliman's mixed-file problem because they failed to uncover the software problem with HII blocking. *See*, Exhibit 1, Kuehn Report at pp. 15-16. Kuehn also recognizes that Milliman did not identify its software problem until **after** Plaintiff filed her Complaint in this case. *See*, *id*. Yet Kuehn opines that Milliman's failure to timely correct the problem was reasonable and "entirely consistent with industry standards and practices." *Id*. at p. 16.

This opinion could mislead the jury in at least two crucial respects. First, it could lead the jury to conclude that a CRA is not liable for inaccurate reporting as long as it *eventually* undertakes some kind of subsequent remedial measures, even if that remediation happens long after both its initial reporting and its reinvestigation. A CRA cannot comply with its duties under the FCRA by waiting until a lawsuit is filed before it fixes the procedures that led to persistent inaccurate reporting. Second, along similar lines, Kuehn does not identify the "industry standards and practices" that would permit a CRA to make grossly dilatory corrections to defective reporting practices. Of course, there are no such standards because such dilatory corrections are contrary to the FCRA.

V.    **<u>CONCLUSION</u>**

Kuehn has no specific knowledge or experience about the reporting of consumer medical information, admits that she does not understand the software problem that is at the heart of this case, and based her opinion by blindly accepting Milliman's preferred version of the facts, which was convey to her in hearsay statements from Milliman's corporate representative. Despite her lack of relevant knowledge, she asserts that Milliman's procedures conform to industry standards, even though she never identifies what those standards are. As such, her opinions are nothing more than bare legal conclusions that are pasted on to Milliman's factual theories. Such opinion evidence is inadmissible because it can confuse the jury and prejudice Plaintiff. Consequently, Plaintiff asks this Court to exclude all opinion evidence from Kuehn.

/ /

RESPECTFULLY SUBMITTED on this 22nd day of November 2024.

By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No. 036711
admitted *pro hac vice*
**CONSUMER ATTORNEYS PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (718) 715-1750
Email: mczabaj@consumerattorneys.com

Yosef Steinmetz, Bar No. 119968
*Of Counsel to Consumer Attorneys*
**SFT LEGAL SERVICES P.A.**
4014 Chase Avenue, Suite 220
Miami Beach, Florida 33140
Phone: (786) 368-5617
Email: yosef@sftlegal.net

*Attorneys for Plaintiff Barbara Cooper*


## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, I electronically filed the foregoing

with the Clerk of the Court using the ECF system, which will send notice of such

filing to all attorneys of record in this matter. Since none of the attorneys of record

are non-ECF participants, hard copies of the foregoing have not been provided via

personal delivery or by postal mail.

**CONSUMER ATTORNEYS**

By: */s/ Gracelyn Stewart*
Gracelyn Stewart