# EXHIBIT 1

**CONFIDENTIAL**

**EXPERT REPORT OF REBECCA E. KUEHN**

In the matter of Barbara Cooper v. Milliman, Inc.

December 4, 2023

## I.      INTRODUCTION.

My name is Rebecca E. Kuehn.  I am an attorney focusing on consumer financial services and consumer protection matters in the Washington, D.C. office of Hudson Cook, LLP.  I have prepared this expert report at the request of Milliman, Inc. ("Milliman"), which has sought my expert analysis regarding the claims related to Milliman's procedures to assure maximum possible accuracy and prevent the reinsertion of disputed information that was previously removed from a consumer report. Specifically, I have been asked to provide rebuttal testimony in response to certain opinions offered by Plaintiff's proffered expert witness, Evan Henricks.[1]

As set forth more fully below, based on my extensive knowledge of and experience with consumer reporting agencies' processes, knowledge of industry standards, and review of the record in this case, Milliman's procedure for matching consumer information to a consumer, which is based on providing identifying information to a provider and requesting that the provider return records on that consumer, is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry. Further, it is my expert opinion that Milliman's procedures to block disputed information that was previously removed from a consumer report is consistent with relevant industry standards and practices. In fact, because of those procedures, records that had been previously removed in this matter did not appear in a subsequent report.

## II.      EXPERT QUALIFICATIONS.

I am an expert in the policies, procedures, and practices that consumer reporting agencies ("CRAs") use to ensure compliance with the FCRA.  I developed this expertise through substantial experience in the industry, advising CRAs, lenders, and other users of credit reports on the development of procedures designed to comply with the FCRA.  I also gained expertise and insight into the practices of the industry through five years working at the Federal Trade Commission ("FTC"), which is a federal agency tasked with the enforcement of the FCRA (as discussed more fully herein).

In all, I have nearly two decades of experience in advising companies, consumers, industry, and policymakers on the FCRA and its requirements.  Beginning in 1997, with the advent of litigation against credit furnishers following the 1996 amendments to the FCRA, I defended banks and other financial institutions against claims asserting violations of the reinvestigation provisions of the FCRA.  My practice expanded to include litigation and counseling matters involving CRAs and public records vendors that retrieve records for use by CRAs.  Through this work, I developed an expertise in the FCRA, which led to my move to the FTC.

---

[1] In forming my opinions, I have become aware and gained an understanding of the facts and allegations involved in the present case.  The materials I reviewed and considered in this regard are listed in Exhibit A.  My report often references these sources where helpful and appropriate; however, I have reviewed all of the materials listed on Exhibit A, and the absence of any specific reference does not mean that I did not consider it in forming a particular opinion or making any particular statement.

In May 2006, I was appointed Assistant Director in the Division of Privacy and Identity Protection at the FTC.  That division oversees issues related to consumer privacy, credit reporting, identity theft, and information security.  In that role with the FTC, I led the FCRA program and oversaw the FTC's enforcement, outreach, and rulemaking activities in that area.  I regularly coordinated with federal financial agencies in developing, issuing, and interpreting interagency rules, such as the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Disputes Rules, and amendments to the Gramm-Leach-Bliley Privacy Rule.

During my tenure at the FTC, I also supervised several investigations involving employment and tenant screening companies, as well as employers that used consumer reports, some of which resulted in cases brought by the FTC.[2]  In addition, I met with a number of industry representatives and consumer advocates on a variety of issues related to the FCRA, including the challenges presented in acquiring and matching public records.  My experience in this regard is broad, and specifically includes involvement in issues relating to both the accuracy and completeness of public records.  My work at the FTC also included oversight and participation in the development of education about the use of consumer reports in employment and tenant screening.[3]  In addition, I oversaw the development and issuance of the FTC staff report, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* ("40 Years Report").  The 40 Years Report, issued in July 2011, is a compilation of FTC staff guidance and incorporates much of the FTC's prior "Commentary" (published in 1990).  The 40 Years Report is relied upon by government and industry as an authoritative source on the FCRA.

Building on my knowledge and understanding of the consumer reporting industry in this country, my work at the FTC additionally supported global credit reporting initiatives.  For example, in 2007, while at the FTC, I was selected to work with the U.S. Agency for International Development (known as "USAID") to provide technical assistance to the Central Bank of Egypt in the development of regulations and oversight over credit bureaus.  I worked with representatives of the Central Bank to provide them insight into the FCRA and oversight over credit bureaus in the United States.  I also served as the FTC's representative to the World Bank Task Force on Credit Reporting.  This international Task Force worked to develop an agreed framework in the form of international standards for credit reporting systems' policy and oversight.  This work culminated in a report, *General Principles for Credit Reporting*, issued September 2011.[4]

---

[2] *See, e.g., United States v. Rental Research Services, Inc., et al., available at* https://www.ftc.gov/enforcement/cases-proceedings/072-3228/rental-research-services-inc-corporation-et-al-united-states; *United States v. First Advantage SafeRent, Inc., et al., available at* https://www.ftc.gov/enforcement/cases-proceedings/082-3016/first-advantage-saferent-inc-et-al-usa-ftc; *United States v. Rail Terminal Services, LLC, available at* https://www.ftc.gov/enforcement/cases-proceedings/082-3023/united-states-america-federal-trade-commission-plaintiff-v; *United States v. Quality Terminal Services, LLC, available at* https://www.ftc.gov/enforcement/cases-proceedings/082-3022/united-states-america-federal-trade-commission-plaintiff-v.

[3] In my role as Assistant Director, I spoke at a number of industry conferences about the work of the FTC and the requirements of the FCRA.  A selected list of presentations is listed in Exhibit C.

[4] *See* The World Bank, "General Principles for Credit Reporting" (Sept. 2011), *available at* http://siteresources.worldbank.org/FINANCIALSECTOR/Resources/Credit_Reporting_text.pdf.

From September 2011 through April 2015, I served as Vice President and Senior Regulatory Counsel for CoreLogic, Inc., which is a leading provider of consumer, financial and other information, analytics and services to business and government.  In that capacity, I was the lead lawyer and coverage counsel for CoreLogic's credit reporting and consumer data businesses, which included a tenant screening company (formerly known as SafeRent), a credit report reseller, and a CRA that provides reports in the short-term lending market.  CoreLogic also is a public records vendor, and obtains, normalizes, and licenses public record data of different types, including data on real estate transactions, criminal records, and tenant history data.  CoreLogic obtains records from a variety of sources, covering 99.9% of U.S. properties obtained from over 3,100 counties nationwide.

In my role as counsel to CoreLogic, I worked with operations and compliance personnel to develop and revise policies, procedures, and standards related to ensuring maximum possible accuracy and completeness and up-to-date processes, including the development of a consumer report that leveraged the public record property data in consumer report products.  I also worked on policy issues related to access to public records.  I provided advice and guidance to management on a wide variety of consumer data and privacy-related regulatory issues, including the FCRA and Gramm-Leach Bliley Act.

I am currently a partner at the law firm Hudson Cook, LLP, a leading firm in consumer financial services law and compliance.  I joined the firm's Washington, D.C. office in April 2015.  At Hudson Cook, I work with financial institutions, public record vendors, and consumer reporting clients of different sizes that I advise on legal compliance matters.  My practice is focused on consumer privacy and consumer reporting issues.  I regularly provide advice and representation to businesses involved in the consumer reporting industry, including CRAs, users of consumer reports (*e.g.*, automotive finance companies), and furnishers of information to CRAs (*e.g.*, credit card companies).  I also advise trade associations in the consumer reporting industry, including the Consumer Data Industry Association, a trade association that represents the nationwide credit bureaus, regional and specialized bureaus, background check companies, and others, and Professional Background Screening Association (formerly the National Association of Professional Background Screeners), which is an internationally-prominent trade association consisting of employment and tenant screening companies.

In December 2019, I was the only private industry lawyer invited to participate as a panelist at the "Accuracy in Consumer Reporting" workshop hosted by the CFPB and FTC, where I participated in a discussion about navigating the dispute process.  I am an active member of the Consumer Financial Services Committee, which is part of the American Bar Association's Section of Business Law.

For the past several years, I have taught new attorneys about the Fair Credit Reporting Act as part of the ABA's National Institute on Consumer Financial Services Law, and I have served as chair of the National Institute.  I am a Fellow of the American College of Consumer Financial Services Lawyers.  I regularly monitor the industry developments and government activities relating to the FCRA and matters of consumer data privacy more generally.  I speak frequently at industry conferences on FCRA and other financial services and privacy topics.  Exhibit C to my Report provides a representative sample of presentations I have given.

3

The publications I have authored in the past 10 years also are listed on Exhibit B, which is attached to my Report.  During the past four years, I have provided deposition or trial testimony in *Collins v. Milliman, Inc.*, Civil Action No. 2:22-cv-00061-RAJ, in the United States District Court for the Western District of Washington; *Duane E. Norman, Sr. v. Trans Union, LLC*, Civil Action No. 18-5225, in the United States District Court for the Eastern District of Pennsylvania; *In re: Capital One Consumer Data Security Breach Litigation,* MDL No. 1:19md2915 (AJT/JFA), in the United States District Court for the Eastern District of Virginia; *Theresa Hill v. LexisNexis Risk Solutions Bureau LLC*, Civil Action No. 4:18-00560-CV-RK, in the United States District Court for the Western District of Missouri, and *Kelly v. RealPage, Inc., d/b/a/ On-Site and RP On-Site LLC*, Civil Action No. 2:19-cv-01706, in the United States District Court for the Eastern District of Pennsylvania.

In May 2021, I testified before the U.S. House Committee on Financial Services, Subcommittee on Oversight & Investigations, on behalf of the Consumer Data Industry Association, at a hearing on "Consumer Credit Reporting:  Assessing Accuracy and Compliance."  In addition, I have testified on proposed legislation affecting CRAs before the Maryland House Economic Matters Committee at the request of the Consumer Data Industry Association.

I hold a Bachelor of Arts degree (*summa cum laude)* from Frostburg State University and a Juris Doctor (*with high honors*) degree from the National Law Center at George Washington University.  I am a member of the Virginia, Maryland, and District of Columbia bars, and am admitted to practice before the United States Supreme Court.

A copy of my resume is appended hereto as Exhibit C.  I am being compensated at a rate of $835 per hour for my work in this matter.  I have no financial or other stake in the outcome of this case.

## III.    NATURE AND REGULATION OF THE CONSUMER REPORTING INDUSTRY

### A.    The Fair Credit Reporting Act

Enacted in 1970, the Fair Credit Reporting Act—or FCRA—governs the collection, assembly, and use of consumer report information and provides the framework for our nation's consumer reporting system.  Its dual and equally important purposes are: (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's banking and consumer credit systems.[5]  The FCRA is a complex statute, which Congress has amended a number of times in many significant respects.  The FCRA's requirements govern all aspects of credit reporting, an industry that has changed significantly

---

[5] Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report with Summary of Interpretations* (July 2011) ("40 Years Report"), at 1. The Report is relied upon by government and industry as an authoritative source on the FCRA.

since the statute's original passage.  As the Supreme Court has observed, the FCRA is a "less-than-pellucid" statute[6] and sets forth a number of responsibilities on CRAs and others, some highly technical.

The FCRA regulates the practices of three principal groups: (1) consumer reporting agencies (previously referred to as "CRAs"), which include medical record CRAs; (2) furnishers of consumer report information to the CRAs; and (3) users of consumer reports.  CRAs collect and compile consumer information into consumer reports and provide them to authorized users—for example, landlords, property managers, credit grantors, insurance companies, and employers —that make eligibility decisions.

In enacting the FCRA, Congress recognized the value of the consumer reporting industry, finding that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[7]  The FCRA "seeks to balance the needs of consumers and businesses" with respect to the use of consumer information.[8]

In 1990, the FTC published a "Commentary," consolidating all of its FCRA guidance issued to that date.  In July 2011, the Commentary was incorporated in large part, along with other FTC formal and informal guidance and interpretations, into the FTC's *40 Years Report*, which I mention above as part of my experience.  The Report was provided to the Consumer Financial Protection Bureau ("CFPB"), which now shares enforcement authority over the FCRA with the FTC over non-depository institutions and also has rulemaking authority.[9]  The *40 Years Report* is relied upon by government and industry.  In addition, the CFPB has issued guidance in a number of forms, including advisory opinions, bulletins and circulars.[10]

### B.    Responsibilities of Consumer Reporting Agencies

Under the FCRA, consumer reporting agencies or "CRAs" are charged with the responsibility of adopting "reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with

---

[6] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007).

[7] 15 U.S.C. § 1681(a)(3).

[8] S. Rep. No. 209, 103rd Cong., 2d Sess. (1993).

[9] 40 Years Report, *supra* n. 5, at pp. 5-7.  Specifically, the CFPB and FTC have concurrent FCRA enforcement authority over non-depository institutions.  With respect to banks and other depository institutions, which are exempt from FTC authority, the CFPB shares jurisdiction with the federal bank regulatory agencies.

[10] See, e.g., CFPB, Consumer Financial Protection Circular 2022-07, *Reasonable investigation of consumer reporting duties* (Nov. 10, 2022) (The CFPB reminded the consumer reporting industry that a CRA (1) must conduct a reasonable investigation of all nonfrivolous and relevant disputes, (2) may not require a consumer to obtain a file disclosure or a copy of the consumer's report prior to filing a dispute with the CRA, (3)may not require a consumer to use a proprietary form as a condition to investigating a consumer's dispute, (4) must forward "all relevant information" to the furnisher of the information in dispute; and (5) furnishers of information to CRAs must investigate all indirect disputes forwarded by CRAs); CFPB, Advisory Opinion, *Name-Only Matching Procedures*, 86 Fed. Reg. 62472 (Nov. 10, 2021) (The Advisory Opinion indicates that a policy which indicates that a CRA will associate a particular record to a consumer based on a name-only match to the consumer is not a reasonable procedure to assure maximum possible accuracy).

the requirements of this title."[11]  As set forth below, principal among those duties are the requirement to maintain reasonable procedures to assure the maximum possible accuracy of the information in consumer reports and to reinvestigate consumer disputes of the accuracy or completeness of that information. Those duties need to be discharged "with fairness, impartiality, and a respect for the consumer's right to privacy."[12]

### 1.    Reinvestigation of Disputes

With respect to consumer disputes, a CRA is required to "conduct a reasonable reinvestigation" when a consumer disputes the accuracy or completeness of information in the consumer's file at the CRA.[13]  This responsibility is triggered when a "consumer notifies a [CRA] directly or indirectly through a reseller" that there is an inaccuracy of the information in the consumer's file at the CRA.[14]

Once a dispute is received from a consumer, the CRA "shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file… before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute…."[15]  Within 5 days of the CRA receiving the dispute, the CRA "shall provide notification of the dispute to any person who provided any item of information in dispute."[16]  This notification includes "all relevant information regarding the dispute that is received by the" CRA.[17]  The FCRA also requires a CRA to "provide written notice to a consumer of the results of a reinvestigation."[18]

A CRA is required to maintain reasonable procedures to prevent the reappearance of previously deleted information from a consumer's file and in consumer reports on the consumer, unless the person who furnished the information certifies that the information is complete and accurate.[19]

### 2.    Reasonable Procedures to Assure Maximum Possible Accuracy

Another responsibility identified under the FCRA is a CRA's responsibility to "follow reasonable procedures to ensure maximum possible accuracy of the information concerning the individual about whom the report relates."[20]

Due to the recognized complexity of reporting processes and the competing interests identified above, it is critical to understand that the FCRA does not establish a "strict liability" standard for CRAs

---

[11] Section 602(b), 15 U.S.C. § 1681(b).
[12] 15 U.S.C. § 1681(a)(4).
[13] Section 611(a)(1)(A) of the FCRA, 15 U.S.C. § 1681i(a)(1)(A).
[14] *Id.*
[15] 15 U.S.C. § 1681i(a)(1).
[16] 15 U.S.C. § 1681i(a)(2).
[17] 15 U.S.C. § 1681i(a)(2).
[18] 15 U.S.C. § 1681i(a)(6).
[19] 15 U.S.C. 1681i(a)(5)(C); 15 U.S.C. § 1681i(a)(5)(B).
[20] 15 U.S.C. § 1681e(b).

with respect to the accuracy requirement – it requires only that CRAs act reasonably. "By its terms ('reasonable procedures . . . maximum possible accuracy'), the statute itself recognizes that absolute accuracy is, as a practical matter, impossible."[21] As the FTC staff has noted, "[i]f a CRA reports an item of information that turns out to be inaccurate, it does not violate [section 607(b) of the FCRA] if it has established and followed reasonable procedures in reporting the item."[22] Section 602(b) of the FCRA, 15 U.S.C. § 1681(b), states that "[i]t is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures . . . with regard to the confidentiality, accuracy, relevancy, and proper utilization of [consumer report] information in accordance with the requirements of this title." The duty to have reasonable procedures does not mean that a CRA must take every step to improve accuracy regardless of cost; rather, a CRA must take "steps that it can take to improve the accuracy of its reports at a reasonable cost."[23]

One of the basic tenets of the FCRA is that the concept of "reasonable procedures" informs all of a CRA's duties:

It is the purpose of this title to require that consumer reporting agencies adopt … reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, or other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this title.[24]

As the FTC noted in its report to Congress on the credit reporting system, the FCRA was designed to provide CRAs flexibility in their approach to accuracy: "Rather than precisely regulating the way that CRAs maintain their files, Congress opted to hold CRAs accountable for their procedures, and to give consumers the opportunity to check the accuracy of their files."[25] The right of a consumer to dispute inaccurate information is an important component of accuracy – the FCRA "promotes accuracy

---

[21] Federal Trade Commission, Report to Congress Under Section 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003 ("FACTA Report"), December 2004, at p. 17, n. 53, *available at* https://www.ftc.gov/sites/default/files/documents/reports/under-section-318-and-319-fair-and-accurate-credit-transaction-act-2003/041209factarpt.pdf.

[22] 40 Years Report, *supra* n. 5, at p. 67.

[23] *Id.*

[24] 15 U.S.C. § 1681(b).  This concept of reasonable procedures is further reflected in specific provisions of the FCRA, such as 15 U.S.C. § 1681e(b) (requiring CRAs to maintain "reasonable procedures to ensure maximum possible accuracy").  Both the CFPB and FTC have recognized that the "reasonable procedures" requirement does not establish a "strict liability" standard for CRAs.  *See* Statement of Peggy Twohig, Assistant Director, Office of Supervisions Policy, Supervision Enforcement and Fair Lending Division, Bureau of Consumer Financial Protection, Senate Committee on Banking, Housing and Urban Affairs "An Overview of Credit Bureaus and the Fair Credit Reporting Act" (July 12, 2018) at p. 2, *available at* https://www.banking.senate.gov/imo/media/doc/Twohig%20Testimony%207-12-18.pdf (noting that the requirements of the FCRA "anticipate that all reports will not be perfect; instead the FCRA requires that credit reporting agencies (CRAs) have "reasonable procedures to assure maximum possible accuracy" of reports"); FACTA Report, *supra* n. 21, at p. 17, n. 53 ("By its terms ('reasonable procedures . . . maximum possible accuracy'), the statute itself recognizes that absolute accuracy is, as a practical matter, impossible.").

[25] FACTA Report, *supra* n. 21, at p. 8.

by creating a self-help mechanism that empowers consumers to obtain copies of their reports and dispute erroneous or incomplete information."[26]

CRAs obtain records from a variety of sources that maintain data in a variety of ways.[27]  Given these challenges, a CRA will establish policies and procedures designed to assure maximum possible accuracy, which take into account the availability of the identifiers in the underlying records.  There is no perfect set of identifiers and what information is needed depends on the data set.  For example, in obtaining checking history information to prepare a consumer report based on a consumer's past bad check history, a CRA may need the routing and checking account number from the check being presented; a consumer's Social Security number would not assist the CRA in obtaining those records.  Similarly, for CRAs that obtain and use checking account balance information obtained from a consumer's bank with their permission (to verify assets or employment), those CRAs often rely on the consumer providing their bank login information to identify the correct account.

Considering the above, the ability of any CRA to identify a particular record as belonging to a particular consumer (or, conversely, to eliminate any particular record) presents substantial challenges, and the challenge of matching a particular record to a consumer is complex and context-dependent: In its examination of data matching required by the FACT Act, the FTC concluded in its report to Congress that mandatory matching rules would be likely to lower match efficiency, and stated that "[a] matching process is efficient if the number of incorrect matches cannot be reduced without also reducing correct matches, or vice-versa."[28]

### C.    Medical Information Presents Unique Privacy Concerns.

In addition to the privacy protections that are incorporated into the FCRA, the Health Insurance Portability and Accountability Act ("HIPAA") requires "covered entities" to protect the privacy[29] and security of health information.  Health information includes information created or received by a life insurer.[30]  A covered entity includes a health plan, a health care clearinghouse, and a health care provider that transmits electronic health information.[31]  A business associate is an entity that works on behalf of a covered entity to receive and transmit protected health information.[32]  Specifically, covered

---

[26] See Prepared Statement of Federal Trade Commission, on Credit Reports:  Consumers' Ability to Dispute and Change Inaccurate Information, Before the House Committee on Financial Services, June 19, 2007, at. p. 4, available at https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-credit-reports-consumers-ability-dispute-and-change/070619credittestimony.pdf; see also FACTA Report, supra n. 21, at p. 8 ("In guaranteeing consumers access to their own credit reports and creating the dispute process, Congress recognized that consumers have a critical role in ensuring the accuracy of credit reports.").

[27] See Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System: A review of how the nation's largest credit bureaus manage consumer data ("Key Dimensions"), December 2012 (noting that credit bureaus have established standardized reporting formats and that they "deliver credit reporting information to users in standardized electronic formats"), at pp. 3, 10, 14.

[28] FACTA Report, supra n. 21, at p. 47

[29] 45 C.F.R. Parts 150 and 154.

[30] 45 C.F.R § 160.103.

[31] 45 C.F.R § 160.103.

[32] 45 C.F.R § 160.103.

entities and their business associates may use and disclose protected health information only as authorized under HIPAA,[33] including "pursuant to and in compliance with a valid authorization."[34] Thus, a CRA that receives or discloses protected health information must comply with both the FCRA and HIPAA.

## IV.    UNDERSTANDING OF THE CASE

Though the following description is not exhaustive, it is my understanding that the record reflects the following facts:

Plaintiff Barbara Cooper filed her complaint against Milliman on January 13, 2023.  Milliman is a CRA that gathers medical history records from third-party data sources upon a consumer's request and provides the records to the entity designated by the consumer upon the consumer's HIPAA authorization.[35] Plaintiff alleges in her complaint that (1) Milliman "failed to establish, maintain, and/or follow reasonable procedures to assure maximum possible accuracy in the preparation and maintenance of" Plaintiff's consumer report, and (2) Milliman "violated the FCRA by reinserting information previously deleted from Plaintiff's consumer report" and failed to "maintain reasonable procedures to prevent the information's reappearance."  Dkt. No. 1.

The medical history consumer reports at issue were generated in connection with Plaintiff's requests for supplemental Medicare coverage (Plan G) through Continental Life Insurance Company of Brentwood Tennessee, an Aetna Inc. company ("Aetna"). Dkt. No. 1, ¶¶ 11, 67. Aetna requested the first report on October 16, 2022 and provided to Milliman Plaintiff's first and last name, Social Security number, date of birth, gender, and zip code.[36]

Milliman utilizes demographic information to identify and locate prescription and medical information for consumers from its data sources.[37] The creation of a report is an automated process.[38] Generally, Milliman uses its own proprietary matching logic to match demographic information supplied by consumers to medical and prescription records.[39] Certain data sources use their own proprietary matching logic to match demographic information and provide Milliman with the relevant records.[40] In these instances, Milliman engages with a potential data source prior to onboarding to discuss the data source's processes and procedures.[41] Milliman also tests and analyzes sample data sets to ensure it meets its quality standards.[42] Once a data source is approved, Milliman introduces the data in phases to

---

[33] 45 C.F.R § 164.502(a).
[34] 45 C.F.R § 164.502(a)(1)(iv). "[B]usiness associates may disclose protected health information only as permitted or required under its business associate contract."  45 C.F.R §164.502(a)(3).
[35] Interview with Joel Strassburg (Dec. 1, 2023).
[36] Milliman's Answers to Plaintiff's First Set of Interrogatories No. 5.
[37] *Id.* at No. 6.
[38] *Id.* at No. 7.
[39] *Id.* at No. 6.
[40] Interview with Joel Strassburg, *supra* n. 35.
[41] *Id.*
[42] *Id.*

monitor for "hit rates," which is an evaluation of whether it receives the anticipated responses or "hits" from a given data source, and consumer disputes, which ultimately informs quality conversations Milliman has with its data sources.[43] After onboarding, Milliman continuously monitors "hit rates" and consumer disputes for all of its data sources.[44]

Further, Milliman adopted procedures to ensure maximum accuracy and completeness when a report is created.[45] For example, in addition to monitoring "hit rates," Milliman utilizes data enhancement processes that allows it to obtain additional demographic data on applicants beyond that provided.[46] Milliman also monitors consumer disputes for potential matching issues and uses its issue management process to resolve them.[47]

Using these procedures and the Plaintiff's demographic information, Milliman obtained information from three data sources: Carelon, a subsidiary of Anthem Insurance Companies, Inc. ("Anthem"),[48] eSolutions Inc., and Waystar Inc.[49] With respect to the records obtained from Anthem (which appear to be the sole focus of Mr. Hendricks' report, *see* pp. 2-3), those records involved a matching process that is proprietary to Anthem.[50] Anthem, which has been supplying data to Milliman since April 18, 2022, was onboarded as a data source following the process outlined above.[51] After initial testing and evaluation, the adoption of the Anthem data was rolled out in phases, and Milliman closely monitored the hit rates and disputes for Anthem data.[52] Milliman regularly met with Anthem on accuracy, including matching, and as a result, Anthem increased the threshold of its internal matching score on September 30, 2022.[53]

On October 17, 2022, Aetna sent Plaintiff an adverse action letter denying her coverage because of several diagnoses and prescriptions that were on Plaintiff's medical history consumer report.[54] Plaintiff alleges that a number of these diagnoses and prescription records were included in her report in error. On October 19, 2022, Plaintiff called Milliman and left a voicemail,[55] and subsequently sent an email to Milliman requesting a copy of the report on October 20, 2022.[56] Milliman emailed Plaintiff a copy of the report on October 24, 2022.[57] On the same day, Plaintiff called Milliman to dispute items on

---

[43] *Id.*

[44] *Id.*

[45] Milliman's Answers to Plaintiff's First Set of Interrogatories No. 5.

[46] *Id.*

[47] Interview with Joel Strassburg, *supra* n. 35.

[48] Anthem is now named "Elevance Health, Inc."

[49] MM_Cooper000003.

[50] Interview with Joel Strassburg, *supra* n. 35.

[51] *Id.*

[52] *Id.*

[53] Anthem has made additional adjustments to its matching process in 2023, as the result of Milliman's monitoring and oversight. *Id.*

[54] COOPER_000002.

[55] MM_Cooper000015.

[56] *Id.*

[57] MM_Cooper000125.

her report[58] and Milliman emailed Plaintiff suggestions on how to dispute items on the report that were potentially inaccurate.[59] These suggestions included steps, such as obtaining copies of the relevant records from the pharmacy or medical provider at issue, that could make the dispute process quicker and more efficient.[60] Milliman, however, processes disputes regardless of whether a consumer follows each suggestion.[61]

On October 26, 2022, Plaintiff initiated a dispute to remove certain items she claimed were not hers.[62] Over the course of two weeks, Milliman constantly communicated with Plaintiff via phone and email to determine which items were hers and which items inaccurate.[63]

Milliman emailed Plaintiff and Aetna a revised medical history consumer report on November 25, 2022.[64] All of the information that Plaintiff disputed and confirmed was not hers was removed and was not in the revised report.[65]

Further, in accordance with its dispute policy and procedures, Milliman applied blocking to the information that had been removed to ensure that it did not return.[66] Milliman generally applies two types of blocking: record-level blocking, which focuses on the specific fields of a record, and health insurance identifier ("HII") or batch blocking, which focuses on HII numbers that are unique to each consumer with a particular insurance company[67]  Record-level blocking ensures that information that is deleted from a report does not reappear on future, and is applied to each item of information that is deleted from a consumer report following a reinvestigation.  HII blocking is used to prevent records from being returned about an identified consumer when it appears that the consumer's information is being linked to a different consumer.   Milliman uses this blocking if it suspects the health records of two consumers will continue to mix in subsequent reports.[68]

In this matter, Milliman applied both record-level and HII blocking following its reinvestigation of Plaintiff's disputes.[69] The record-level block was directed at the information that Milliman removed from the October 26, 2022 report.[70] Because the disputed records related to a different consumer,

---

[58] MM_Cooper000006.

[59] MM_Cooper000122.

[60] *Id.*

[61] *Id.*

[62] MM_Cooper000001.

[63] *See* MM_Cooper000003.  During these communications, Plaintiff confirmed that certain items she initially disputed did in fact belong to her.

[64] MM_Cooper000060; MM_Cooper000199.

[65] Deposition Transcript for Barbara Cooper (Oct. 10, 2023) at 34.

[66] Interview with Joel Strassburg, *supra* n. 35.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

Milliman also employed the HII blocking procedure to block the HII numbers that were associated with each record.[71]

Unbeknownst to Milliman at the time, Milliman's attempt to block HII numbers was impacted by an issue with a system software change that was implemented on November 6, 2022.[72] As Milliman later discovered (after Plaintiff filed her suit in January 2023), the change in the software to use full HII numbers (instead of truncated numbers) did not account for prior blocks for comparison purposes so the system did not know to compare the truncated HII numbers with the full 32-character HII numbers.[73] Nevertheless, because of the record-level blocking, all of the disputed items that were removed by Milliman did not appear in Plaintiff's subsequent reports.[74]

On December 5, 2022, Plaintiff reapplied for supplemental Medicare coverage through Aetna using an insurance agent, and a new medical history consumer report was requested.[75] Milliman sent Aetna a report on December 5, 2022 (the December 5 report). The December 5 report did not contain any of the disputed information that was previously removed by Milliman. However, the December 5 report did contain new medication records that were similar to the records Milliman had previously removed from Plaintiff's report (consisting of medication refills with different fill dates).[76] Although Aetna initially denied Plaintiff's application, it was approved less than 24 hours later based on the revised report it received from Milliman on November 25, 2022.[77] Aetna notified the agent that although Plaintiff's application had initially been decisioned as a denial through an automated process, Aetna used the information from the November 25, 2022 report to approve the application before a denial letter was sent.[78]

On December 29, 2022, Plaintiff requested a copy of the December 5 report.[79] Plaintiff received the copy from Milliman on January 3, 2023.[80] Plaintiff did not submit a dispute related to the newly reported records directly to Milliman, but instead filed her lawsuit on January 13, 2023. As a result of Plaintiff's lawsuit, Milliman initiated a dispute on Plaintiff's behalf and removed the records associated with the new medication refills. A revised report was sent to Plaintiff and Aetna on January 27, 2023.[81] Further, as a result of its analysis of the errors in this dispute, Milliman identified the HII blocking issue from the technology change because of the lawsuit and subsequently remediated the issue.[82]

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] COOPER_000116.

[76] Interview with Joel Strassburg, *supra* n. 35; *see also* MM_Cooper000200- MM_Cooper000253 and COOPER_000139- COOPER_000144.

[77] COOPER_000116.

[78] *Id.*; *see also* Deposition Transcript for Barbara Cooper at 41.

[79] MM_Cooper000052.

[80] MM_Cooper000037.

[81] MM_Cooper000059.

[82] Interview with Joel Strassburg, *supra* n. 35.

## V.    EXPERT OPINIONS

I offer the following opinions in rebuttal to Mr. Hendricks based on my review of the record in this case.  Specifically, I offer my opinions to rebut the opinions of Mr. Hendricks related to (1) Milliman's procedures to ensure maximum possible accuracy with respect to the Anthem records[83], and (2) Milliman's blocking procedures to prevent records that were previously removed from a consumer report from being reinserted in future reports.

### A.    Milliman's Process for Matching Consumer Records is Consistent with Industry Practice and Otherwise Reasonable.

Mr. Hendricks takes issue with Milliman's matching process for the Anthem records at issue in this case.  Mr. Hendricks' report, however, does not identify any particular failures with Milliman's matching process aside from an assertion that Milliman "did not have enough key identifiers" to match the records to the consumer, including Social Security number and health insurance identifiers.  Mr. Hendricks' report does not address the specific identifiers that Milliman obtained or the matching of the records by the underlying healthcare provider.

To process a request for a report, Milliman requests first and last name, Social Security number, date of birth, gender, and zip code. [84] The records at issue here were obtained from Anthem, which receives first and last name, social security number, date of birth, gender, and zip code from Milliman to identify and retrieve records relating to the consumers.[85] Anthem manages its own match logic to identify the records.[86]  Anthem's matching process is proprietary to Anthem, but Milliman engages in oversight (through monitoring hit rates and disputes, as well regular meetings with Anthem.  Milliman also notifies Anthem of disputed records and leverages information from those disputes to improve accuracy.

Here, using its proprietary matching process, Anthem returned (and Milliman included) a number of records for a "Barbara Cooper" who shares the same date of birth as the Plaintiff.  Following Plaintiff's dispute, Anthem shared with Milliman the following information about the matching:

*We found an exact match on the First Name, Last Name, DOB on the claims file. There was a mismatch in Zip and SSN but the threshold was in the acceptable range because of*

---

[83] Mr. Hendricks' report focuses on the Anthem records included in Plaintiff's reports.  I reserve the right to supplement this report in the event that Mr. Hendricks seeks to offer opinions regarding any records from other sources of data.

[84] Milliman's Answers to Plaintiff's First Set of Interrogatories No. 5.

[85] MM_Cooper000266.

[86] *Id*. I am unable to opine on Anthem's matching processes as there is not information in the record about those processes, other than the fact that Anthem employs its own proprietary matching logic that involves a match scoring methodology. However, as the result of Milliman's oversight and regular meetings with Anthem, Anthem increased the threshold for its internal matching score for records returned to Milliman on September 30, 2022, just prior to the report on the Plaintiff was run.  Interview with Joel Strassburg.  Anthem continues to adjust and improve its match logic in based on Milliman's oversight and feedback. *Id*.

> *the uniqueness of this member information against all of Anthem owned data.*
> *Considering that our member matching score is based on the data that we own, and not*
> *universal, I'll leave it up to you to decide the validity of this dispute based on the*
> *responses you may have received from other carriers.[87]*

Mr. Hendricks quotes some of this message in his expert report, but does not identify what was unreasonable about how Milliman, or Anthem for that matter, matched information to Plaintiff's report, except to state (incorrectly) that "Milliman failed to prevent the reappearance of multiple prescription records and physician entries from appearing in Plaintiff's report after investigating Plaintiff's dispute."[88] Further, Anthem's statement acknowledges that it did consider the Plaintiff's Social Security number in its matching, but it found that the matching threshold was acceptable based on the uniqueness of the data.[89]

As discussed previously, as part of its standard process, Milliman engaged with Anthem prior to including Anthem's data in Milliman's reports to discuss the data source's processes and procedures.[90] Milliman also tested and analyzed sample data sets to ensure records met its quality and accuracy standards.[91] Further, Milliman introduced Anthem's data in phases to monitor for "hit rates" and consumer disputes, which Milliman used to inform quality discussions with Anthem.[92] This process is well within the bounds of what is reasonable in the industry and what is expected by regulators.

With respect to matching procedures generally, Mr. Hendricks does not make any observations about the standard that applies when a CRA obtains records from a data source in connection with a particular request for a consumer report. Rather, the primary cases and standards that he cites to relate to the nationwide CRAs, which obtain – and maintain in their own databases – data from furnishers on regular basis (such as the "mixed file" issues referenced on pp. 3-4 of his report). Here, Milliman obtains information from data sources only when a report is requested on a particular consumer and does not maintain files on consumers that would enable it to identify false positive matches. In the case of the Anthem records, it relies on Anthem to return the correct records in response to queries which include a consumer's identifying information only. In my experience, depending on the records and the methods of retrieval, a CRA may rely on the source of the records to return records about the correct consumer

---

[87] MM_Cooper000003.

[88] As noted below, **none** of the entries that were removed as a result of Plaintiff's dispute reappeared in her December 4 report, so Mr. Hendricks statement is incorrect.

[89] *See* FACTA Report, *supra* n. 21, at p. 38 (finding that while Social Security numbers are important for data matching, CRAs should not rely on it completely); *see also* R.I. Gen. Laws § 6-13.1-29 (2022) (prohibiting CRAs from using Social Security number as the sole factor when matching)

[90] Interview with Joel Strassburg, *supra* n. 35.

[91] *Id.*

[92] *Id.*

identified by the query information, and thus such reliance does not reflect a per se failure to maintain reasonable procedures, as Mr. Hendricks suggests.[93]

For example, in the context of employment background screening reports, it is common for a CRA to obtain records from a former employer (such as to verify prior employment or obtain related information) by requesting that information using personally identifiable information and an authorization provided by the consumer. Similarly, when conducting an education verification, a CRA may obtain records by making a request to a clearinghouse that operates on behalf of the educational institutions by providing personally identifiable information and an authorization provided by the consumer. The process employed here, which relies on the source of the data – Anthem – to return records on the consumer in response to a query is consistent with industry standards and otherwise reasonable.

Finally, Mr. Hendricks makes much of the prior FTC enforcement case involving Milliman as putting Milliman on "notice" that its policies and procedures were inadequate. *See* Hendricks Report at pp. 6-7. Mr. Hendricks' comments regarding the prior enforcement case, however, evince a complete lack of understanding regarding the difference between an FTC complaint (which sets forth the agency's assertions related to the alleged deficiencies) and the order (which often, among other requirements, includes general fencing-in relief). In my experience, it is a common practice–and particularly at the time the Milliman consent order was entered into – for consent orders in FCRA cases to require compliance with the FCRA generally, including enumerated provisions, even where those provisions were not at issue in the underlying investigation. The FTC complaint against Milliman did not allege any deficiencies in Milliman's reinvestigation procedures or its procedures to assure the maximum possible accuracy of the information included in consumer reports. Rather, the complaint only alleged a single violation – Milliman's failure to provide a "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA" as required by FCRA Section 607(d), 15 U.S.C. § 1681e(d).[94]

### B.    Milliman's Procedure for Blocking Information that was Previously Removed from a Consumer Report is Consistent with Industry Practice and Reasonable.

In my experience, Milliman's procedure to block information that was previously removed from its consumer reports worked as intended and is reasonable. Mr. Hendrick incorrectly concludes that

---

[93] Mr. Hendricks also refers to a pending case, *Healy v. Milliman*, as putting Milliman "on notice" of certain alleged failures. It is my understanding, however, that this case has not gone to trial. Further, the only case that has gone to trial, *Collins v. Milliman*, which focused on the reasonableness of Milliman's reliance on its data source to match records, resulted in a defense verdict.

[94] *See* Complaint in In re Milliman, FTC No. 062-3189, https://www.ftc.gov/sites/default/files/documents/cases/2008/02/080212complaint_0.pdf. Further, it is notable that the FTC did not seek penalties from Milliman in the enforcement case, and specifically rejected the request of a commenter on the settlement to do so. https://www.ftc.gov/sites/default/files/documents/cases/2008/02/080212letter_0.pdf. During my tenure at the FTC, I supervised the staff attorneys who handled the investigation and the complaint and consent agreement. *See* https://www.ftc.gov/news-events/news/press-releases/2007/09/providers-consumers-medical-profiles-agree-comply-fair-credit-reporting-act.

"Milliman re-inserted previously deleted material, and disregarded reinsertion-related standards," but the fact is that the records Milliman blocked after Plaintiff's October 24, 2022 dispute were not reinserted.

Milliman applied record-level and HII blocking to the records Plaintiff confirmed were not hers.[95] Milliman blocked the "Fill Date" for each prescription and "Claim Date" for each record that was removed.[96] Milliman also blocked truncated HII numbers that were associated with each record, but because of the technology change on November 6, 2022, the HII block was not effective.[97] The record-level blocking, however, did effectively block the previously removed information.[98] As a result, the report that Aetna received in response to its December 5, 2023 request did contain *new* medication records that were similar to the records Milliman had previously removed from Plaintiff's report, but were new medication refills with different, more recent fill dates.[99]

To the extent that Mr. Hendricks is asserting that Milliman did not employ reasonable procedures to address the issue of a mixed file, the facts in the case demonstrate the exact opposite. Milliman's HII blocking process is specifically designed to address this issue and prevent the inclusion of records that do not belong to the correct consumer from appearing in subsequent reports. Milliman sought to employ that process with respect to the Plaintiff, but due to a then-unknown issue with a system software change that was implemented on November 6, 2022 (while Plaintiff's dispute was being reinvestigated), records similar to the ones that Milliman removed from the October report appeared on the December 5 report. Once Milliman was on notice of the issue in its HII blocking process (through the allegations of the Plaintiff's lawsuit), it took steps to remediate the issue and ensure the system would compare truncated HII numbers with the full HII number moving forward.[100] Milliman's dispute monitoring and issue management processes ensured that consumers, including Plaintiff, would not be impacted from that technology issue in the future. That is certainly consistent with industry standards and practice.

---

[95] Interview with Joel Strassburg, *supra* n. 35.
[96] *Id*.
[97] *Id*.
[98] *Id*.
[99] *Id*.; *see also* MM_Cooper000200- MM_Cooper000253 and COOPER_000139- COOPER_000144.
[100] Interview with Joel Strassburg, *supra* n. 35.

## VI.    CONCLUSION

In my opinion, Milliman's procedure for matching consumer information to a consumer, which is based on providing identifying information to a data source and requesting that the data source return records on that consumer, is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry. Further, Milliman's procedure for blocking records that were previously removed from a consumer report not only worked in this instance, but it is also consistent with industry standards and practices and is reasonable.

**SIGNED:**

Rebecca E. Kuehn

# EXHIBIT A

**Exhibit A to Expert Report of Rebecca Kuehn**

**Materials Considered and/or Relied Upon**

<u>Case Materials</u>

Interview with Joel Strassburg (Dec. 1, 2023)
Documents produced by Milliman (MM_Cooper000001-MM_Cooper000292)
Documents produced by Plaintiff (COOPER_000001- COOPER_000210)
Milliman's Answers to Plaintiff's First Set of Interrogatories
Deposition Transcript for Barbara Cooper (Oct. 10, 2023)
Deposition Transcript for Evan Hendricks (Nov. 16, 2023)

<u>Other</u>

All additional and/or other materials cited and/or referenced in my Report, including statutes,
     regulations, government publications, and websites

# EXHIBIT B

**Exhibit B to Expert Report of Rebecca Kuehn**

**Additional Information**

<u>**Publications Authored by Rebecca Kuehn**</u>

"Don't Cross the Double Lines: CFPB Reminds Credit Report Users to Have Permissible Purpose Before Obtaining Credit Reports," Spot Delivery, August 2022

"Lessons Learned from Dun & Bradstreet," Hudson Cook *Insights*, February 2022, co-authored with Meg Nicholls

Kuehn, Rebecca; *Blowing the Whistle on Discrimination: Spotlight on Regulatory Interest in Discrimination by Algorithms*, Spot Delivery, January/February 2022

Kuehn, Rebecca, and Anthony, David; *FCRA Year in Review: FCRA Appellate Decisions*; ABA, July 2021

Kuehn, Rebecca, and Newman, Cierra; *FTC Brings First Enforcement Action Alleging Failure to Provide Documentation of Identity Theft to Victims*; Hudson Cook Insights, June 2020

Kuehn, Rebecca, and McArthur, Webb, *Springing Consumer Rights: Responding to the Federal Government Shutdown and Anticipating Another*, Hudson Cook Insights, March 2019

Kuehn, Rebecca, and Udell, Nora R., *Dead Men Violate No Injunctions*, Hudson Cook Insights, October 2018

Kuehn, Rebecca; *The Myth of Fingerprints: The Privacy Pitfalls of Biometric Data*; Spot Delivery, July 2018

Kuehn, Rebecca, and Zaman, Latif, *New York Court of Appeals to Consider Scope of Law Prohibiting Discrimination Based on a Criminal Conviction*, Hudson Cook Insights, January 2017

Kuehn, Rebecca, and Denson, Allen H.; *Important Rules of the Road for BHPH Dealers Who Furnish Information to Credit Bureaus*; Spot Delivery, September 2015

Kuehn, Rebecca, and Musselman, Meghan S., *Third Circuit Thwarts Challenge to FTC's Data Security Authority*, Spot Delivery, September 2015

# EXHIBIT C

**Rebecca E. Kuehn**

Hudson Cook, LLP
1909 K Street, N.W., 4th Floor
Washington, DC  20006
202-715-2008
rkuehn@hudco.com

*Professional Profile*

Experienced consumer financial services attorney with significant privacy expertise.

*Work Experience*

**Hudson Cook, LLP**, Washington, D.C.
Partner, April 2015 to Present

Practice focuses on consumer financial services and consumer protection matters. Counsels financial institutions, consumer reporting agencies, service providers, and others in complying with consumer financial laws and prohibitions against unfair, deceptive, or abusive trade practices. Represents clients before federal and state agencies and the courts, particularly the Federal Trade Commission and Consumer Financial Protection Bureau, in investigations and other proceedings.

**CoreLogic**, McLean, VA
Vice President and Senior Regulatory Counsel, September 2011 to April 2015

Served as lead lawyer and coverage counsel for the CoreLogic credit reporting and consumer data businesses, providing advice and guidance to management on a variety of consumer data and privacy-related regulatory issues, including the Fair Credit Reporting Act (FCRA) and the Gramm-Leach-Bliley Act.

**Federal Trade Commission**, Bureau of Consumer Protection, Washington, D.C.
Assistant Director, Division of Privacy and Identity Protection, May 2006 to September 2011

Supervised attorneys and other staff on investigations and policy work related to credit reporting, consumer privacy, identity theft, and information security.  Primarily responsible for the Fair Credit Reporting Act program, leading the Commission's enforcement, policy, outreach, and rulemaking activities in that area.  Regularly coordinated with the federal financial agencies in the development, issuance, and interpretation of interagency rules, including the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Dispute Rules, and the amendments to Gramm-Leach-Bliley Privacy Rule.
Responsibilities included analyzing and providing comment on legislative proposals to senior Commission staff and Congressional staff, coordinating legal interpretations and policy across intra- and interagency boundaries, and serving as a subject matter expert and resource to Commission staff and industry.  Provided technical assistance to Egypt on oversight and regulation of credit bureaus as part of USAID mission.  Served on the World Bank Credit Reporting Task Force, providing significant contributions to the development of a consultative

draft report entitled General Principles for Credit Reporting.

**LeClair Ryan**, Alexandria, VA
Partner, January 2002 to May 2006
Associate, February 2000 to December 2001

Developed litigation and counseling practice concentrated on the representation of financial
service providers and consumer reporting agencies, including claims brought under state law,
the Fair Credit Reporting Act, the Truth in Lending Act, and the Fair Debt Collection Practices
Act. Significant first-chair trial experience. Responsible for the supervision of junior attorneys
and the management of case assignments for office.

**Reed Smith Hazel & Thomas LLP**, Falls Church, VA
Associate, January 1997 to February 2000

Primarily responsible for a variety of civil litigation matters, including commercial matters,
software and other technology-related disputes, lender liability, medical malpractice defense,
and products liability actions.

**Spriggs & Hollingsworth**, Washington, D.C.
Associate, September 1994 to January 1997

Litigation practice, primarily focused on commercial matters, multi-party toxic tort actions, and
insurance coverage disputes.

### *Bar Contributions*

Co-Chair, FCRA Litigation Subcommittee, American Bar Association, Section of Litigation,
Woman Advocate Committee

Contributor, CFPB Biweekly Updates, American Bar Association, Section of Antitrust, Consumer
Protection Committee, 2015 to Present

Faculty, National Institute for Consumer Financial Services Basics, 2013, 2014, 2015, 2016, 2017,
2018 (Chair, 2016)

Observer, Criminal Records Accuracy Committee, Uniform Law Commission, 2015 – Present

Co-Chair, Consumer Litigation Subcommittee, American Bar Association, Section of Litigation,
Woman Advocate Committee

### *Education*

**The George Washington University, National Law Center, Washington, D.C.**
Juris Doctor with High Honors, May 1994
Class Rank: Top 5%
Member, The Order of the Coif

Member, *The George Washington Law Review*
Anne Wells Branscomb Award for Graduating Student with Highest Average
 in Part-Time Course of Study

**Frostburg State University, Frostburg, MD**
Bachelor of Arts, Magna Cum Laude, December 1988
English Major with Business Minor
Commencement Speaker for Graduating Class

### *Bar Admissions*

Admitted to practice in Maryland, Virginia, and the District of Columbia

### *Selected Presentations*

"Driving Change: Litigation & Enforcement Developments in the Consumer Reporting Industry," CDIA Virtual Law & Industry Conference, June 2022

"Removing Bias in Lending for a More Equitable Financial System," LendIt Fintech USA 2022, May 2022

"Getting a Clearer Picture or Merely a Caricature? The Use of Alternative Data and Artificial Intelligence in Credit Decisions, Servicing and Collection," CCFL Annual Consumer Financial Services Conference, May 2022

"Fair Lending Tune-Up," FICO World 2022, May 2022

"Tracking New Debt Collection Regulations and Policy: Opportunities in Loss Prevention," FICO World 2022, May 2022

"Tenant and Employment Screening Under the FCRA," PBSA Webinar, April 2022

"Big Changes in Reporting Medical Collections Debt: A CDIA Webinar exploring what happened, what's next and why it matters," CDIA Webinar, April 2022

"From the Hill: the regulatory landscape in motion," Experian Vision 2022, April 2022

"The War on Tenant Screening: How Regulatory and Legislative Changes in Washington Are Impacting the Industry," PBSA 2022 Mid-Year Legislative and Regulatory Conference, April 2022

"Fast and Furious with the FCRA: Fifty Minutes on the Latest Developments in FCRA Litigation," ABA Litigation Section, Consumer Litigation Committee, The Woman Advocate Committee Webinar, April 2022

"The CFPB's View of Credit Reporting," CDIA Webinar, March 2022

"A Holistic View of Red Flags," Hudson Cook Compliance Coffee Break, March 2022

"Mingling with Membership: Data Privacy and Security: Lessons Learned from FTC Developments,"
North Carolina Bar Association Webinar, February 2022

"FTC Expands Safeguards Rule to Address Cybersecurity Risks & Privacy," CDIA Webinar, December 2021

"Regulatory Changes Pave the Way for a New Era of Consumer Protection," CDIA Webinar, November
2021

"What to Expect in Supervisory Examinations in the Biden Administration," INFiN MoneyTrends,
November 2021

"Credit Reporting," ABA Consumer Financial Services Basics Virtual Conference, October 2021

"Stretching Your Outside Counsel Dollar: Strategies for Maximizing Your Legal Budget," Professional
Background Screening Association Annual Conference, September 2021

"Rise of the Machines: Using AI and Other Data Analytics to Improve Compliance and Deliver Better
Products," Professional Background Screening Association Annual Conference, September 2021

"Litigation & Enforcement Trends: What will we see in 2021," CDIA 2021 Virtual Law & Industry
Conference, July 2021

"Consumer Protection Gotchas for Lenders and MSBs: Privacy, Safeguards, Red Flags and the ADA,"
INFiN Webinar, July 2021

"Supreme Court Decision: *TransUnion v. Ramirez*," CDIA Webinar, June 2021

"Employment/Income/Asset Verification: New Trends in Underwriting," 2021 Virtual Financial Services
Conference, May 2021

"VCDPA - The newest consumer data privacy law comes to Virginia," Hudson Cook Compliance Coffee
Break, April 2021

"Compliance Priorities for Tenant Screeners to Reduce Regulatory and Litigation Risk," Professional
Background Screening Association Virtual 2021 Mid-Year Legislative & Regulatory Conference, April
2021

"FCRA Litigation: A Review of Top Issues from 2020 and What to Expect in 2021," ABA Consumer
Litigation Committee Virtual Roundtable, February 2021

"The Changing Dynamics of Litigation & Enforcement," CDIA Webinar Rebroadcast, December 2020

"The Changing Dynamics of Litigation & Enforcement," CDIA 2020 Virtual Law & Industry Conference,
September 2020

"FCRA Basics for Screeners - Distance Learning Style," Professional Background Screening Association
Virtual Conference, September 2020

"FTC to Ramp Up the GLBA Safeguards Rule," CDIA Webinar, August 2020

"CFPB Director Kraninger To Address Credit Reporting Industry - A CDIA Teleseminar with comments on the impact of the CARES Act on the compliance ecosystem," CDIA Webinar, June 2020

*Fair Lending Fundamentals in Today's Information-based World, NAFCU Webinar, May 2020*

*Consumer Protection Considerations for Small Dollar Lenders During Covid-19, Hudson Cook webinar, April 2020*

*COVID-19 in the Screening Industry Q&A Part I, Professional Background Screening Association Webinar, April 2020*

*The CARES Act: Modifications to Data Furnishers' FCRA Obligations, CDIA Webinar, April 2020*

*Conducting Internal Investigations Post-Connolly, ABA 2020 Corporate Counsel CLE Seminar, February 2020*

*CDIA Briefing on CFPB/FTC Workshop on Accuracy in Credit Reporting, CDIA Webinar, December 2019*

*Data Management for Business Operations, and Compliance Speedsmarts: Technology, AFSA Annual Meeting, October 2019*

*Navigating the Challenges in Today's Litigation and Enforcement Environment, CDIA webinar, October 2019*

*Lessons for Tenant Screeners from the Front Lines, and Ask the Lawyers, Professional Background Screening Association, September 2019*

*Getting Prepared for Data Privacy in Debt Collections, and Data Privacy meet Regulatory Oversight in Debt Collection, Automotive Intelligence Summit, July 2019*

*Examining the Hottest Claims of 2019 Under the FCRA and ECOA, ACI Consumer Finance: Class Actions, Litigation & Government Enforcement Actions, July 2019*

*Managing Risk in an Always-Changing Litigation & Enforcement Environment, CDIA Law & Industry Conference, June 2019*

*A New Way to (Really) Know Your Customers: Consumer-Permissioned Access to Financial Accounts, and Privacy in the New World: Post-GDPR State Law Privacy Developments in the United States, Consumer Financial Services Conference, Hudson Cook/CounselorLibrary, April 2019*

*Trends in Fraud, and How to Avoid It, CBA Live 2019, April 2019*

*Privacy in the New World: Post-GDPR State Law Privacy Developments, FiSCA Annual Conference & Expo, October 2018*

*You've Got Questions – They've Got Answers, and Island of Misfit Toys: How Does the FCRA Apply to FINRA Onboarding, and Other 'Not Quite Employment' Circumstances (If at All)?, National Association of Professional Background Screeners Annual Conference, October 2018*

*State and Local Law Developments in Residential Screening, National Consumer Reporting Association Conference, November 2017*
*A Conversation with the Federal Trade Commission,* and *Don't Let Your Audit Reports Become "Exhibit A" in Court:  The Do's and Don'ts of Conducting Audits to Manage Compliance and Litigation Risk,* National Association of Professional Background Screeners Annual Conference, September 2017

*Tenant Screening Basics,* National Association of Professional Background Screeners Annual Conference, September 2016

*Class Actions After Spokeo, Inc. v. Robins*, ABA Section of Business Law Annual Meeting, September 2016

*Privacy Law Developments – Emerging Data Trends, Privacy Law Developments – Employment, Privacy Law Update,* Counselor Library Conference 2016, April 2016

*The Automobile as the Ultimate Mobility Device – Autonomous, Connected, Electric Shared*, FICO World 2016 Conference, April 2016

*Simplified Compliance Management for Screening Companies*, National Association of Professional Background Screeners Annual Conference, September 2015

*Fair Credit Reporting Act:  Litigation, Regulatory and Enforcement Developments in the Financial Services Industry and Beyond*, Stafford Conferences Webinar, June 2015

*Big Data and Global Privacy*, FICO World Conference, November 2014

*Fair Credit Reporting Act and Financial Privacy*, ABA National Institute on Consumer Financial Law Basics, October 2014

*Alternative Credit Data*, Credit Builders Alliance Credit Building Symposium, July 2014

*CFPB and Furnisher FCRA Obligations*, ABA Consumer Financial Services Committee Winter Meeting, January 2014

*Background Screening:  Is FCRA Compliance Enough or Does the FTC Want More?*, International Association of Privacy Professionals, December 2013

*Top 10 Compliance Challenges for CRAs*, National Association of Professional Background Screeners Annual Conference, September 2013

*International Credit Reporting and Alternative Data*, NCLC/Suffolk Law School, Credit Reporting and Credit Scoring Symposium, June 2012

*Update by the Federal Trade Commission*, 2011 National Association of Professional Background Screeners Annual Conference, March 22, 2011

*Update on the FTC*, 2010 National Credit Reporting Association Annual Conference, November 11, 2010

*Federal FCRA* and *FTC Enforcement Initiatives*, 24th Annual Payment Card Institute, May 6-7, 2010

*The Inside Straight on the Changing Government Role in the Economy*, ACA International's 70th Annual Convention, July 14, 2009

*Implementation of the Affiliate Sharing Rule and Red Flags Rule*, American Bar Association Consumer Financial Services Committee, 2008 Winter Meeting, January 11, 2009

*The FCRA:  It's Not Just for Credit Bureaus*, IAPP Privacy Academy, Sept. 23, 2008

*Identity Theft and Privacy Rules*, 2008 NACCA Examiner's School, May 8, 2008

*Security Freezes and the Impact on the Credit Reporting System*, Fair Isaac's 2007 InterACT Conference, San Francisco, CA, May 15, 2007

*Data Security and Recommendations of the President's Identity Theft Task Force*, Collection and Recovery Solutions 2007 Conference, Las Vegas, NV, May 3, 2007

*Recent Developments in Data Security*, American Financial Services Association, Law Committee Meeting, January 29, 2007

*Current Topics in Credit Reporting and Credit Scoring*, American Financial Services Association, 8th Annual State Government Affairs Forum, September 28, 2006