# EXHIBIT 2

# In the Matter of:

*Cooper*

*v*

***Milliman***

---

*Videorecorded Videoconference Deposition of Rebecca Keuhn*

*October 10, 2024*

---



## GRIFFIN GROUP INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

| | |
|---|---|
| BARBARA COOPER, | ) Civil No. |
| | ) 2:23-cv-00028-JES-NPM |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| MILLIMAN, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF

REBECCA KUEHN

Zoom Videoconference

October 10, 2024

1:29 p.m. EDT

REPORTED BY:
TERI HOSKINS, RMR, CSR
Certified Reporter

PREPARED FOR:
THE COURT

(Original)



Page 2

```
1              VIDEORECORDED VIDEOCONFERENCE DEPOSITION OF

2                   REBECCA KUEHN,

3    was taken on October 10, 2024, commencing at

4    1:29 p.m. EDT, via Zoom Videoconference, before

5    TERI HOSKINS, a Certified Court Reporter.
```

Page 3

```
1    COUNSEL APPEARING:

2    For the Plaintiff:

3         CONSUMER ATTORNEYS
          BY:  McKENZIE CZABAJ, ESQ.

4         8095 North 85th Way
          Scottsdale, Arizona 85258

5         mczabaj@consumerattorneys.com
          (480)626-2376

6

7

8    For the Defendant Milliman, Inc.:

9         WILLIAMS KASTNER & GIBBS
          BY:  JEFFERY MARK WELLS, ESQ.

10        601 Union Street, Suite 4100
          Seattle, Washington 98101

11        jwells@williamskastner.com
          (206)233-2985
```

Page 4

CONTENTS

```
DEPONENT                                       PAGE

    REBECCA KUEHN

    EXAMINATION BY MS. CZABAJ                    5
```

EXHIBITS

```
DEPOSITION EXHIBIT                             PAGE

Exhibit 1   Confidential Expert Report of       21
            Rebecca E. Kuehn
```

Page 5

```
1              October 10, 2024
2              1:29 p.m. EDT
3
4              REBECCA KUEHN,
5    having been first duly sworn or affirmed to tell the
6    truth, the whole truth, and nothing but the truth, was
7    examined and testified as follows:
8
9              EXAMINATION
10   BY MS. CZABAJ:
11        Q.   Ms. Kuehn, could you please state, for the
12   record, your first and last name and spell it.
13        A.   Yes.  My name is Rebecca Kuehn.  The first
14   name is R-e-b-e-c-c-a, last name Kuehn, K-u-e-h-n.
15        Q.   What is the physical address from which you
16   are giving your testimony today?
17        A.   It's in my office in Washington DC.  That's
18   at 1909 K Street Northwest, Washington DC 20006.
19        Q.   And you are a licensed and practicing
20   attorney in Washington DC, correct?
21        A.   Yes.
22        Q.   And you were barred there in 1995.  Is that
23   correct?
24        A.   Yes.
25        Q.   You are also licensed to practice law in
```



Page 6

1 Maryland. Is that correct?
2    **A.  That's correct.**
3    Q.  And you were barred there in 2005. Is that
4 correct?
5    **A.  Sounds right.**
6    Q.  And you were also licensed to practice law
7 in Virginia. Is that correct?
8    **A.  Yes.**
9    Q.  And you were barred there in 1994. Is that
10 correct?
11   **A.  Yes.**
12   Q.  Are you admitted to any other state bars?
13   **A.  No.**
14   Q.  I expect that you have given depositions
15 before. Is that fair?
16   **A.  Yes.**
17   Q.  And I expect that you've taken depositions
18 before as well. Is that correct?
19   **A.  Yes.**
20   Q.  Have you ever given testimony as a witness
21 in a courtroom?
22   **A.  Yes.**
23   Q.  On approximately how many occasions?
24   **A.  Two occasions.**
25   Q.  Were each of those times as an expert

Page 7

1 witness?
2    **A.  Yes.**
3    Q.  Approximately how many times have you had
4 your deposition taken?
5    **A.  I haven't counted.  At least more than ten.**
6    Q.  Okay.  And were all of those times as an
7 expert witness?
8    **A.  Yes.**
9    Q.  When was the last time that you were
10 deposed?
11   **A.  I want to say it's probably within the last**
12 **six months.**
13   Q.  Okay.  I understand that as an attorney,
14 you're obviously aware of this, but for the sake of
15 this deposition, do you understand that you are here
16 today under oath?
17   **A.  Yes.**
18   Q.  And you understand that everything you
19 testify to today has the same force and effect as if
20 we were in a courtroom in front of a judge, correct?
21   **A.  Yes.**
22   Q.  Have you consumed any drugs or alcohol in
23 the last 24 hours that would inhibit your ability to
24 testify truthfully and accurately today?
25   **A.  No.**

Page 8

1    Q.  Are you on any prescription medication which
2 would inhibit your ability to testify truthfully or
3 accurately today?
4    **A.  No.**
5    Q.  Okay.  Because of your background, I'm going
6 to skip a number of the ground rules that I typically
7 go over, but I would like to confirm one thing first.
8       During the course of today's deposition, if
9 I ask any questions that you do not understand or
10 cannot hear, just let me know, and I can either
11 restate it or have it read back.
12      With that being said, if you do answer a
13 question, I'm going to assume that you heard my
14 question and you understood my question.  Is that
15 fair?
16   **A.  Yes.**
17   Q.  And I don't expect today's deposition to
18 take too much time, but if you need a break at any
19 point, please let me know.  As long as there's no
20 pending question, I'm completely okay with that.
21      All right.  What did you do to prepare for
22 today's deposition?
23   **A.  I reviewed my report, documents related to**
24 **the case, and I met with Mr. Wells.**
25   Q.  How long did the two of you meet?

Page 9

1    **A.  Briefly, less than an hour.**
2    Q.  Was that over Zoom, by the phone, or in
3 person?
4    **A.  By Zoom.**
5    Q.  Was anyone else present?
6    **A.  Yes.**
7    Q.  Who else was present?
8    **A.  My colleague, Jason Estevez.**
9    Q.  Is he your supervisor?
10   **A.  No.**
11   Q.  Would you consider yourself on the same
12 level, or is he someone that you supervise?
13   **A.  He is someone I supervise.**
14   Q.  Okay.  Now, you have been designated by
15 Milliman as an expert witness in this case.  Is that
16 correct?
17   **A.  Yes.**
18   Q.  Do you consider yourself an expert?
19   **A.  For the purposes of the topics I've been**
20 **designated on, yes.**
21   Q.  What specifically do you consider your area
22 of expertise?
23   **A.  I have been asked to opine on the company's**
24 **procedures for assuring maximum possible accuracy as**
25 **well as their procedures for preventing the**

Cooper v.
Milliman

Case 2:23-cv-00028-JES-NPM    Document 83-2    Filed 11/22/24    Page 6 of 34 PageID
962
Videorecorded Videoconference Deposition of Rebecca Keuhn

Page 10

1    reinsertion of information into a consumer report.
2        Q.   Approximately how many times have you been
3    retained as an expert before?
4        A.   I don't know the exact count.  I would say
5    probably more than 15 times.
6        Q.   Okay.  Would you say that it's more than
7    25 times?
8        A.   That might be right, but I haven't had
9    occasion to count.
10       Q.   Okay.  And your hourly rate as an expert
11   witness is $835 an hour.  Is that correct?
12       A.   Yes, I believe so.
13       Q.   How many hours have you billed to Milliman
14   in this case?
15       A.   I don't recall.  I didn't review that in
16   preparation for today, but it was mostly in connection
17   with the preparation of the report in December.
18       Q.   Are you able to give me any kind of
19   approximation on time?
20       A.   I'd probably say it was around five to
21   ten hours for preparation of the report, which
22   included reviewing Mr. Hendricks' report, the relevant
23   documents, drafting, et cetera.
24       Q.   Okay.  And your hourly rate of $835, is that
25   different from your hourly rate as an attorney?

Page 11

1        A.   No.
2        Q.   Okay.  Where did you attend law school?
3        A.   The George Washington Law School.
4        Q.   What year did you graduate?
5        A.   '94.
6        Q.   And are you currently employed by a law
7    firm?
8        A.   Yes.
9        Q.   What law firm is that?
10       A.   Hudson Cook, LLP.
11       Q.   What is your job title?
12       A.   I'm a partner.
13       Q.   Are you paid a salary?
14       A.   I am paid a distribution of profits.  We're
15   a limited liability partnership.
16       Q.   Okay.  And when did you start working there?
17       A.   I started working for Hudson Cook in --
18   about eight years ago -- 2015.
19       Q.   What kind of practice do you have.
20       A.   I largely do compliance work, so I work with
21   companies on their compliance with a variety of
22   consumer financial laws and related privacy laws.
23       Q.   Do you ever work with the CDIA?
24       A.   Yes.
25       Q.   And do you work with the PBSA?

Page 12

1        A.   Yes.
2        Q.   In your practice area, are you ever involved
3    in any litigation?
4        A.   Aside from serving as an expert witness, I
5    have, on occasion, handled one or two litigation
6    matters.  I have other partners who focus on
7    litigation.
8        Q.   Have you previously worked for any other law
9    firms?
10       A.   Yes.
11       Q.   Was your practice area different at any of
12   those firms?
13       A.   Yes.  Back in -- it's largely focused in the
14   same practice area, but when I started in this
15   practice area around '97 -- '96-'97, I focused on
16   litigation, mostly.  Litigation defense.
17       Q.   What area of law did you practice prior to
18   that?
19       A.   I worked for a law firm that handled toxic
20   tort cases, and then when I moved from that firm to
21   another firm in Virginia, my practice shifted to being
22   in the financial services area and then eventually
23   focusing on Fair Credit Reporting Act and similar
24   laws.
25       Q.   How much of your work today is related to

Page 13

1    consumer reporting?
2        A.   I would say 99 percent.
3        Q.   Have you ever represented Milliman as its
4    attorney before?
5        A.   Yes.
6        Q.   When was that?
7        A.   When -- earlier at this firm, Hudson Cook, I
8    advised them on a couple of discrete FCRA matters.
9        Q.   Have you ever represented any other consumer
10   reporting agency?
11       A.   Yes.
12       Q.   What consumer reporting agencies?
13       A.   Well, I'm not at liberty to disclose the
14   identity of my clients due to my obligations to them,
15   but I can describe for you the types of consumer
16   reporting agencies I have represented over the years.
17       Q.   Yes, please.
18       A.   I have worked with credit reporting
19   companies, resellers in both the auto and mortgage
20   space, entities that deal with small-dollar payment
21   history, entities that deal with fraud-related
22   information, that deal with payment-related
23   information, as well as employment screeners and
24   tenant screeners.
25       Q.   Have you ever been employed directly by a

Page 14

1  consumer reporting agency?
2      A.  Yes.
3      Q.  What consumer reporting agency or agencies?
4      A.  I was employed by CoreLogic.  And my role
5  there, I provided legal support to three different
6  consumer reporting agencies: Credco, which is a credit
7  report reseller in the auto and mortgage space, what
8  was called then SafeRent, which was a tenant screening
9  company, and Teletrack, which provided reports related
10  to small-dollar transactions.
11      Q.  What was your job title at CoreLogic?
12      A.  Senior regulatory counsel vice president,
13  something like that.
14      Q.  Okay.  And while working for CoreLogic, did
15  you play any role in developing policies and
16  procedures under the FCRA?
17      A.  Yes.
18      Q.  What role did you play in that matter?
19      A.  As senior regulatory counsel, I would work
20  with the compliance personnel in each of the different
21  entities to help them identify what their obligations
22  were under the variety of laws.  I would keep them
23  apprised of regulatory developments, such as
24  enforcement cases brought by various agencies,
25  guidance issued by the agencies to help inform them of

Page 15

1  the types of policies and procedures they needed to
2  have in place.
3      Q.  Have you ever represented a furnisher as
4  that term is contemplated by the FCRA?
5      A.  Yes.
6      Q.  Have you ever represented a consumer in an
7  FCRA action?
8      A.  I -- I characterize my work at the FTC as
9  representing the consumer, so that's primarily where
10  I've worked with consumers.
11      Q.  Did you ever represent a consumer in a FCRA
12  action outside of your time at the FTC?
13      A.  I have not.
14      Q.  Okay.  Have you ever represented a consumer
15  in any litigation against a consumer reporting agency?
16      A.  I have not.
17      Q.  And in your time at the FTC, what years was
18  that?
19      A.  The -- I started at the FTC in 2006 and was
20  there through 2011.
21      Q.  What was your job title at the FTC?
22      A.  I was an assistant director in the Division
23  of Privacy and Identity Protection.
24      Q.  What were some of your job duties as
25  assistant director?

Page 16

1      A.  My principal role was to run the Fair Credit
2  Reporting Act program for the FTC, so that involved
3  both overseeing the attorneys who would investigate
4  and work up cases against a variety of companies for
5  potential violations of the FCRA.
6      We worked on guidance pieces to industry and
7  to consumers and also helped finish up the FACTA
8  rule-makings that were still in process when I got
9  there.
10      Q.  You mentioned that you were involved in
11  investigations.  Is it fair to say that that was of
12  consumer reporting agencies?
13      A.  Yes, of the consumer reporter agencies, but
14  also users of consumer reports, for example, for
15  failing to provide adverse action notices that they
16  were required to provide under the FCRA.  But largely
17  it was looking at companies who dealt with data and
18  largely consumer reporting agencies.
19      Q.  What is the 40 Years Report?
20      A.  The 40 Years Report is a staff report that
21  took into account the earlier FCRA commentary that had
22  been prepared by the Federal Trade Commission as well
23  as many of the intervening opinion letters that were
24  written by staff, other guidance or informal guidance
25  that the agency had put together.  So it's a

Page 17

1  compilation of that put together by the staff.  So
2  it's written as a staff report.
3      Q.  When was it issued?
4      A.  It was issued in 2011, I believe, right
5  around the time -- just before I left the FTC.
6      Q.  And you helped develop the report, correct?
7      A.  Yes.
8      Q.  What specifically was your involvement?
9      A.  I was the supervisor.  So as an assistant
10  director, I worked with staff, helped them with the
11  drafting of the report, reviewing the drafts,
12  conferring with management on various issues, as the
13  report was presented to the commission to be approved
14  for release.
15      Q.  And you mentioned kind of working more so in
16  compliance now.  Is it fair to say that you serve as a
17  consultant for consumer reporting agencies on hand?
18      A.  I'm still counsel.  And I say that because
19  there are folks who style themselves as compliance
20  consultants who help with, like, day-to-day drafting
21  of policies, procedures, et cetera.
22      I see my role as, in many ways, sort of
23  their external/internal counsel to help them answer
24  questions or resolve ambiguities in the law, to work
25  through good procedures on how to move their



Cooper v.
Milliman

Case 2:23-cv-00028-JES-NPM     Document 83-2     Filed 11/22/24     Page 8 of 34 PageID
964

Videorecorded Videoconference Deposition of Rebecca Keuhn
Milliman

Page 18

1   compliance forward.
2       Q.  When did Milliman first contact you to
3   discuss being their expert?
4       A.  I believe it was just shortly after
5   receiving Mr. Hendricks' report, so I want to say
6   that's November of '23.
7       Q.  When -- sorry.
8           Has Milliman ever asked you to be their
9   expert for any other matter?
10      A.  Yes.
11      Q.  What cases were those?
12      A.  I served as an expert for Milliman in a case
13  that was pending out in Seattle, Washington.
14  Plaintiff's name was Collins.
15      Q.  And do you recall the names of the other
16  cases in which you have served as an expert?
17      A.  For Milliman?
18      Q.  Outside of Milliman.
19      A.  Outside of Milliman.  I identified a few of
20  those in my report, and I'm trying to think if there
21  were any others.  The ones that I have been deposed in
22  are identified in my report.
23          I have served as an expert for a company
24  called RealPage, which is a tenant screening company.
25  I have, on occasion, served as an expert for Experian.

Page 19

1   I served as an expert for -- it's now -- it's now
2   HireRight, but formerly GIS, which is a background
3   screening company.
4           Those are ones that immediately come to
5   mind.  I know there are others.
6       Q.  So the cases in your report, Collins v.
7   Milliman, Duane E. Norman, Sr. v. TransUnion, In Re:
8   Capital One Consumer Data Security Breach, Theresa
9   Hill v. LexisNexis Risk Solutions, and Kelly v.
10  RealPage, were those the ones in which you were
11  deposed in?
12      A.  Yes.
13      Q.  Okay.
14      A.  Or otherwise provided testimony, as in the
15  Collins case.
16      Q.  Okay.  And you were not involved in the
17  Duane Cooper v. Milliman matter.  Is that correct?
18      A.  That's correct.
19      Q.  Were you involved in the Healy v. Milliman
20  matter?
21      A.  No.
22      Q.  Okay.  In each of the cases in which you
23  have served as an expert, were you hired by the
24  defendant?
25      A.  Yes.

Page 20

1       Q.  Can you recall how many expert reports you
2   have prepared to date?
3       A.  Again, I don't have a precise number.  I
4   would imagine it's more than 15.
5       Q.  Okay.  And were all of those expert reports
6   relating to the Fair Credit Reporting Act?
7       A.  Yes.  And I hesitate because at least one
8   expert report I had related more toward oversight of
9   service providers and general procedures for engaging
10  in overseeing service providers, but it was in the
11  context of a case that involved the FCRA, a commercial
12  dispute.
13      Q.  Do you have any experience related to the
14  medical field?
15      A.  I work with companies who involve -- who are
16  using medical information in a variety of ways.
17          While I was at the FTC, we also head started
18  the rule-making for the HITECH rule, which related to
19  the security of medical information when it's in
20  someone other than a health care provider.
21      Q.  So is it fair to say, then, that that
22  experience also relates to reviewing medical records?
23      A.  I would say my experience is more related to
24  the laws that are applicable to ensuring security and
25  privacy of medical information more so than the

Page 21

1   medical records themselves.
2       Q.  Do you have any experience with reviewing
3   medical claims data?
4       A.  Only in connection with earlier litigation
5   earlier in my career.
6       Q.  Okay.  Do you have any experience with
7   prescription or pharmacy records?
8       A.  Again, nothing -- nothing outside of my own
9   personal experience either in earlier litigation I
10  handled, personal injury-type cases, and then of
11  course working with my own medical information.
12      Q.  Okay.
13          (Document was displayed.)
14  BY MS. CZABAJ:
15      Q.  All right.  Can you see the document on your
16  screen?
17      A.  Yes.
18      Q.  Okay.  I have now placed on the screen what
19  I'm designating as Plaintiff's Exhibit 1.
20          Have you seen this document before?
21      A.  Do you mind if we flip through it?
22      Q.  Of course.  Let me know if you need me to
23  scroll faster, slower, or zoom in at all.
24      A.  You can scroll to the end, then I'll just
25  make sure it's a complete copy.

Page 22

1    Thank you.
2    Q.   So have you seen this document before?
3    A.   Yes.
4    Q.   Are you familiar with this document?
5    A.   Yes, I am.
6    Q.   What is this document?
7    A.   This appears to be a copy of the expert
8    report that I prepared in this case.
9    Q.   Okay.  And when did you prepare this report?
10   A.   It was shortly after I was contacted by
11   Mr. Wells and provided with a copy of Mr. Hendricks'
12   report and all of the related documents.
13       Given the date, I would say it's probably
14   the last couple weeks of November.
15   Q.   Okay.  And how many drafts did you prepare
16   of this report?
17   A.   I don't recall how many drafts.  There were
18   at least probably three or four.
19   Q.   Did Mr. Wells or any of the other defense
20   attorneys in this case play any role in preparing your
21   expert report?
22   A.   No.  Obviously I discussed my report and
23   what I intended to cover in my report with Mr. Wells,
24   but the drafting of the report is my own.
25   Q.   Does your expert report contain all of your

Page 23

1    expert opinions in this matter?
2    A.   Yes.
3    Q.   Are there any assumptions that you made in
4    this case?
5    A.   No.  I believe I received all the
6    information I needed in order to render the opinions I
7    offered.
8    Q.   Okay.  Throughout your expert report, you
9    cite to an interview with Joel Strassburg.  Is that
10   correct?
11   A.   Yes.
12   Q.   And who is that?
13   A.   He is employed by Milliman and helped me
14   understand their process for preventing reinsertion of
15   records within the system.
16   Q.   Okay.
17   A.   As well as information.
18   Q.   What day did the interview take place?
19   A.   I believe I identified in my report.  It
20   probably would have been toward the end of
21   November/beginning of December.
22   Q.   How long did the interview last?
23   A.   My recollection, it was probably about an
24   hour.
25   Q.   Was the interview by phone, Zoom, or in

Page 24

1    person?
2    A.   Zoom.
3    Q.   Was there anyone else present for the
4    interview?
5    A.   Yes.  Mr. Wells.
6    Q.   Anyone else?
7    A.   I don't recall.  I might have had my
8    colleague, Mr. Estevez, on the call, but I can't
9    recall that for sure.
10   Q.   Okay.  Was the witness under oath during
11   this interview?
12   A.   No.
13   Q.   And who was asking him the questions?
14   A.   I was.
15   Q.   Was the interview audio recorded?
16   A.   No.
17   Q.   Was the interview videorecorded?
18   A.   No.
19   Q.   Was the interview transcribed?
20   A.   No.
21   Q.   Did you take any notes during the interview?
22   A.   Yes.
23   Q.   Is there any other record of the interview
24   occurring or what was discussed?
25   A.   I'm not aware of any other record.

Page 25

1    Q.   During the interview, did the witness look
2    at any documents?
3    A.   Yes.
4    Q.   What documents did he look at?
5    A.   They were documents that had been produced
6    in this case that were relevant to the mechanics of
7    preventing the reinsertion of records.
8    Q.   Now I'm going to scroll down to page 13 here
9    of your expert report.  You see the page number there
10   is 13 at the bottom.
11       And in here and on to the next page, you
12   quote a communication from Anthem to Milliman,
13   correct?
14   A.   Yes.
15   Q.   And Milli -- or -- and Anthem is the
16   provider of the information that Milliman reported
17   about Ms. Cooper.  Is that correct?
18   A.   It's my understanding they were the source
19   of the information that's at issue in this lawsuit.
20   Q.   Okay.  The communication quoted states that
21   "There was a mismatch in Zip and SSN but the threshold
22   was in...acceptable range because of the uniqueness of
23   this member information against all of Anthem owned
24   data," correct?
25   A.   That's what it says.

Page 26

1    Q.   And then you state that Mr. Hendricks did
2   not identify what was unreasonable about the match in
3   this case.  Is that correct?
4    **A.   Yes.**
5    Q.   So what would make a match reasonable?
6    **A.   When you're trying to figure out how to**
7   **identify records to a particular consumer, there are a**
8   **number of factors.**
9        **One is what information do you have about**
10  **the consumer, so what's the identifying information**
11  **you've been provided?**
12       **Second is what is the identifying**
13  **information that's within the source that you're**
14  **looking to match against?**
15       **And how you sort of measure that information**
16  **against each other.**
17   Q.   Okay.  And in this communication, it said
18  "acceptable range."
19       Do you know what the acceptable range was in
20  this case?
21   **A.   I do not.  It's my understanding Anthem has**
22  **a proprietary matching process, and this statement**
23  **appears to be based on what their matching process**
24  **involves.**
25   Q.   In footnote 89 here, there are a couple

Page 27

1   items cited to that essentially say that while Social
2   Security numbers are important for data matching, CRAs
3   should not rely on it completely and that CRAs should
4   not use an SSN as the sole factor when matching.  Is
5   that correct?
6    **A.   Yes, that's what that footnote says.**
7    Q.   Are you aware of any CFPB opinions, case
8   law, et cetera, that states a CRA should not use a
9   Social Security number for matching purposes?
10   **A.   Aside from the Rhode Island statute that**
11  **prohibits you to use that as a sole factor, I'm not**
12  **aware of any guidance that says don't use Social**
13  **Security numbers for matching.**
14       **I am aware of guidance, as I point out in**
15  **the report, that talks about either using it as a sole**
16  **factor or relying on it solely.**
17   Q.   Okay.  So, then, is it useful for CRAs to
18  use Social Security numbers within their matching
19  logic?
20   **A.   Again, that depends on the nature of the**
21  **data that you're seeking to match to.  So in public**
22  **records, for example, there often are no Social**
23  **Security numbers or Social Security numbers I would**
24  **say in less than 10 percent of any records.**
25       **So having a Social Security number may not**

Page 28

1   be helpful in that regard.  Again, it depends on the
2   data that you're seeking to match to and how that
3   matching is done.
4    Q.   If I told you that the first five digits of
5   Plaintiff's and the other Barbara Cooper's Social
6   Security number matched, would you say that that was a
7   reasonable match?
8        MR. WELLS:  Object to form.
9        **THE WITNESS:  Again, that's not enough,**
10  **really, facts to know for sure.  Again, you'd have to**
11  **know what are the available pieces of information?**
12  **How was the matching done?  What weight different**
13  **things were given.**
14  BY MS. CZABAJ:
15   Q.   Similarly, if I told you that the last
16  four digits of Plaintiff's and the other Barbara
17  Cooper's Social Security number were not a complete
18  match, would you say that this was a reasonable match?
19       MR. WELLS:  Object to form.
20       **THE WITNESS:  Again, it really depends on**
21  **the circumstances and the nature of the data.  As you**
22  **know, the F -- FACTA report notes, there are sometimes**
23  **issues with Social Security numbers, fat finger**
24  **matches, et cetera, things that get mixed up, and**
25  **matching requires more than just looking at a single**

Page 29

1   piece of data.
2   BY MS. CZABAJ:
3    Q.   Okay.  And are you able to put a number on
4   how many digits of a Social Security number would have
5   to match for it to be reasonable?
6    **A.   No.**
7    Q.   Are you aware of how many digits matched
8   between Plaintiff and the other Barbara Cooper for the
9   Social Security number?
10   **A.   I am not.**
11   Q.   Is it possible for two people to have the
12  same first name and the same last name?
13   **A.   Yes.**
14   Q.   Is it possible for two people to have the
15  same date of birth?
16   **A.   Yes.**
17   Q.   Is it possible for two people to have the
18  same first name, last name, and date of birth?
19   **A.   Yes, I imagine so.**
20   Q.   Is it possible for two people to have the
21  same first name, last name, date of birth, and also
22  live within the same ZIP Code?
23   **A.   Yes, that's possible.**
24   Q.   Is it possible for two people to have the
25  same first name, last name, date of birth, gender, and



Page 30

1   also live within the same ZIP Code?
2       **A.  Again, that's possible.**
3       Q.  Is it fair to say that the foregoing
4   situations are more likely for those who have common
5   names?
6           MR. WELLS:  Object to form.
7           **THE WITNESS:  Again, I haven't looked at any**
8   **sort of statistics on this, but I would imagine so.**
9   BY MS. CZABAJ:
10      Q.  What should a CRA do, then, to adequately
11  distinguish between two individuals when there's a
12  common name involved?
13          MR. WELLS:  Object to form.
14          **THE WITNESS:  There are a number of**
15  **different approaches that consumer reporting agencies**
16  **can take with respect to the issue of common names.**
17  **In one, as we mentioned, you know, using a Social**
18  **Security number, which tends to be a more unique**
19  **identifier than just date of birth, for example.**
20  **Using that information in connection with other**
21  **information.**
22          **There are other sort of logical checks that**
23  **you can do.  Do the records sort of relate to other**
24  **records, for example.  I've seen different --**
25  **different procedures for different types of consumer**

Page 31

1   **reporting agencies depending on what information they**
2   **have overall to use for matching.**
3   BY MS. CZABAJ:
4       Q.  Could consumer reporting agencies have
5   procedures that determine what is considered a common
6   name?
7       **A.  Again, it depends on the type of consumer**
8   **reporting agency.  I would say having a process that**
9   **flags where there are common names is more common in**
10  **consumer reporting agencies that don't have Social**
11  **Security number information, like background**
12  **screeners.  A number of background screeners have**
13  **particular processes to help flag common names and**
14  **apply stricter matching criteria, particularly in the**
15  **area of public records.**
16          **It's less common in consumer reporting**
17  **agencies that have other identifying information like**
18  **Social Security numbers or other types of unique**
19  **information, because they have other things to counter**
20  **the common name issue.**
21      Q.  Is it reasonable for a CRA to require an
22  additional identifier to match if the individual has a
23  common name?
24      **A.  Again, it really depends on the nature of**
25  **the data being matched and what other elements of**

Page 32

1   **information that a consumer reporting agency has.**
2       Q.  What other criteria can CRAs use to match
3   information to individuals?
4       **A.  Depending on the nature of the data that's**
5   **involved.  For example, a payment processing type**
6   **consumer reporting agency will often use account**
7   **number and routing number to identify a particular**
8   **consumer's account for purposes of returning records.**
9           **In the employment area, they might get**
10  **additional information about the consumer's address**
11  **history or specific street address history.  That's**
12  **also commonly used by tenant screening companies to be**
13  **able to identify prior property records associated**
14  **with a consumer.**
15      Q.  We discussed first and last name before.
16          Could CRAs also use middle names?
17      **A.  They could, depending on whether the source**
18  **has the middle name or middle initial in it.**
19      Q.  Could CRAs use suffixes?
20      **A.  Yes.**
21      Q.  Are there any other kinds of identifiers
22  that CRAs could use to match information to
23  individuals?
24      **A.  Again, I think it's going to depend on the**
25  **nature of the information being matched and how the**

Page 33

1   **matching process is implemented.**
2       Q.  Milliman uses first names, last names,
3   Social Security numbers, dates of birth, gender, and
4   ZIP Codes to match.  Is that correct?
5           MR. WELLS:  Object to form.
6           **THE WITNESS:  That is the information I**
7   **understand that Milliman obtains from its customers,**
8   **and it uses that information to obtain information**
9   **from a variety of sources.**
10          **In some instances, I understand Milliman**
11  **does the matching or runs its own sort of matching**
12  **logic.**
13          **With respect to the source here, Milliman**
14  **passed along that PII identifying information to the**
15  **source, for the source to identify which records**
16  **related to the individual.**
17  BY MS. CZABAJ:
18      Q.  We just went over a handful of other
19  identifiers that CRAs can use to match an individual.
20  Is it fair to say that Milliman could be using more
21  criteria for matching than it does?
22          MR. WELLS:  Object to form.
23          **THE WITNESS:  I guess anything is possible.**
24  **These are the elements that it's chosen and it has**
25  **determined are the types of information that the**

Page 34

1  sources from which it obtains data need in order to
2  identify records related to a particular consumer.
3  BY MS. CZABAJ:
4      Q.  Does Milliman require a full ZIP Code to
5  match?
6      A.  Again, I think it depends on the source.
7  Here, as I understand it, it provided a full ZIP Code
8  to the source of the data, who is the one that did the
9  matching and returned records related to the consumer.
10     Q.  Do you agree or -- sorry.
11         Does Milliman require a full Social Security
12 number match?
13         MR. WELLS:  Object to form.
14         THE WITNESS:  I'm not familiar with its
15 processes for matching other records.  My focus on
16 here was the information obtained from Anthem.  It's
17 my understanding it provided a full Social Security
18 number to Anthem.
19 BY MS. CZABAJ:
20     Q.  Is the last name Cooper common?
21         MR. WELLS:  Objection.
22         THE WITNESS:  I have no opinion on that.
23 BY MS. CZABAJ:
24     Q.  Would you agree that Barbara Cooper is a
25 common name?

Page 35

1          MR. WELLS:  Object to form.
2          THE WITNESS:  Again, I have no basis for
3  making that assumption one way or the other.
4  BY MS. CZABAJ:
5      Q.  In your experience, do consumer reporting
6  agencies that use data sources -- so, for example,
7  Anthem -- have knowledge of the matching criteria or
8  logic that is being used to make those matches?
9      A.  In my experience, where you're obtaining
10 information from certain sources upon an authorization
11 by a consumer, it may or may not.
12         In this instance, Anthem locates records
13 itself, searching its own system and applying its own
14 matching logic to return records to Milliman based on
15 the consumer's authorization.
16     Q.  How do CRAs typically get knowledge of the
17 data source's matching logic?
18     A.  You're assuming that they always know what
19 the matching logic is, but as I understand it,
20 Milliman here worked with this source to sort of test
21 and verify their data as they brought them on as the
22 source of data in their system; and they routinely
23 monitored their hit rates and looked for issues and
24 disputes and had conversations with the data source to
25 discuss any issue related to matching or otherwise.

Page 36

1      Q.  Is it reasonable for a CRA to blindly rely
2  upon a data furnisher if it does not know how that
3  data source matches information to consumers?
4          MR. WELLS:  Object to form.
5          THE WITNESS:  Your question has a couple of
6  assumptions in there, so let me answer it in part.
7          First is when you're dealing with a source
8  of data that's returning requests about a particular
9  identifying consumer, it is not always common that you
10 know how they do that.
11         So, for example, if I'm an employment
12 screening company and I go to an employer and I ask
13 for records about Jeffery Wells, and I give his Social
14 Security number and his stuff trying to find out his
15 employment history, I don't know specifically how that
16 employer is looking up in their systems Jeffrey's
17 prior history and returning that to me.  I would not
18 have a reason to know that.  I'm trusting on the fact
19 that I've asked for his specific information, that
20 that's what I'm going to get returned.
21         Similarly, when you do a verification of
22 education and you go either to the educational
23 institution or to the clearinghouse that they have,
24 you send them the identifying information that they
25 need in order to locate the record, and you're

Page 37

1  trusting that they have got the right process to send
2  you back the correct information.
3          Similarly here, when Milliman made a request
4  to Anthem, it sent the PII that it had, the first
5  name, last name, Social Security number, gender, date
6  of birth, ZIP Code, and trusted Anthem, essentially,
7  to give it the right information.
8  BY MS. CZABAJ:
9      Q.  Are you aware that Ms. Bolduc -- I think I'm
10 saying her name right -- testified that Anthem did not
11 provide Milliman with a copy of its matching logic?
12         MR. WELLS:  Object to form.
13         THE WITNESS:  I don't recall that
14 specifically.  As I remember, Ms. Bolduc was deposed
15 after I prepared my report.  I understand she's been
16 deposed recently.  I don't remember if I saw anything
17 about that specific question.
18 BY MS. CZABAJ:
19     Q.  Are you aware that Ms. Bolduc also testified
20 Milliman has not been given insights into Anthem's
21 full logic?
22     A.  Again, I don't remember that specific
23 testimony.
24     Q.  Are you aware that Ms. Bolduc testified that
25 Milliman has not asked Anthem for a copy of its



Page 38

1 policies and procedures?
2 　　　MR. WELLS:  Object to form.
3 　　　THE WITNESS:  Same answer.
4 BY MS. CZABAJ:
5 　　Q.  Are you aware that Ms. Bolduc testified
6 Milliman doesn't know where Anthem gets its data?
7 　　　MR. WELLS:  Object to form.
8 　　　THE WITNESS:  Again, I'm not familiar with
9 that testimony.
10 　　　Can we take a quick break?
11 　　　MS. CZABAJ:  Of course.  Is five minutes
12 okay?  Ten minutes?
13 　　　THE WITNESS:  I just need one minute.  The
14 lights in my office went off, because they go off
15 automatically if I don't move enough.
16 　　　MS. CZABAJ:  Okay.
17 　　　THE WITNESS:  Thank you.
18 BY MS. CZABAJ:
19 　　Q.  Ready to begin again?
20 　　A.  Yes.
21 　　Q.  Great.
22 　　　So you also state in your report that
23 Milliman's policy of monitoring hit rates is well
24 within the bounds of what is reasonable in the
25 industry and what is expected by regulators.

Page 39

1 　　　How do you know that?
2 　　A.  So the process of monitoring the data you're
3 receiving from a data source, whether it's a furnisher
4 or other type of data source, making sure you're
5 getting consistent data, that you're getting
6 consistent responses to data, that there don't seem to
7 be outliers, as well as monitoring disputes, which
8 they also do, are some pretty standard procedures used
9 by consumer reporting agencies in assessing the
10 quality of the sources of data that they're receiving.
11 　　Q.  In preparing your expert report, did you
12 review any of Milliman's data pertaining to hit rates
13 for Anthem?
14 　　A.  I remember discussing it with
15 Mr. Strassburg.  I don't remember the specific hit
16 rates, but I do recall that there was a process during
17 the onboarding of Anthem as a data source to review it
18 at that time and that they do regularly review these
19 on a periodic basis.
20 　　Q.  And throughout your report, you seem to
21 distinguish between Milliman and nationwide CRAs.
22 What is a nationwide CRA?
23 　　A.  So a nationwide consumer reporting agency,
24 which is defined under the Fair Credit Reporting Act
25 as a consumer reporting agency that has essentially

Page 40

1 credit history information from consumers on a
2 nationwide basis that is provided from furnishers and
3 maintained in a database and also has public record
4 information.
5 　　Q.  If Milliman is not a nationwide CRA, what
6 kind of CRA is it?
7 　　A.  It is a consumer reporting agency as that
8 term is defined under the Fair Credit Reporting Act.
9 So the Fair Credit Reporting Act defines "consumer
10 reporting agency," and then it has some
11 sub-definitions.  So there are certain CRAs who are
12 resellers, there are certain CRAs who are nationwide
13 consumer reporting agencies, and other CRAs who are
14 nationwide special consumer reporting agencies.  Here,
15 these -- then there's -- everybody else is just a
16 consumer reporting agency.
17 　　Q.  Okay.  So Milliman is not a nationwide
18 specialty CRA.  Is that correct?
19 　　A.  It's not an issue I was asked to opine.  I'm
20 trying to remember the precise categories from the
21 definition.  I memorized a lot of the FCRA, but that
22 one is not immediately in my head.
23 　　　I know it covers employment history, and I
24 believe it also covers medical history.  So they may
25 be a nationwide specialty CRA, but I don't know that

Page 41

1 off the top of my head.
2 　　Q.  Okay.
3 　　A.  It may also depend on whether or not they
4 maintain the information in a database.
5 　　　So as I mentioned with the nationwide
6 consumer reporting agencies, or the NCRAs, they sell
7 credit reports, but the big distinguishing factor is
8 that they maintain that information in a database,
9 whereas like a credit report reseller, it also sells
10 credit reports, but it's not maintaining that
11 information in a database.  It wouldn't be a
12 nationwide.
13 　　　And I believe with the definition of
14 "nationwide specialty," again, I haven't been
15 designated on the topic here, but I believe it also
16 requires that you're maintaining that information in a
17 database.
18 　　Q.  Okay.  And does 15 USC Section 1681e(b)
19 distinguish at all between the different kinds of
20 CRAs?
21 　　A.  No.  That provision generally talks about
22 reasonable procedures to assure maximum possible
23 accuracy.
24 　　Q.  Okay.  So, then, it's fair to say regardless
25 of what kind of CRA you are, you have the same duties



Page 42

1 under that section. Is that correct?
2    A. You have the same legal responsibilities.
3 How you accomplish that, again, because we're dealing
4 with a question of reasonableness, really depends on
5 the type of data you hold and what kind of business
6 you are.
7    Q. So in this bottom paragraph here -- this is
8 what I'm looking at -- you state that "Milliman
9 obtains information from data sources only when a
10 report is requested on a particular consumer."
11      Is that what you mean by "doesn't maintain
12 some active file"?
13    A. Correct. That rather than pulling data from
14 a file, that it maintains as its -- at -- once it's
15 requested for a report, it goes to its variety of
16 sources. It says, hey, I need to get information for
17 purposes of preparing a report on a particular person.
18    Q. And you state that because of this, that
19 Milliman would not have information that would enable
20 it to identify false positive matches. Is that
21 correct?
22    A. That's -- that's correct. In other words,
23 it doesn't have its own source of truth within its own
24 database as to whether or not information it's getting
25 may or may not be a false positive match.

Page 43

1    Q. What do you consider a data source?
2    A. Data source is the -- is the -- where the
3 information that is put into a consumer report, where
4 it was obtained from. So it could be a court. It
5 could be -- here it was, you know, pharmacy benefit
6 managers as well as other sort of insurance claims
7 source of information.
8      You could have -- for other consumer
9 reporting agencies, depending on what they're looking
10 at, like an employment one, it may be verifications of
11 employment they obtained from individual employers.
12 It may be a report they request from another CRA, all
13 of those different varieties of information that you
14 use, although those are sources of information.
15    Q. Okay. And so here Anthem would be the data
16 source that we're talking about. Is that correct?
17    A. Yes.
18    Q. And then because Milliman gets information
19 from Anthem, it would have no way to determine if
20 there is a false match, correct?
21    A. It doesn't have its own information about a
22 consumer to say, oh, Anthem's information is or isn't
23 about the correct consumer. It has to rely, based on
24 the nature of the relationship here and the nature of
25 the data, on Anthem to locate and identify the

Page 44

1 information about the consumer on whom they have
2 submitted a request.
3    Q. So Milliman would not be able to tell if a
4 consumer's Social Security number did not match the
5 records it received. Is that correct?
6      MR. WELLS: Object to form.
7      THE WITNESS: Milliman wouldn't have its own
8 source of a Social Security number or other indicia,
9 whether or not certain records logically matched the
10 consumer. It doesn't have that sort of basic
11 information that would enable it to do some sort of
12 error checking.
13      So the contrast, for example, the nationwide
14 CRAs get regularly furnished files from multiple
15 sources. They maintain pretty robust information on
16 each consumer on whom they maintain a file. And so
17 when they get new sources of information, they can run
18 additional checks to say "This looks like the right
19 consumer" or "There's something in this data that
20 doesn't make sense. We need to flag that."
21 BY MS. CZABAJ:
22    Q. But wouldn't the end user also be considered
23 a source of the Social Security number? So, for
24 example, here, AETNA would have provided the Social
25 Security number to Milliman, the same way that Anthem

Page 45

1 is providing the information to Milliman?
2    A. The user here provided the information in
3 order to make the inquiry, and Milliman used that
4 information in sending out its request to its various
5 data sources to obtain information on this consumer.
6    Q. So, then, is it fair to say that AETNA would
7 have also been a source of this information that
8 Milliman could have compared with?
9      MR. WELLS: Object to form.
10      THE WITNESS: I'm not sure I understand your
11 question.
12 BY MS. CZABAJ:
13    Q. So if Milliman is getting the inquiry from
14 the end user and it has that Social Security number in
15 there, wouldn't that be a source separate from Anthem
16 of the Social Security number?
17    A. Yes.
18    Q. Okay. So knowing that, how can it be that
19 Milliman has no way to determine whether or not the
20 data source made a mistake?
21    A. In this instance, Milliman provided the
22 Social Security number, along with the other
23 identifying information about the consumer, to Anthem.
24 Anthem went through its system and identified the
25 records that it believed were responsive to the



Page 46

1  request and provided those responses back to Milliman.
2      Q.  So couldn't Milliman have used the Social
3  Security number AETNA gave it to compare with the
4  records Anthem provided it to see if there was a
5  Social Security number match?
6      MR. WELLS:  Object to form.
7      THE WITNESS:  Here they relied on Anthem to
8  return records about the correct consumer having
9  provided Anthem with the Social Security number.  So
10  upon the receipt of the records, they made their
11  assumption, based on their process, that these are
12  records that related to this consumer.
13  BY MS. CZABAJ:
14      Q.  Okay.  So instead of comparing the Anthem
15  information with what AETNA provided them, they simply
16  relied on Anthem.  Is that correct?
17      MR. WELLS:  Object to form.
18      THE WITNESS:  Yes, largely.  They do some
19  other error checking when data comes in, but, again,
20  they relied on Anthem to return records about the
21  consumer from whom they had obtained permission to get
22  their medical records.
23  BY MS. CZABAJ:
24      Q.  Okay.  You mentioned other error checking.
25  What other error checking are you referring to?

Page 47

1      A.  So as they're getting the data in, obviously
2  they're making sure the data comes in in the right
3  format and in order to be able to electronically
4  dedupe and synthesize that data for purposes of their
5  report.  So say if they put a request out to a
6  particular source and these things go through an XML
7  process, if things are all in the wrong field, the
8  system would automatically error out.
9      Q.  Are you aware that the raw data from Anthem
10  in this matter did not have a Social Security number?
11      A.  I have not reviewed the raw data in this,
12  but based on my conversations with Mr. Strassburg, I
13  understand they have copies of it.
14      Q.  Are you aware that the raw data showed that
15  the ZIP Code did not match Plaintiff's?
16      A.  I don't recall that specifically.  And I
17  don't -- again, I don't recall reviewing the raw data
18  specifically.
19      Q.  Were you aware that there are instances on
20  Ms. Cooper's report where Milliman reported that she
21  was receiving treatment in Georgia and Florida on the
22  same day at locations that are just under 500 miles
23  apart?
24      A.  I recall that there were -- there was some
25  data like that on her report, yes.

Page 48

1      Q.  Could that have also alerted Milliman to the
2  potential of a mix here?
3      MR. WELLS:  Object to form.
4      THE WITNESS:  Again, it may or may not have.
5  Some medical records, when they talk about who your
6  provider is, may be keyed to a key office or head
7  office, not necessarily to where the services were
8  provided.  So without knowing more, I wouldn't be able
9  to tell you -- answer your question.
10  BY MS. CZABAJ:
11      Q.  Could this have also alerted Milliman to the
12  fact that the data from Anthem may not be reliable?
13      MR. WELLS:  Object to form.
14      THE WITNESS:  Again, one of their processes
15  for maintaining -- you know, monitoring their data
16  sources is to look at disputes like the one that the
17  plaintiff made here and to assess that with respect to
18  the various sources of data, and had done a variety of
19  checks and source -- and reviews of the data they were
20  receiving prior to this.  And this would be something
21  that they would raise and discuss with Anthem on an
22  ongoing basis to ensure that the quality of data
23  they're getting meets their needs.
24  BY MS. CZABAJ:
25      Q.  I don't think that exactly answered my

Page 49

1  question.
2      My question is the reporting of treatment in
3  two different states at locations about 500 miles
4  apart, couldn't that have alerted Milliman to the fact
5  that the data it received from Anthem was not reliable
6  before any dispute happened?
7      MR. WELLS:  Object to form.
8      THE WITNESS:  Again, I'm not sure it would,
9  standing alone.  As I mentioned, there may be a
10  variety of reasons why you would see treatment coming
11  from providers in different locations around the same
12  time.  So standing alone, I don't know that it
13  necessarily would have put them on notice.
14  BY MS. CZABAJ:
15      Q.  I think you mentioned this a little bit
16  earlier.  So I'm looking at page 15 now of your expert
17  report, and you talk about the employment screening
18  sector, how if a CRA wants to verify education, it
19  might send a request to a clearinghouse.
20      What is a clearinghouse?
21      A.  It's my understanding that the universities,
22  rather than having to receive all of these requests
23  directly, have worked together to form a clearinghouse
24  so that the clearinghouse can receive and respond to
25  requests for education verification rather than each



Page 50

1  of them having to stand up an office to handle those.
2      Q.   How is this distinguishable from a data
3  source, if it even is?
4      A.   In this instance, because other CRAs rely on
5  that information, it is a data source to those CRAs.
6  So employment screening companies who are looking to
7  include in a background check the fact that they
8  verified someone's education, the source for that data
9  will be the clearinghouse, potentially, or depending
10 on how the relationship is set up, they may be acting
11 as an agent for a particular university and responding
12 on behalf of that university.
13     Q.   Okay.  So let's say a consumer reporting
14 agency for an employer sends a request to a
15 clearinghouse about a John Smith who's born on
16 January 1st of 1990 and lives in a ZIP Code 12345,
17 with a Social Security number of 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, and the
18 clearinghouse returns information concerning a John
19 Smith born on January 1st of 1990 from a ZIP Code of
20 12399 and with a Social Security number of
21 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.
22     Do you agree that this is not a match?
23     MR. WELLS:  Object to form.
24     THE WITNESS:  It may or may not be.  As I
25 mentioned, Social Security number may not always be

Page 51

1  the best matching, depending on if there was an error
2  in the original Social Security number.
3      Second, the change in the ZIP Code, when
4  you're dealing with employment verification, wouldn't
5  be surprising.  Not many of us live in the same ZIP
6  Code as we lived in when we went to whatever
7  educational institution we went to.
8      So that mismatch, again, you'd have to sort
9  of look at all of the data that's returned, and you'd
10 have to understand, you know, if there are any other
11 reasons why this data may be discrepant.
12     Q.   Okay.  Setting the ZIP Code aside, the
13 two Social Security numbers that I made up for this
14 example only have three digits in common.  So based on
15 that, would you agree that it's not a match?
16     MR. WELLS:  Object to form.
17     THE WITNESS:  Again, without knowing more
18 about the data, I wouldn't be able to tell you that.
19 BY MS. CZABAJ:
20     Q.   Okay.  Would it be reasonable for a consumer
21 reporting agency to include that record in the
22 employment purpose consumer report?
23     MR. WELLS:  Object to form.
24     THE WITNESS:  Again, it depends on the
25 circumstances.  So if I had gone to a university and I

Page 52

1  said, "I'd like records about Jeffery Wells.  Here is
2  all his identifying information," and they sent me
3  back.  Everything else seemed to match.  You know, his
4  employment history, et cetera, and -- but the Social
5  Security number was different, it may still be a
6  reasonable match depending on what I received within
7  the records.
8  BY MS. CZABAJ:
9      Q.   Below that on page 15, you mentioned the FTC
10 enforcement case that Mr. Hendricks talks about in his
11 expert report.
12     A.   Yes.
13     Q.   And you state that while -- or -- sorry.
14     You state that FTC consent orders often
15 require compliance with the FCRA generally, and so
16 they'll enumerate certain provisions even when those
17 provisions were not issued in the underlying
18 enforcement action.  Is that correct?
19     A.   That's correct.
20     Q.   Do you agree that a consent order doing that
21 would still put a CRA on notice of what is reasonable?
22     MR. WELLS:  Object to form.
23     THE WITNESS:  Yes, so that the order here
24 basically says comply with the FCRA insofar that you
25 need to have reasonable procedures to assure maximum

Page 53

1  possible accuracy.
2      As I recall, the consent order doesn't have
3  any sort of additional detail about what it means to
4  comply with that.
5      MS. CZABAJ:  I think now is a good stopping
6  point if you want to take a five-, ten-minute break
7  and then come back.  Let's say, I guess, 11:40
8  Pacific, if that works for everyone?
9      MR. WELLS:  Good.
10     MS. CZABAJ:  Okay.  Thanks.
11     (Recess ensued from 2:30 to 2:42 p.m. EDT.)
12 BY MS. CZABAJ:
13     Q.   So I've got Plaintiff's Exhibit 1 back on
14 the screen, your expert report.
15     In this case, Plaintiff disputed
16 approximately 1,200 inaccuracies with Milliman.  Is
17 that correct?
18     MR. WELLS:  Object to form.
19     THE WITNESS:  I don't recall the count of
20 the records, but I knew there were a number of them.
21 BY MS. CZABAJ:
22     Q.   Okay.  And there is no dispute that those
23 1,200 or so inaccuracies were deleted by Milliman
24 after reinvestigating her dispute, correct?
25     A.   That's correct.



Page 54

1    Q.   And it's also not disputed that the second
2    report about Plaintiff also contained inaccuracies,
3    specifically concerning certain prescription records,
4    correct?
5         MR. WELLS:  Object to form.
6         **THE WITNESS:  That's correct.  It's my**
7    **understanding that following a subsequent dispute,**
8    **those records were removed.**
9    BY MS. CZABAJ:
10   Q.   At the bottom of page 15, though, you state
11   that Milliman's procedure to block information that
12   was previously removed from its consumer reports
13   worked as intended.  Are you saying that Milliman's
14   procedures intended for it to allow the continuing of
15   mixing another consumer with Ms. Cooper?
16        **A.   You're mixing two responsibilities here.  So**
17   **let me clarify.**
18        **First, there's the responsibility to remove**
19   **information that was previously disputed from**
20   **reappearing on a future report.  That process, which I**
21   **think we just discussed, worked as designed.  Those**
22   **records that were disputed did not appear on a future**
23   **report.**
24        **In addition, Milliman has a process when it**
25   **identifies categories of records, like it did here,**

Page 55

1    **with an inaccuracy, to prevent future records from**
2    **appearing on it as part of its reasonable procedures**
3    **to assure maximum possible accuracy.**
4         **Milliman has a process for that.  It**
5    **attempted to use that process, but as my report**
6    **discusses, there was a software glitch.  And with**
7    **respect to that second report you mentioned, similar**
8    **records appeared even though that was not the**
9    **intention of Milliman.  They intended for those**
10   **records to be removed or prevented from showing up on**
11   **future reports.**
12        Q.   And so you keep stating that they're not the
13   same records and the ones that were on the second
14   report were similar, so I want to kind of go through
15   an example.
16        Are you, in your experience, also familiar
17   with credit reporting specifically tradelines?
18   **A.   Yes.**
19   Q.   If a consumer disputed a Capital One
20   tradeline that belonged to a different individual and
21   that CRA removed the trade line after the consumer
22   disputed but then allowed an American Express
23   tradeline belonging to that same other individual to
24   appear post-dispute, would you agree that the CRA
25   failed to prevent the mix from reoccurring?

Page 56

1    **A.   It did not fail to prevent the reinsertion**
2    **of the record that was disputed.  Again, like I said,**
3    **you're mixing two responsibilities of consumer**
4    **reporting agencies.**
5         **First is the responsibility to prevent the**
6    **reinsertion of records that have previously been**
7    **disputed and determined not to be correct, whether**
8    **it's records that aren't about the consumer or, for**
9    **example, a delinquency that shouldn't have been**
10   **reflected.  The tradeline should have been reported as**
11   **current.  That's different than saying a brand-new**
12   **tradeline coming on the report.**
13        **And here, Milliman has a procedure to**
14   **address both of those types of instances.  One is its**
15   **procedure to prevent the reinsertion of records that**
16   **have been previously deleted, so those are the items**
17   **of things that have been disputed; and the other is a**
18   **procedure to identify those that are kind of the same**
19   **class category or issue so that those records won't**
20   **appear.  That's part of its accuracy procedures.**
21   Q.   I wasn't necessarily asking if this was a
22   reinsertion of that Capital One tradeline, because
23   this time it was an American Express tradeline in the
24   example.
25        But did the CRA fail to prevent the mix of

Page 57

1    the two individuals from reoccurring?
2    **A.   Without knowing more facts, I wouldn't be**
3    **able to tell you.**
4         **So that second tradeline that came in from a**
5    **wholly different furnisher, with a wholly different**
6    **set of information, we don't know what PII that they**
7    **provided with their Metro 2 file, what other**
8    **information was associated with it, or what else was**
9    **known by the consumer reporting agency regarding the**
10   **cause of the mixed file to start with.  So --**
11   (crosstalk, indiscernible.)
12        (Court reporter clarified.)
13        **THE WITNESS:  I don't have enough facts to**
14   **answer your question.**
15   BY MS. CZABAJ:
16   Q.   So in this example, the Capital One
17   tradeline and the American Express tradeline do, in
18   fact, belong to Individual B, and both of them
19   appeared in Individual A's credit file.  One, the
20   Capital One tradeline appeared before a dispute and
21   then was removed, and the American Express tradeline
22   appeared after the dispute.
23        Do you agree that the CRA failed to prevent
24   the mix of Individual A and Individual B from
25   happening a second time?



Page 58

1          MR. WELLS:  Object to form.
2          THE WITNESS:  Again, I don't know all of the
3   facts, so I can't answer that question.  I don't know
4   what caused the first tradeline to appear on a
5   particular consumer's report, what data was involved
6   with respect to the identification of that consumer,
7   and whether it was the same that related to the second
8   consumer.
9          I do know that with respect to the
10  requirement to prevent reinsertion, it's a requirement
11  to prevent reinsertion of previously deleted material.
12  That presumes or assumes that that information has
13  been on a consumer report and has been disputed by a
14  consumer.
15         So with respect to the tradelines here that
16  the plaintiff disputed, those tradelines were removed
17  and did not appear on a future report.
18  BY MS. CZABAJ:
19      Q.  My question isn't about reinsertion.  It's
20  not about was this reasonable or was it not.  And I've
21  told you that these two tradelines do, in fact, belong
22  to Plaintiff -- or the Individual B.  And I'm just
23  asking would you agree that this CRA failed to prevent
24  the mix from reoccurring after the dispute?
25      A.  And I'm trying to understand the nature of

Page 59

1   your question, because if your question is did they
2   have reasonable procedures to assure maximum possible
3   accuracy with respect to future mixed information, I
4   wouldn't be able to answer that without more
5   information.
6       Q.  That is not what I'm asking.
7          So we agree that Individual B's Capital One
8   tradeline was in Individual A's credit file, correct?
9       A.  Under the facts you've laid out.
10      Q.  And Individual A disputed with a consumer
11  reporting agency, and this Individual B's Capital One
12  tradeline was removed, correct?
13      A.  Those are the facts you represent.
14      Q.  And then post-dispute, an American Express
15  tradeline belonging to Individual B appears in
16  Individual A's credit file.  Would you agree that the
17  credit file of Individual A was mixed both before and
18  after the dispute?
19      A.  Based on those facts where there was
20  information about another consumer appearing on it,
21  there was an error on both reports.  Yes.
22      Q.  Okay.  So now let's say after the dispute,
23  Capital One deletes this -- or the CRA deletes this
24  Capital One tradeline that belongs to Individual B,
25  but the first time, the Capital One tradeline had a

Page 60

1   balance of $500, and then the CRA allows that same
2   exact Capital One tradeline to appear again, but this
3   time the tradeline has a balance of $550.
4          Would you agree that this is reinsertion of
5   previously disputed information?
6       A.  Depends on the reason and the nature of the
7   dispute.
8          If the dispute was, "Please delete this
9   tradeline because it does not belong to me," then that
10  tradeline should not be reinserted on the file at all.
11         If the dispute was, "The balance is
12  incorrect.  I've paid that down.  It should be $0,"
13  and then the consumer charges $500 more, that's new
14  reporting; so that's not reinstating the previously
15  deleted, because all of the balances are tied to the
16  dates.
17         So, in other words, they could not reinsert
18  a report of a $500 balance in June which was disputed
19  and removed, but if the consumer runs up a new balance
20  and it's their account, they could report a $500
21  balance in August.
22      Q.  So in this situation, the account does not
23  belong to the individual and it's disputed as being a
24  mixed file.
25         Is it fair to say, then, that this CRA

Page 61

1   reinserted the Capital One tradeline into
2   Individual A's credit file?
3       A.  Again, we're assuming that they've
4   reported -- re-reported the Capital One tradeline as
5   belonging to the consumer?
6       Q.  Yes.
7       A.  The same account and number?
8       Q.  Same exact account.
9       A.  Under that circumstance, they shouldn't be
10  reporting that tradeline at all for that consumer.
11      Q.  Okay.  Even though it has a different
12  balance than it had the first time, pre-dispute,
13  correct?
14      A.  Correct.  It's my understanding the nature
15  of the dispute was because the fact of its existence.
16      Q.  Okay.  On page 16 of your expert report, you
17  reference HII.  What is HII?
18      A.  It's my understanding that is a form of
19  blocking that allows Milliman to find other similar
20  information that's coming from the same source or in
21  certain categories from appearing on a report in the
22  future.
23         So in this instance, where they determined
24  that there were records that did not belong to the
25  plaintiff that were appearing on her report, they



Page 62

1  blocked both the records that had been on her report,
2  and they placed HII blocking, which I think is Health
3  Information Indicator or something like that. I may
4  not have gotten that exactly correct. Basically, it's
5  a number used by the particular source to say hey, we
6  don't want records related to this other consumer, and
7  here's our way to make sure that happens, that it
8  stays off the report.
9      Q.  Does each individual have their own HII
10  number?
11      A.  I think it -- there may be some nuances to
12  that, depending on the particular source, but that's
13  my understanding.
14      Q.  Is it similar to Social Security numbers
15  where it would be across the board, or could you have
16  a different HII number at each source that has your
17  information?
18      A.  I don't know that answer for sure, but as I
19  recall, I believe at least for Anthem, it was specific
20  to Anthem.
21      Q.  Okay. Is HII one of the matching criteria
22  used by Milliman?
23      A.  No, not for obtaining records in the first
24  instance, but obviously for applying the H -- the
25  filter for records that returned, they use that number

Page 63

1  in order to identify those records.
2      Q.  Okay. So on page 16, you state that
3  Milliman's HII blocking procedure is specifically
4  designed to prevent the inclusion of records that do
5  not belong to the correct consumer from appearing in
6  subsequent reports.
7          Well, we all agree that Milliman did allow
8  records not belonging to Plaintiff in her subsequent
9  report, correct?
10      A.  Not intentionally. It had actually placed
11  an HII block, but due to a software update, that block
12  facility didn't seem to be operating properly, which
13  they discovered later and fixed.
14      Q.  So regardless of intention, Milliman did
15  allow records not belonging to Plaintiff in her
16  subsequent report, correct?
17      A.  That's correct.
18      Q.  And those records that did not belong to
19  Plaintiff and appeared in the subsequent Milliman
20  report all belonged to the same individual as the
21  information that did not belong to Plaintiff in the
22  first report. Is that correct?
23      A.  It's my understanding that it was confirmed
24  they did not belong to the plaintiff. I don't know
25  whether they belonged all to the same other consumer.

Page 64

1      Q.  Okay. And the records that appeared on the
2  subsequent report that did not belong to Plaintiff
3  concerned the same medication and associated
4  pharmacist as the first -- sorry. Let me rephrase
5  that.
6          And the records that appeared on the
7  subsequent Milliman report concerned the same
8  medications and were associated with the same
9  prescribing doctors as the first report, correct?
10      A.  It's my understanding they were similar to
11  the prior records that had been reported, which is why
12  they were identified by the HII number.
13      Q.  Okay. You said "similar," but I want to
14  know is it the same exact prescription name? So let's
15  say Advil and Advil or ibuprofen and ibuprofen.
16      A.  I haven't specifically compared them, but
17  it's my understanding they were subsequent fills of
18  different prescriptions.
19      Q.  So if these fills of the prescriptions
20  appeared on the subsequent report, is it fair to say
21  that Milliman's HII blocking process did not work as
22  intended here?
23      A.  That's correct. It's my understanding that
24  due to a technology change, there was essentially a
25  failure of the system to catch and to screen out those

Page 65

1  records.
2      Q.  Is it fair to say that oftentimes, a
3  prescription will need to be refilled or is prescribed
4  more than once to the same individual?
5          MR. WELLS:  Object to form.
6          THE WITNESS:  Based on my personal
7  experience, yes.
8  BY MS. CZABAJ:
9      Q.  And this would be particularly true if an
10  individual has a lifelong condition, right?
11          MR. WELLS:  Object to form.
12          THE WITNESS:  Again, just speaking from my
13  own personal experience, I'd agree with that
14  statement.
15  BY MS. CZABAJ:
16      Q.  So, then, is it foreseeable that an
17  individual with a lifelong condition will be refilling
18  their prescriptions needed to treat that condition?
19          MR. WELLS:  Object to form.
20          THE WITNESS:  Same answer.  Yes.
21  BY MS. CZABAJ:
22      Q.  And Milliman understands that, and that's
23  part of the reason why it has this blocking procedure,
24  correct?
25          MR. WELLS:  Object to form.



Page 66

1    THE WITNESS: It has the blocking procedure
2 when it identifies issues like the one that was
3 identified from the plaintiff's first dispute, where
4 there's a group of records that are clearly not
5 associated with this particular consumer, to make sure
6 that future records that are of a similar type are not
7 showing on her report.
8 BY MS. CZABAJ:
9    Q.    When a consumer reporting agency implements
10 a new procedure, should there be any kind of testing
11 or monitoring to make sure that procedure works as
12 planned?
13    A.    So part of standard rollout of software
14 updates is you create the software update, you test
15 the update, you QA/QC it just to make sure it's
16 working properly.
17    Here, as I understand it, the software
18 change went in place, but they didn't catch what --
19 the little hiccup that it had with respect to how it
20 was identifying and collecting the HII numbers until
21 they understood from Ms. Cooper's lawsuit what had
22 happened, and they went back and looked and found that
23 there was a problem with the technology.
24    Q.    Is it common for consumer reporting agencies
25 to monitor new procedures to ensure they are going as

Page 67

1 planned?
2    A.    Yes.
3    Q.    Do you believe that a consumer reporting
4 agency follows reasonable procedures to ensure maximum
5 possible accuracy if it implements a new procedure and
6 doesn't test or monitor it?
7    MR. WELLS:  Object to form.
8    THE WITNESS:  Again, as I understand what
9 happened here, they implemented the software change,
10 which they had -- you know, it went through their
11 normal software development process, but, again, there
12 was a hiccup in the system which they discovered
13 following the identification from a dispute.  And
14 disputes are often one of the most common sources
15 where you find out something is wrong with your data.
16 BY MS. CZABAJ:
17    Q.    That's not exactly what I was looking for.
18    I'm speaking generally here about consumer
19 reporting agencies, not Milliman or this exact
20 situation.
21    But do you believe that a consumer reporting
22 agency follows reasonable procedures to ensure maximum
23 possible accuracy if it implements a new procedure and
24 doesn't test or monitor it?
25    A.    Again, it really sort of depends.  So let me

Page 68

1 give you an example.  If my new procedure is I found
2 that my consumer letter was a little confusing, and I
3 changed a sentence in my consumer letter, and I've
4 updated that letter, there's not a lot of future
5 testing and evaluation I need to do with that.
6    If I've changed it how my intake folks get
7 information from consumers on classifying disputes,
8 for example -- let's say I create a new
9 classification -- I may look monthly to see whether or
10 not my consumer relations people are using that,
11 whether they're using it appropriately, et cetera.
12    So there's a variety -- it depends on the
13 nature of the procedure and it depends on what kind of
14 testing or evaluation you might need to do.
15    Q.    Is it foreseeable that updates to software
16 systems may not go according to plan?
17    A.    I -- as a general premise, I would say
18 that's correct.
19    Q.    And specifically going back to what happened
20 here with Milliman, can you kind of describe to me
21 exactly why the HII blocking did not work as Milliman
22 intended?
23    A.    It's my understanding there was some
24 discrepancy between what the software was looking for
25 and what they were receiving with respect to the HII

Page 69

1 numbers.
2    Q.    Do you believe that that kind of issue was
3 foreseeable to Milliman?
4    MR. WELLS:  Object to form.
5    THE WITNESS:  Again, I'm not sure that
6 Milliman would have wanted to implement a procedure
7 that it didn't think worked is my understanding from
8 talking with Mr. Strassburg.  They had done this
9 update to sort of improve the system, but clearly
10 there was a hiccup in the way that it was operating.
11 BY MS. CZABAJ:
12    Q.    Do you think that Milliman should have
13 monitored this software update to ensure that it went
14 according to plan?
15    MR. WELLS:  Object to form.
16    THE WITNESS:  Again, I'm not a software
17 expert, so I don't know what kind of monitoring that
18 would involve, but I do know they watch their dispute
19 data to see if there are issues popping up, and this
20 issue was identified through a dispute.
21 BY MS. CZABAJ:
22    Q.    Turning to Exhibit A of your expert report,
23 you identify a handful of items that were considered
24 materials considered or relied upon in forming your
25 opinions.



Page 70

1      The first is the interview we've talked
2  about a couple of times.
3      The second would be Milliman-produced
4  documents 1 through 292.
5      The third is Plaintiff-produced documents
6  1 through 210.
7      The fourth would be Milliman's responses to
8  Plaintiff's interrogatory requests.
9      The fifth would be the deposition transcript
10  for the plaintiff.
11      And the sixth would be the deposition
12  transcript for Plaintiff's expert, as well as all
13  additional and/or other materials cited and/or
14  referenced in your report, including statutes,
15  regulations, government publications, and websites.
16      Is that correct?
17  **A.   That's correct.**
18  Q.   Okay.  And in preparing your expert report,
19  did you review or consider Mr. Hendricks' expert
20  report?
21  **A.   I reviewed his report, yes.**
22  Q.   Okay.
23  **A.   Which I identify in my report.**
24  Q.   Between completing this expert report and
25  today, were there any other materials that you have

Page 71

1  considered or relied upon in forming your opinions?
2  **A.   I haven't changed my opinions.  I did review**
3  **the transcript from Mr. Strassburg's deposition as**
4  **well as Ms. Bolduc's deposition.**
5  Q.   Did you review any documents that either
6  party produced after the date of your report?
7  **A.   I have received copies of them.  I have not**
8  **reviewed them before today.**
9  Q.   Is there any other material that you've
10  relied on to support your expert opinions that we
11  either did not discuss today or that were not
12  identified in your expert report?
13  **A.   Not to my knowledge.**
14  Q.   Do you intend to supplement your report?
15  **A.   Not to my knowledge, but I will leave that**
16  **to counsel.**
17  Q.   Have we discussed all of the opinions that
18  you intend or expect to offer at trial?
19  **A.   In part.  All of my opinions that I tend to**
20  **offer at trial are disclosed in my report.  To the**
21  **extent we've discussed pieces of those opinions,**
22  **they're all reflected in my report.**
23  Q.   Do you intend to offer an opinion as to
24  Milliman's error rate at trial?
25  **A.   No.**

Page 72

1  Q.   Are there any opinions in this report that
2  you no longer agree with?
3  **A.   No.**
4  Q.   You have previously discussed that you have
5  been retained in multiple Fair Credit Reporting Act
6  cases.  And of those times, you've only ever been
7  retained by the defendant, not the plaintiff, correct?
8  **A.   That's correct.**
9  Q.   In any of the FCRA cases that you have been
10  retained for, have you ever found that the CRA acted
11  unreasonably?
12  **A.   I have been approached to be considered as**
13  **an expert, and based on my review, the client found my**
14  **testimony would probably not be helpful; so I'm**
15  **usually not asked to prepare a report if my**
16  **conclusions are that they did not act reasonably.**
17  Q.   In any of the other FCRA cases that you have
18  been retained for, have you ever found that the CRA
19  violated the FCRA?
20  **A.   Again, for the -- although I've been**
21  **approached in more cases in which -- than I have**
22  **prepared a report in, usually the reason I don't**
23  **prepare a report is because I've found there was an**
24  **issue or an area of concern where my report would not**
25  **be helpful to the defense of the case; so I was not**

Page 73

1  asked to prepare reports in those cases.
2  Q.   Okay.  And the defendant in this matter is
3  paying you for your expert opinions, correct?
4  **A.   They are paying me to provide expert witness**
5  **services.  My opinions are my own.**
6      MS. CZABAJ:  Okay.  That's it for me.
7      MR. WELLS:  No questions.
8      MS. CZABAJ:  Okay.  Great.  Thank you very
9  much for your time today.
10      Are we off the record?  Could we go off the
11  record?
12      COURT REPORTER:  Sure.
13      (The deposition concluded at 3:08 p.m. EDT.)
14
15
16
17
18
19
20
21
22
23
24
25



Page 74

```
 1              C E R T I F I C A T E

 2
            BE IT KNOWN that the foregoing proceedings
 3   were taken before me; that the witness before
     testifying was duly sworn by me to testify to the
 4   whole truth; that the foregoing pages are a full,
     true, and accurate record of the proceedings, all done
 5   to the best of my skill and ability; that the
     proceedings were taken down by me in shorthand and
 6   thereafter reduced to print under my direction.

 7          [ ] Review and signature was requested; any
     changes made by the witness will be attached to the
 8   original transcript.

            [x] Review and signature was waived/not
 9   requested.

            [ ] Review and signature not required.
10

            I CERTIFY that I am in no way related to any
11   of the parties thereto nor am I in any way interested
     in the outcome hereof.
12

13          Dated this 28th day of October 2024.

14

15          _/s/ Teri Hoskins_____
            TERI HOSKINS, RMR
16          Certified Reporter
            Certificate No. 51037

17

18

19

20

21

22

23

24

25
```



**Griffin Group International**
**888.529.9990  |  602.264.2230**

**$**

**$0**
60:12

**$500**
60:1,13,18,20

**$550**
60:3

**$835**
10:11,24

**1**

**1**
21:19 53:13 70:4,6

**1,200**
53:16,23

**10**
5:1 27:24

**11:40**
53:7

**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**
50:17

**12345**
50:16

**12399**
50:20

**13**
25:8,10

**15**
10:5 20:4 41:18
49:16 52:9 54:10

**16**
61:16 63:2

**1681e(b)**
41:18

**1909**
5:18

**1990**
50:16,19

**1994**
6:9

**1995**
5:22

**1:29**
5:2

**1st**
50:16,19

**2**

**2**
57:7

**20006**
5:18

**2005**
6:3

**2006**
15:19

**2011**
15:20 17:4

**2015**
11:18

**2024**
5:1

**210**
70:6

**23**
18:6

**24**
7:23

**25**
10:7

**292**
70:4

**2:30**
53:11

**2:42**
53:11

**3**

**3:08**
73:13

**4**

**40**
16:19,20

**5**

**500**
47:22 49:3

**8**

**89**
26:25

**9**

**94**
11:5

**96-'97**
12:15

**97**
12:15

**99**
13:2

**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**
50:21

**A**

**A's**
57:19 59:8,16 61:2

**ability**
7:23 8:2

**acceptable**
26:18,19

**accomplish**
42:3

**account**
16:21 32:6,8 60:20,
22 61:7,8

**accuracy**
9:24 41:23 53:1 55:3
56:20 59:3 67:5,23

**accurately**
7:24 8:3

**act**
12:23 16:2 20:6
39:24 40:8,9 72:5,16

**acted**
72:10

**acting**
50:10

**action**
15:7,12 16:15 52:18

**active**
42:12

**addition**
54:24

**additional**
31:22 32:10 44:18
53:3 70:13

**address**
5:15 32:10,11 56:14

**adequately**
30:10

**admitted**
6:12

**adverse**
16:15

**Advil**
64:15

**advised**
13:8

**AETNA**
44:24 45:6 46:3,15

**affirmed**
5:5

**agencies**
13:12,16 14:3,6,24,
25 16:12,13,18 17:17
30:15 31:1,4,10,17
35:6 39:9 40:13,14
41:6 43:9 56:4 66:24
67:19

**agency**
13:10 14:1,3 15:15
16:25 31:8 32:1,6
39:23,25 40:7,10,16
50:14 51:21 57:9
59:11 66:9 67:4,22

**agent**
50:11

**agree**
34:10,24 50:22 51:15
52:20 55:24 57:23
58:23 59:7,16 60:4
63:7 65:13 72:2

**alcohol**
7:22

**alerted**
48:1,11 49:4

**allowed**
55:22

**ambiguities**
17:24

**American**
55:22 56:23 57:17,21
59:14

**and/or**
70:13

**Anthem**
25:12,15,23 26:21
34:16,18 35:7,12
37:4,6,10,25 38:6

**39:13,17 43:15,19,25**
44:25 45:15,23,24
46:4,7,9,14,16,20
47:9 48:12,21 49:5
62:19,20

**Anthem's**
37:20 43:22

**appeared**
55:8 57:19,20,22
63:19 64:1,6,20

**appearing**
55:2 59:20 61:21,25
63:5

**appears**
22:7 26:23 59:15

**applicable**
20:24

**apply**
31:14

**applying**
35:13 62:24

**apprised**
14:23

**approached**
72:12,21

**approaches**
30:15

**appropriately**
68:11

**approved**
17:13

**approximately**
6:23 7:3 10:2 53:16

**approximation**
10:19

**area**
9:21 12:2,11,14,15,
17,22 31:15 32:9
72:24

**assess**
48:17

**assessing**
39:9

**assistant**
15:22,25 17:9

**assume**
8:13

**assumes**
58:12



**assuming**
35:18 61:3

**assumption**
35:3 46:11

**assumptions**
23:3 36:6

**assure**
41:22 52:25 55:3
59:2

**assuring**
9:24

**attempted**
55:5

**attend**
11:2

**attorney**
5:20 7:13 10:25 13:4

**attorneys**
16:3 22:20

**audio**
24:15

**August**
60:21

**authorization**
35:10,15

**auto**
13:19 14:7

**automatically**
38:15 47:8

**aware**
7:14 24:25 27:7,12,
14 29:7 37:9,19,24
38:5 47:9,14,19

**B**

**B's**
59:7,11

**back**
8:11 12:13 37:2 46:1
52:3 53:7,13 66:22
68:19

**background**
8:5 19:2 31:11,12
50:7

**balance**
60:1,3,11,18,19,21
61:12

**balances**
60:15

**Barbara**
28:5,16 29:8 34:24

**barred**
5:22 6:3,9

**bars**
6:12

**based**
26:23 35:14 43:23
46:11 47:12 51:14
59:19 65:6 72:13

**basic**
44:10

**basically**
52:24 62:4

**basis**
35:2 39:19 40:2
48:22

**begin**
38:19

**behalf**
50:12

**believed**
45:25

**belong**
57:18 58:21 60:9,23
61:24 63:5,18,21,24
64:2

**belonged**
55:20 63:20,25

**belonging**
55:23 59:15 61:5
63:8,15

**belongs**
59:24

**benefit**
43:5

**big**
41:7

**billed**
10:13

**birth**
29:15,18,21,25 30:19
33:3 37:6

**bit**
49:15

**blindly**
36:1

**block**
54:11 63:11

**blocked**
62:1

**blocking**
61:19 62:2 63:3
64:21 65:23 66:1
68:21

**board**
62:15

**Bolduc**
37:9,14,19,24 38:5

**Bolduc's**
71:4

**born**
50:15,19

**bottom**
25:10 42:7 54:10

**bounds**
38:24

**brand-new**
56:11

**Breach**
19:8

**break**
8:18 38:10 53:6

**Briefly**
9:1

**brought**
14:24 35:21

**business**
42:5

**C**

**call**
24:8

**called**
14:8 18:24

**Capital**
19:8 55:19 56:22
57:16,20 59:7,11,23,
24,25 60:2 61:1,4

**care**
20:20

**career**
21:5

**case**
8:24 9:15 10:14
18:12 19:15 20:11
22:8,20 23:4 25:6
26:3,20 27:7 52:10

**blocked**
53:15 72:25

**cases**
12:20 14:24 16:4
18:11,16 19:6,22
21:10 72:6,9,17,21
73:1

**catch**
64:25 66:18

**categories**
40:20 54:25 61:21

**category**
56:19

**caused**
58:4

**CDIA**
11:23

**cetera**
10:23 17:21 27:8
28:24 52:4 68:11

**CFPB**
27:7

**change**
51:3 64:24 66:18
67:9

**changed**
68:3,6 71:2

**characterize**
15:8

**charges**
60:13

**check**
50:7

**checking**
44:12 46:19,24,25

**checks**
30:22 44:18 48:19

**chosen**
33:24

**circumstance**
61:9

**circumstances**
28:21 51:25

**cite**
23:9

**cited**
27:1 70:13

**claims**
21:3 43:6

**clarified**
57:12

**clarify**
54:17

**class**
56:19

**classification**
68:9

**classifying**
68:7

**clearinghouse**
36:23 49:19,20,23,24
50:9,15,18

**client**
72:13

**clients**
13:14

**Code**
29:22 30:1 34:4,7
37:6 47:15 50:16,19
51:3,6,12

**Codes**
33:4

**colleague**
9:8 24:8

**collecting**
66:20

**Collins**
18:14 19:6,15

**commentary**
16:21

**commercial**
20:11

**commission**
16:22 17:13

**common**
30:4,12,16 31:5,9,13,
16,20,23 34:20,25
36:9 51:14 66:24
67:14

**commonly**
32:12

**communication**
25:12,20 26:17

**companies**
11:21 13:19 16:4,17
20:15 32:12 50:6

**company**
14:9 18:23,24 19:3
36:12

**company's**
9:23



**compare**
46:3

**compared**
45:8 64:16

**comparing**
46:14

**compilation**
17:1

**complete**
21:25 28:17

**completely**
8:20 27:3

**completing**
70:24

**compliance**
11:20,21 14:20
17:16,19 18:1 52:15

**comply**
52:24 53:4

**concern**
72:24

**concerned**
64:3,7

**concluded**
73:13

**conclusions**
72:16

**condition**
65:10,17,18

**conferring**
17:12

**confirm**
8:7

**confirmed**
63:23

**confusing**
68:2

**connection**
10:16 21:4 30:20

**consent**
52:14,20 53:2

**considered**
31:5 44:22 69:23,24
71:1 72:12

**consistent**
39:5,6

**consultant**
17:17

**consultants**

**17:20**

**consumed**
7:22

**consumer**
10:1 11:22 13:1,9,12,
15 14:1,3,6 15:6,9,
11,14,15 16:12,13,
14,18 17:17 19:8
26:7,10 30:15,25
31:4,7,10,16 32:1,6,
14 34:2,9 35:5,11
36:9 39:9,23,25 40:7,
9,13,14,16 41:6
42:10 43:3,8,22,23
44:1,10,16,19 45:5,
23 46:8,12,21 50:13
51:20,22 54:12,15
55:19,21 56:3,8 57:9
58:6,8,13,14 59:10,
20 60:13,19 61:5,10
62:6 63:5,25 66:5,9,
24 67:3,18,21 68:2,3,
10

**consumer's**
32:8,10 35:15 44:4
58:5

**consumers**
15:10 16:7 36:3 40:1
68:7

**contact**
18:2

**contacted**
22:10

**contained**
54:2

**contemplated**
15:4

**context**
20:11

**continuing**
54:14

**contrast**
44:13

**conversations**
35:24 47:12

**Cook**
11:10,17 13:7

**Cooper**
19:17 25:17 29:8
34:20,24 54:15

**Cooper's**
28:5,17 47:20 66:21

**copies**
47:13 71:7

**copy**
21:25 22:7,11 37:11,
25

**Corelogic**
14:4,11,14

**correct**
5:20,23 6:1,2,4,7,10,
18 7:20 9:16 10:11
17:6 19:17,18 23:10
25:13,17,24 26:3
27:5 33:4 37:2 40:18
42:1,13,21,22 43:16,
20,23 44:5 46:8,16
52:18,19 53:17,24,25
54:4,6 56:7 59:8,12
61:13,14 62:4 63:5,9,
16,17,22 64:9,23
65:24 68:18 70:16,17
72:7,8 73:3

**counsel**
14:12,19 17:18,23
71:16

**count**
10:4,9 53:19

**counted**
7:5

**counter**
31:19

**couple**
13:8 22:14 26:25
36:5 70:2

**court**
43:4 57:12 73:12

**courtroom**
6:21 7:20

**cover**
22:23

**covers**
40:23,24

**CRA**
27:8 30:10 31:21
36:1 39:22 40:5,6,18,
25 41:25 43:12 49:18
52:21 55:21,24 56:25
57:23 58:23 59:23
60:1,25 72:10,18

**CRAS**
27:2,3,17 32:2,16,19,
22 33:19 35:16 39:21
40:11,12,13 41:20
44:14 50:4,5

**create**
66:14 68:8

**Credco**
14:6

**credit**
12:23 13:18 14:6
16:1 20:6 39:24 40:1,
8,9 41:7,9,10 55:17
57:19 59:8,16,17
61:2 72:5

**criteria**
31:14 32:2 33:21
35:7 62:21

**crosstalk**
57:11

**current**
56:11

**customers**
33:7

**CZABAJ**
5:10 21:14 28:14
29:2 30:9 31:3 33:17
34:3,19,23 35:4 37:8,
18 38:4,11,16,18
44:21 45:12 46:13,23
48:10,24 49:14 51:19
52:8 53:5,10,12,21
54:9 57:15 58:18
65:8,15,21 66:8
67:16 69:11,21 73:6,
8

---

**D**

**data**
16:17 19:8 21:3
25:24 27:2,21 28:2,
21 29:1 31:25 32:4
34:1,8 35:6,17,21,22,
24 36:2,3,8 38:6
39:2,3,4,5,6,10,12,17
42:5,9,13 43:1,2,15,
25 44:19 45:5,20
46:19 47:1,2,4,9,11,
14,17,25 48:12,15,
18,19,22 49:5 50:2,5,
8 51:9,11,18 58:5

**67:15 69:19**

**database**
40:3 41:4,8,11,17
42:24

**date**
20:2 22:13 29:15,18,
21,25 30:19 37:5
71:6

**dates**
33:3 60:16

**day**
23:18 47:22

**day-to-day**
17:20

**DC**
5:17,18,20

**deal**
13:20,21,22

**dealing**
36:7 42:3 51:4

**dealt**
16:17

**December**
10:17 23:21

**dedupe**
47:4

**defendant**
19:24 72:7 73:2

**defense**
12:16 22:19 72:25

**defined**
39:24 40:8

**defines**
40:9

**definition**
40:21 41:13

**delete**
60:8

**deleted**
53:23 56:16 58:11
60:15

**deletes**
59:23

**delinquency**
56:9

**depend**
32:24 41:3

**depending**
31:1 32:4,17 43:9
50:9 51:1 52:6 62:12



**depends**
27:20 28:1,20 31:7,
24 34:6 42:4 51:24
60:6 67:25 68:12,13

**deposed**
7:10 18:21 19:11
37:14,16

**deposition**
7:4,15 8:8,17,22
70:9,11 71:3,4 73:13

**depositions**
6:14,17

**describe**
13:15 68:20

**designated**
9:14,20 41:15

**designating**
21:19

**designed**
54:21 63:4

**detail**
53:3

**determine**
31:5 43:19 45:19

**determined**
33:25 56:7 61:23

**develop**
17:6

**developing**
14:15

**development**
67:11

**developments**
14:23

**digits**
28:4,16 29:4,7 51:14

**directly**
13:25 49:23

**director**
15:22,25 17:10

**disclose**
13:13

**disclosed**
71:20

**discovered**
63:13 67:12

**discrepancy**
68:24

**discrepant**
51:11

**discrete**
13:8

**discuss**
18:3 35:25 48:21
71:11

**discussed**
22:22 24:24 32:15
54:21 71:17,21 72:4

**discusses**
55:6

**discussing**
39:14

**displayed**
21:13

**dispute**
20:12 49:6 53:22,24
54:7 57:20,22 58:24
59:18,22 60:7,8,11
61:15 66:3 67:13
69:18,20

**disputed**
53:15 54:1,19,22
55:19,22 56:2,7,17
58:13,16 59:10 60:5,
18,23

**disputes**
35:24 39:7 48:16
67:14 68:7

**distinguish**
30:11 39:21 41:19

**distinguishable**
50:2

**distinguishing**
41:7

**distribution**
11:14

**Division**
15:22

**doctors**
64:9

**document**
21:13,15,20 22:2,4,6

**documents**
8:23 10:23 22:12
25:2,4,5 70:4,5 71:5

**drafting**
10:23 17:11,20 22:24

**drafts**
17:11 22:15,17

**drugs**

**7:22**

**Duane**
19:7,17

**due**
13:14 63:11 64:24

**duly**
5:5

**duties**
15:24 41:25

——————

**E**

**earlier**
13:7 16:21 21:4,5,9
49:16

**EDT**
5:2 53:11 73:13

**education**
36:22 49:18,25 50:8

**educational**
36:22 51:7

**effect**
7:19

**electronically**
47:3

**elements**
31:25 33:24

**employed**
11:6 13:25 14:4
23:13

**employer**
36:12,16 50:14

**employers**
43:11

**employment**
13:23 32:9 36:11,15
40:23 43:10,11 49:17
50:6 51:4,22 52:4

**enable**
42:19 44:11

**end**
21:24 23:20 44:22
45:14

**enforcement**
14:24 52:10,18

**engaging**
20:9

**ensued**
53:11

**ensure**
48:22 66:25 67:4,22
69:13

**ensuring**
20:24

**entities**
13:20,21 14:21

**enumerate**
52:16

**error**
44:12 46:19,24,25
47:8 51:1 59:21
71:24

**essentially**
27:1 37:6 39:25
64:24

**Estevez**
9:8 24:8

**evaluation**
68:5,14

**eventually**
12:22

**exact**
10:4 60:2 61:8 64:14
67:19

**EXAMINATION**
5:9

**examined**
5:7

**Exhibit**
21:19 53:13 69:22

**existence**
61:15

**expect**
6:14,17 8:17 71:18

**expected**
38:25

**Experian**
18:25

**experience**
20:13,22,23 21:2,6,9
35:5,9 55:16 65:7,13

**expert**
6:25 7:7 9:15,18
10:3,10 12:4 18:3,9,
12,16,23,25 19:1,23
20:1,5,8 22:7,21,25
23:1,8 25:9 39:11
49:16 52:11 53:14
61:16 69:17,22

**70:**12,18,19,24
71:10,12 72:13 73:3,
4

**expertise**
9:22

**Express**
55:22 56:23 57:17,21
59:14

**extent**
71:21

**external/internal**
17:23

——————

**F**

**facility**
63:12

**fact**
36:18 48:12 49:4
50:7 57:18 58:21
61:15

**FACTA**
16:7 28:22

**factor**
27:4,11,16 41:7

**factors**
26:8

**facts**
28:10 57:2,13 58:3
59:9,13,19

**fail**
56:1,25

**failed**
55:25 57:23 58:23

**failing**
16:15

**failure**
64:25

**fair**
6:15 8:15 12:23 16:1,
11 17:16 20:6,21
30:3 33:20 39:24
40:8,9 41:24 45:6
60:25 64:20 65:2
72:5

**false**
42:20,25 43:20

**familiar**
22:4 34:14 38:8
55:16



**faster**
21:23
**fat**
28:23
**FCRA**
13:8 14:16 15:4,7,11
16:5,16,21 20:11
40:21 52:15,24 72:9,
17,19
**Federal**
16:22
**field**
20:14 47:7
**figure**
26:6
**file**
42:12,14 44:16 57:7,
10,19 59:8,16,17
60:10,24 61:2
**files**
44:14
**fills**
64:17,19
**filter**
62:25
**financial**
11:22 12:22
**find**
36:14 61:19 67:15
**finger**
28:23
**finish**
16:7
**firm**
11:7,9 12:19,20,21
13:7
**firms**
12:9,12
**five-**
53:6
**fixed**
63:13
**flag**
31:13 44:20
**flags**
31:9
**flip**
21:21
**Florida**
47:21

**focus**
12:6 34:15
**focused**
12:13,15
**focusing**
12:23
**folks**
17:19 68:6
**footnote**
26:25 27:6
**force**
7:19
**foregoing**
30:3
**foreseeable**
65:16 68:15 69:3
**form**
28:8,19 30:6,13 33:5,
22 34:13 35:1 36:4
37:12 38:2,7 44:6
45:9 46:6,17 48:3,13
49:7,23 50:23 51:16,
23 52:22 53:18 54:5
58:1 61:18 65:5,11,
19,25 67:7 69:4,15
**format**
47:3
**forming**
69:24 71:1
**forward**
18:1
**found**
66:22 68:1 72:10,13,
18,23
**fourth**
70:7
**fraud-related**
13:21
**front**
7:20
**FTC**
15:8,12,17,19,21
16:2 17:5 20:17 52:9,
14
**full**
34:4,7,11,17 37:21
**furnished**
44:14
**furnisher**
15:3 36:2 39:3 57:5

**furnishers**
40:2
**future**
54:20,22 55:1,11
58:17 59:3 61:22
66:6 68:4

**G**

**gave**
46:3
**gender**
29:25 33:3 37:5
**general**
20:9 68:17
**generally**
41:21 52:15 67:18
**George**
11:3
**Georgia**
47:21
**GIS**
19:2
**give**
10:18 36:13 37:7
68:1
**giving**
5:16
**glitch**
55:6
**good**
17:25 53:5,9
**government**
70:15
**graduate**
11:4
**Great**
38:21 73:8
**ground**
8:6
**group**
66:4
**guess**
33:23 53:7
**guidance**
14:25 16:6,24 27:12,
14

**H**

**hand**
17:17
**handful**
33:18 69:23
**handle**
50:1
**handled**
12:5,19 21:10
**happened**
49:6 66:22 67:9
68:19
**happening**
57:25
**head**
20:17 40:22 41:1
48:6
**health**
20:20 62:2
**Healy**
19:19
**hear**
8:10
**heard**
8:13
**helped**
16:7 17:6,10 23:13
**helpful**
28:1 72:14,25
**Hendricks**
26:1 52:10
**Hendricks'**
10:22 18:5 22:11
70:19
**hesitate**
20:7
**hey**
42:16 62:5
**hiccup**
66:19 67:12 69:10
**HII**
61:17 62:2,9,16,21
63:3,11 64:12,21
66:20 68:21,25
**Hill**
19:9
**hired**
19:23

**Hireright**
19:2
**history**
13:21 32:11 36:15,17
40:1,23,24 52:4
**hit**
35:23 38:23 39:12,15
**HITECH**
20:18
**hold**
42:5
**hour**
9:1 10:11 23:24
**hourly**
10:10,24,25
**hours**
7:23 10:13,21
**Hudson**
11:10,17 13:7

**I**

**ibuprofen**
64:15
**identification**
58:6 67:13
**identified**
18:19,22 23:19 45:24
64:12 66:3 69:20
71:12
**identifier**
30:19 31:22
**identifiers**
32:21 33:19
**identifies**
54:25 66:2
**identify**
14:21 26:2,7 32:7,13
33:15 34:2 42:20
43:25 56:18 63:1
69:23 70:23
**identifying**
26:10,12 31:17 33:14
36:9,24 45:23 52:2
66:20
**identity**
13:14 15:23
**imagine**
20:4 29:19 30:8
**immediately**



**implement**
19:4 40:22

**implement**
69:6

**implemented**
33:1 67:9

**implements**
66:9 67:5,23

**important**
27:2

**improve**
69:9

**in...acceptable**
25:22

**inaccuracies**
53:16,23 54:2

**inaccuracy**
55:1

**include**
50:7 51:21

**included**
10:22

**including**
70:14

**inclusion**
63:4

**incorrect**
60:12

**Indicator**
62:3

**indicia**
44:8

**indiscernible**
57:11

**individual**
31:22 33:16,19 43:11
55:20,23 57:18,19,24
58:22 59:7,8,10,11,
15,16,17,24 60:23
61:2 62:9 63:20 65:4,
10,17

**individuals**
30:11 32:3,23 57:1

**industry**
16:6 38:25

**inform**
14:25

**informal**
16:24

**information**
10:1 13:22,23 20:16,
19,25 21:11 23:6,17
25:16,19,23 26:9,10,
13,15 28:11 30:20,21
31:1,11,17,19 32:1,3,
10,22,25 33:6,8,14,
25 34:16 35:10 36:3,
19,24 37:2,7 40:1,4
41:4,8,11,16 42:9,16,
19,24 43:3,7,13,14,
18,21,22 44:1,11,15,
17 45:1,2,4,5,7,23
46:15 50:5,18 52:2
54:11,19 57:6,8
58:12 59:3,5,20 60:5
61:20 62:3,17 63:21
68:7

**inhibit**
7:23 8:2

**initial**
32:18

**injury-type**
21:10

**inquiry**
45:3,13

**insights**
37:20

**instance**
35:12 45:21 50:4
61:23 62:24

**instances**
33:10 47:19 56:14

**institution**
36:23 51:7

**insurance**
43:6

**intake**
68:6

**intend**
71:14,18,23

**intended**
22:23 54:13,14 55:9
64:22 68:22

**intention**
55:9 63:14

**intentionally**
63:10

**interrogatory**
70:8

**intervening**
16:23

**interview**
23:9,18,22,25 24:4,
11,15,17,19,21,23
25:1 70:1

**investigate**
16:3

**investigations**
16:11

**involve**
20:15 69:18

**involved**
12:2 16:2,10 19:16,
19 20:11 30:12 32:5
58:5

**involvement**
17:8

**involves**
26:24

**Island**
27:10

**issue**
25:19 30:16 31:20
35:25 40:19 56:19
69:2,20 72:24

**issued**
14:25 17:3,4 52:17

**issues**
17:12 28:23 35:23
66:2 69:19

**items**
27:1 56:16 69:23

**J**

**January**
50:16,19

**Jason**
9:8

**Jeffery**
36:13 52:1

**Jeffrey's**
36:16

**job**
11:11 14:11 15:21,24

**Joel**
23:9

**John**
50:15,18

**judge**
7:20

**June**
60:18

**K**

**K-U-E-H-N**
5:14

**Kelly**
19:9

**key**
48:6

**keyed**
48:6

**kind**
10:18 11:19 17:15
40:6 41:25 42:5
55:14 56:18 66:10
68:13,20 69:2,17

**kinds**
32:21 41:19

**knew**
53:20

**knowing**
45:18 48:8 51:17
57:2

**knowledge**
35:7,16 71:13,15

**Kuehn**
5:4,11,13,14

**L**

**laid**
59:9

**largely**
11:20 12:13 16:16,18
46:18

**law**
5:25 6:6 11:2,3,6,9
12:8,17,19 17:24
27:8

**laws**
11:22 12:24 14:22
20:24

**lawsuit**
25:19 66:21

**leave**
71:15

**left**
17:5

**legal**
14:5 42:2

**letter**
68:2,3,4

**letters**
16:23

**level**
9:12

**Lexisnexis**
19:9

**liability**
11:15

**liberty**
13:13

**licensed**
5:19,25 6:6

**lifelong**
65:10,17

**lights**
38:14

**limited**
11:15

**litigation**
12:3,5,7,16 15:15
21:4,9

**live**
29:22 30:1 51:5

**lived**
51:6

**lives**
50:16

**LLP**
11:10

**locate**
36:25 43:25

**locates**
35:12

**locations**
47:22 49:3,11

**logic**
27:19 33:12 35:8,14,
17,19 37:11,21

**logical**
30:22

**logically**
44:9

**long**
8:19,25 23:22

**longer**



72:2
**looked**
30:7 35:23 66:22
**lot**
40:21 68:4

## M

**made**
23:3 37:3 45:20
46:10 48:17 51:13
**maintain**
41:4,8 42:11 44:15,
16
**maintained**
40:3
**maintaining**
41:10,16 48:15
**maintains**
42:14
**make**
21:25 26:5 35:8
44:20 45:3 62:7 66:5,
11,15
**making**
35:3 39:4 47:2
**management**
17:12
**managers**
43:6
**Maryland**
6:1
**match**
26:2,5,14 27:21 28:2,
7,18 29:5 31:22 32:2,
22 33:4,19 34:5,12
42:25 43:20 44:4
46:5 47:15 50:22
51:15 52:3,6
**matched**
28:6 29:7 31:25
32:25 44:9
**matches**
28:24 35:8 36:3
42:20
**matching**
26:22,23 27:2,4,9,13,
18 28:3,12,25 31:2,
14 33:1,11,21 34:9,
15 35:7,14,17,19,25
37:11 51:1 62:21

**material**
58:11 71:9
**materials**
69:24 70:13,25
**matter**
14:18 18:9 19:17,20
23:1 47:10 73:2
**matters**
12:6 13:8
**maximum**
9:24 41:22 52:25
55:3 59:2 67:4,22
**means**
53:3
**measure**
26:15
**mechanics**
25:6
**medical**
20:14,16,19,22,25
21:1,3,11 40:24
46:22 48:5
**medication**
8:1 64:3
**medications**
64:8
**meet**
8:25
**meets**
48:23
**member**
25:23
**memorized**
40:21
**mentioned**
16:10 17:15 30:17
41:5 46:24 49:9,15
50:25 52:9 55:7
**met**
8:24
**Metro**
57:7
**middle**
32:16,18
**miles**
47:22 49:3
**Milli**
25:15
**Milliman**
9:15 10:13 13:3 18:2,

8,12,17,18,19 19:7,
17,19 23:13 25:12,16
33:2,7,10,13,20 34:4,
11 35:14,20 37:3,11,
20,25 38:6 39:21
40:5,17 42:8,19
43:18 44:3,7,25 45:1,
3,8,13,19,21 46:1,2
47:20 48:1,11 49:4
53:16,23 54:24 55:4,
9 56:13 61:19 62:22
63:7,14,19 64:7
65:22 67:19 68:20,21
69:3,6,12
**Milliman's**
38:23 39:12 54:11,13
63:3 64:21 70:7
71:24
**Milliman-produced**
70:3
**mind**
19:5 21:21
**minute**
38:13
**minutes**
38:11,12
**mismatch**
25:21 51:8
**mistake**
45:20
**mix**
48:2 55:25 56:25
57:24 58:24
**mixed**
28:24 57:10 59:3,17
60:24
**mixing**
54:15,16 56:3
**monitor**
66:25 67:6,24
**monitored**
35:23 69:13
**monitoring**
38:23 39:2,7 48:15
66:11 69:17
**monthly**
68:9
**months**
7:12
**mortgage**
13:19 14:7

**move**
17:25 38:15
**moved**
12:20
**multiple**
44:14 72:5

## N

**names**
18:15 30:5,16 31:9,
13 32:16 33:2
**nationwide**
39:21,22,23 40:2,5,
12,14,17,25 41:5,12,
14 44:13
**nature**
27:20 28:21 31:24
32:4,25 43:24 58:25
60:6 61:14 68:13
**NCRAS**
41:6
**necessarily**
48:7 49:13 56:21
**needed**
15:1 23:6 65:18
**normal**
67:11
**Norman**
19:7
**Northwest**
5:18
**notes**
24:21 28:22
**notice**
49:13 52:21
**notices**
16:15
**November**
18:6 22:14
**November/beginning**
23:21
**nuances**
62:11
**number**
8:6 20:3 25:9 26:8
27:9,25 28:6,17 29:3,
4,9 30:14,18 31:11,
12 32:7 34:12,18
36:14 37:5 44:4,8,23,

25 45:14,16,22 46:3,
5,9 47:10 50:17,20,
25 51:2 52:5 53:20
61:7 62:5,10,16,25
64:12
**numbers**
27:2,13,18,23 28:23
31:18 33:3 51:13
62:14 66:20 69:1

## O

**oath**
7:16 24:10
**Object**
28:8,19 30:6,13 33:5,
22 34:13 35:1 36:4
37:12 38:2,7 44:6
45:9 46:6,17 48:3,13
49:7 50:23 51:16,23
52:22 53:18 54:5
58:1 65:5,11,19,25
67:7 69:4,15
**Objection**
34:21
**obligations**
13:14 14:21
**obtain**
33:8 45:5
**obtained**
34:16 43:4,11 46:21
**obtaining**
35:9 62:23
**obtains**
33:7 34:1 42:9
**occasion**
10:9 12:5 18:25
**occasions**
6:23,24
**occurring**
24:24
**October**
5:1
**offer**
71:18,20,23
**offered**
23:7
**office**
5:17 38:14 48:6,7
50:1



**oftentimes**
65:2

**onboarding**
39:17

**ongoing**
48:22

**operating**
63:12 69:10

**opine**
9:23 40:19

**opinion**
16:23 34:22 71:23

**opinions**
23:1,6 27:7 69:25 71:1,2,10,17,19,21 72:1 73:3,5

**order**
23:6 34:1 36:25 45:3 47:3 52:20,23 53:2 63:1

**orders**
52:14

**original**
51:2

**outliers**
39:7

**overseeing**
16:3 20:10

**oversight**
20:8

**owned**
25:23

**P**

**p.m.**
5:2 53:11 73:13

**Pacific**
53:8

**paid**
11:13,14 60:12

**paragraph**
42:7

**part**
36:6 55:2 56:20 65:23 66:13 71:19

**partner**
11:12

**partners**
12:6

**partnership**
11:15

**party**
71:6

**passed**
33:14

**paying**
73:3,4

**payment**
13:20 32:5

**payment-related**
13:22

**PBSA**
11:25

**pending**
8:20 18:13

**people**
29:11,14,17,20,24 68:10

**percent**
13:2 27:24

**periodic**
39:19

**permission**
46:21

**person**
9:3 24:1 42:17

**personal**
21:9,10 65:6,13

**personnel**
14:20

**pertaining**
39:12

**pharmacist**
64:4

**pharmacy**
21:7 43:5

**phone**
9:2 23:25

**physical**
5:15

**piece**
29:1

**pieces**
16:6 28:11 71:21

**PII**
33:14 37:4 57:6

**place**
15:2 23:18 66:18

**plaintiff**
29:8 48:17 53:15 54:2 58:16,22 61:25 63:8,15,19,21,24 64:2 70:10 72:7

**plaintiff's**
18:14 21:19 28:5,16 47:15 53:13 66:3 70:8,12

**Plaintiff-produced**
70:5

**plan**
68:16 69:14

**planned**
66:12 67:1

**play**
14:15,18 22:20

**point**
8:19 27:14 53:6

**policies**
14:15 15:1 17:21 38:1

**policy**
38:23

**popping**
69:19

**positive**
42:20,25

**post-dispute**
55:24 59:14

**potential**
16:5 48:2

**potentially**
50:9

**practice**
5:25 6:6 11:19 12:2, 11,14,15,17,21

**practicing**
5:19

**pre-dispute**
61:12

**precise**
20:3 40:20

**premise**
68:17

**preparation**
10:16,17,21

**prepare**
8:21 22:9,15 72:15, 23 73:1

**prepared**
16:22 20:2 22:8 37:15 72:22

**preparing**
22:20 39:11 42:17 70:18

**prescribed**
65:3

**prescribing**
64:9

**prescription**
8:1 21:7 54:3 64:14 65:3

**prescriptions**
64:18,19 65:18

**present**
9:5,7 24:3

**presented**
17:13

**president**
14:12

**presumes**
58:12

**pretty**
39:8 44:15

**prevent**
55:1,25 56:1,5,15,25 57:23 58:10,11,23 63:4

**prevented**
55:10

**preventing**
9:25 23:14 25:7

**previously**
12:8 54:12,19 56:6, 16 58:11 60:5,14 72:4

**primarily**
15:9

**principal**
16:1

**prior**
12:17 32:13 36:17 48:20 64:11

**privacy**
11:22 15:23 20:25

**problem**
66:23

**procedure**
54:11 56:13,15,18

**63:3 65:23 66:1,10, 11 67:5,23 68:1,13 69:6**

**procedures**
9:24,25 14:16 15:1 17:21,25 20:9 30:25 31:5 38:1 39:8 41:22 52:25 54:14 55:2 56:20 59:2 66:25 67:4,22

**process**
16:8 23:14 26:22,23 31:8 33:1 37:1 39:2, 16 46:11 47:7 54:20, 24 55:4,5 64:21 67:11

**processes**
31:13 34:15 48:14

**processing**
32:5

**produced**
25:5 71:6

**profits**
11:14

**program**
16:2

**prohibits**
27:11

**properly**
63:12 66:16

**property**
32:13

**proprietary**
26:22

**Protection**
15:23

**provide**
16:15,16 37:11 73:4

**provided**
14:5,9 19:14 22:11 26:11 34:7,17 40:2 44:24 45:2,21 46:1,4, 9,15 48:8 57:7

**provider**
20:20 25:16 48:6

**providers**
20:9,10 49:11

**providing**
45:1

**provision**



Case 2:23-cv-00028-JES-NPM    Document 83-2    Filed 11/22/24    Page 31 of 34 PageID
987
Cooper v.    Videorecorded Videoconference Deposition of Rebecca Keuhn
Milliman

41:21
provisions
52:16,17
public
27:21 31:15 40:3
publications
70:15
pulling
42:13
purpose
51:22
purposes
9:19 27:9 32:8 42:17
47:4
put
16:25 17:1 29:3 43:3
47:5 49:13 52:21

Q

QA/QC
66:15
quality
39:10 48:22
question
8:13,14,20 36:5
37:17 42:4 45:11
48:9 49:1,2 57:14
58:3,19 59:1
questions
8:9 17:24 24:13 73:7
quick
38:10
quote
25:12
quoted
25:20

R

R-E-B-E-C-C-A
5:14
raise
48:21
range
25:22 26:18,19
rate
10:10,24,25 71:24
rates
35:23 38:23 39:12,16

raw
47:9,11,14,17
re-reported
61:4
read
8:11
Ready
38:19
Realpage
18:24 19:10
reappearing
54:20
reason
36:18 60:6 65:23
72:22
reasonable
26:5 28:7,18 29:5
31:21 36:1 38:24
41:22 51:20 52:6,21,
25 55:2 58:20 59:2
67:4,22
reasonableness
42:4
reasons
49:10 51:11
Rebecca
5:4,13
recall
10:15 18:15 20:1
22:17 24:7,9 37:13
39:16 47:16,17,24
53:2,19 62:19
receipt
46:10
receive
49:22,24
received
23:5 44:5 49:5 52:6
71:7
receiving
18:5 39:3,10 47:21
48:20 68:25
recently
37:16
recess
53:11
recollection
23:23
record
5:12 24:23,25 36:25

40:3 51:21 56:2
73:10,11
recorded
24:15
records
20:22 21:1,7 23:15
25:7 26:7 27:22,24
30:23,24 31:15 32:8,
13 33:15 34:2,9,15
35:12,14 36:13 44:5,
9 45:25 46:4,8,10,12,
20,22 48:5 52:1,7
53:20 54:3,8,22,25
55:1,8,10,13 56:6,8,
15,19 61:24 62:1,6,
23,25 63:1,4,8,15,18
64:1,6,11 65:1 66:4,6
reference
61:17
referenced
70:14
referring
46:25
refilled
65:3
refilling
65:17
reflected
56:10 71:22
regard
28:1
regularly
39:18 44:14
regulations
70:15
regulators
38:25
regulatory
14:12,19,23
reinsert
60:17
reinserted
60:10 61:1
reinsertion
10:1 23:14 25:7 56:1,
6,15,22 58:10,11,19
60:4
reinstating
60:14
reinvestigating

53:24
relate
30:23
related
8:23 11:22 12:25
14:9 20:8,13,18,23
22:12 33:16 34:2,9
35:25 46:12 58:7
62:6
relates
20:22
relating
20:6
relations
68:10
relationship
43:24 50:10
release
17:14
relevant
10:22 25:6
reliable
48:12 49:5
relied
46:7,16,20 69:24
71:1,10
rely
27:3 36:1 43:23 50:4
relying
27:16
remember
37:14,16,22 39:14,15
40:20
remove
54:18
removed
54:8,12 55:10,21
57:21 58:16 59:12
60:19
render
23:6
reoccurring
55:25 57:1 58:24
rephrase
64:4
report
8:23 10:1,17,21,22
14:7 16:19,20 17:2,6,
11,13 18:5,20,22
19:6 20:8 22:8,9,12,

16,21,22,23,24,25
23:8,19 25:9 27:15
28:22 37:15 38:22
39:11,20 41:9 42:10,
15,17 43:3,12 47:5,
20,25 49:17 51:22
52:11 53:14 54:2,20,
23 55:5,7,14 56:12
58:5,13,17 60:18,20
61:16,21,25 62:1,8
63:9,16,20,22 64:2,7,
9,20 66:7 69:22
70:14,18,20,21,23,24
71:6,12,14,20,22
72:1,15,22,23,24
reported
25:16 47:20 56:10
61:4 64:11
reporter
16:13 57:12 73:12
reporting
12:23 13:1,10,12,16,
18 14:1,3,6 15:15
16:2,12,18 17:17
20:6 30:15 31:1,4,8,
10,16 32:1,6 35:5
39:9,23,24,25 40:7,8,
9,10,13,14,16 41:6
43:9 49:2 50:13
51:21 55:17 56:4
57:9 59:11 60:14
61:10 66:9,24 67:3,
19,21 72:5
reports
14:9 16:14 20:1,5
41:7,10 54:12 55:11
59:21 63:6 73:1
represent
15:11 59:13
represented
13:3,9,16 15:3,6,14
representing
15:9
request
37:3 43:12 44:2 45:4
46:1 47:5 49:19
50:14
requested
42:10,15
requests
36:8 49:22,25 70:8



require
  31:21 34:4,11 52:15
required
  16:16
requirement
  58:10
requires
  28:25 41:16
reseller
  14:7 41:9
resellers
  13:19 40:12
resolve
  17:24
respect
  30:16 33:13 48:17
  55:7 58:6,9,15 59:3
  66:19 68:25
respond
  49:24
responding
  50:11
responses
  39:6 46:1 70:7
responsibilities
  42:2 54:16 56:3
responsibility
  54:18 56:5
responsive
  45:25
restate
  8:11
retained
  10:3 72:5,7,10,18
return
  35:14 46:8,20
returned
  34:9 36:20 51:9
  62:25
returning
  32:8 36:8,17
returns
  50:18
review
  10:15 39:12,17,18
  70:19 71:2,5 72:13
reviewed
  8:23 47:11 70:21
  71:8

reviewing
  10:22 17:11 20:22
  21:2 47:17
reviews
  48:19
Rhode
  27:10
Risk
  19:9
robust
  44:15
role
  14:4,15,18 16:1
  17:22 22:20
rollout
  66:13
routinely
  35:22
routing
  32:7
rule
  20:18
rule-making
  20:18
rule-makings
  16:8
rules
  8:6
run
  16:1 44:17
runs
  33:11 60:19

_____

S

Saferent
  14:8
sake
  7:14
salary
  11:13
school
  11:2,3
screen
  21:16,18 53:14 64:25
screeners
  13:23,24 31:12
screening
  14:8 18:24 19:3
  32:12 36:12 49:17

50:6
scroll
  21:23,24 25:8
searching
  35:13
Seattle
  18:13
section
  41:18 42:1
sector
  49:18
security
  19:8 20:19,24 27:2,9,
  13,18,23,25 28:6,17,
  23 29:4,9 30:18
  31:11,18 33:3 34:11,
  17 36:14 37:5 44:4,8,
  23,25 45:14,16,22
  46:3,5,9 47:10 50:17,
  20,25 51:2,13 52:5
  62:14
seeking
  27:21 28:2
sell
  41:6
sells
  41:9
send
  36:24 37:1 49:19
sending
  45:4
sends
  50:14
senior
  14:12,19
sense
  44:20
sentence
  68:3
separate
  45:15
serve
  17:16
served
  18:12,16,23,25 19:1,
  23
service
  20:9,10
services
  12:22 48:7 73:5

serving
  12:4
set
  50:10 57:6
Setting
  51:12
shifted
  12:21
shortly
  18:4 22:10
showed
  47:14
showing
  55:10 66:7
similar
  12:23 55:7,14 61:19
  62:14 64:10,13 66:6
Similarly
  28:15 36:21 37:3
simply
  46:15
single
  28:25
situation
  60:22 67:20
situations
  30:4
sixth
  70:11
skip
  8:6
slower
  21:23
small-dollar
  13:20 14:10
Smith
  50:15,19
Social
  27:1,9,12,18,22,23,
  25 28:5,17,23 29:4,9
  30:17 31:10,18 33:3
  34:11,17 36:13 37:5
  44:4,8,23,24 45:14,
  16,22 46:2,5,9 47:10
  50:17,20,25 51:2,13
  52:4 62:14
software
  55:6 63:11 66:13,14,
  17 67:9,11 68:15,24
  69:13,16

sole
  27:4,11,15
solely
  27:16
Solutions
  19:9
someone's
  50:8
sort
  17:22 26:15 30:8,22,
  23 33:11 35:20 43:6
  44:10,11 51:8 53:3
  67:25 69:9
Sounds
  6:5
source
  25:18 26:13 32:17
  33:13,15 34:6,8
  35:20,22,24 36:3,7
  39:3,4,17 42:23 43:1,
  2,7,16 44:8,23 45:7,
  15,20 47:6 48:19
  50:3,5,8 61:20 62:5,
  12,16
source's
  35:17
sources
  33:9 34:1 35:6,10
  39:10 42:9,16 43:14
  44:15,17 45:5 48:16,
  18 67:14
space
  13:20 14:7
speaking
  65:12 67:18
special
  40:14
specialty
  40:18,25 41:14
specific
  32:11 36:19 37:17,22
  39:15 62:19
specifically
  9:21 17:8 36:15
  37:14 47:16,18 54:3
  55:17 63:3 64:16
  68:19
spell
  5:12
Sr
  19:7



**SSN**
 25:21 27:4
**staff**
 16:20,24 17:1,2,10
**stand**
 50:1
**standard**
 39:8 66:13
**standing**
 49:9,12
**start**
 11:16 57:10
**started**
 11:17 12:14 15:19
 20:17
**state**
 5:11 6:12 26:1 38:22
 42:8,18 52:13,14
 54:10 63:2
**statement**
 26:22 65:14
**states**
 25:20 27:8 49:3
**stating**
 55:12
**statistics**
 30:8
**statute**
 27:10
**statutes**
 70:14
**stays**
 62:8
**stopping**
 53:5
**Strassburg**
 23:9 39:15 47:12
 69:8
**Strassburg's**
 71:3
**street**
 5:18 32:11
**stricter**
 31:14
**stuff**
 36:14
**style**
 17:19
**sub-definitions**
 40:11

**submitted**
 44:2
**subsequent**
 54:7 63:6,8,16,19
 64:2,7,17,20
**suffixes**
 32:19
**supervise**
 9:12,13
**supervisor**
 9:9 17:9
**supplement**
 71:14
**support**
 14:5 71:10
**surprising**
 51:5
**sworn**
 5:5
**synthesize**
 47:4
**system**
 23:15 35:13,22 45:24
 47:8 64:25 67:12
 69:9
**systems**
 36:16 68:16

---
**T**

**talk**
 48:5 49:17
**talked**
 70:1
**talking**
 43:16 69:8
**talks**
 27:15 41:21 52:10
**technology**
 64:24 66:23
**Teletrack**
 14:9
**ten**
 7:5 10:21 38:12
**ten-minute**
 53:6
**tenant**
 13:24 14:8 18:24
 32:12

**tend**
 71:19
**term**
 15:4 40:8
**test**
 35:20 66:14 67:6,24
**testified**
 5:7 37:10,19,24 38:5
**testify**
 7:19,24 8:2
**testimony**
 5:16 6:20 19:14
 37:23 38:9 72:14
**testing**
 66:10 68:5,14
**Theresa**
 19:8
**thing**
 8:7
**things**
 28:13,24 31:19 47:6,
 7 56:17
**threshold**
 25:21
**tied**
 60:15
**time**
 7:9 8:18 10:19 15:12,
 17 17:5 39:18 49:12
 56:23 57:25 59:25
 60:3 61:12 73:9
**times**
 6:25 7:3,6 10:2,5,7
 70:2 72:6
**title**
 11:11 14:11 15:21
**today**
 5:16 7:16,19,24 8:3
 10:16 12:25 70:25
 71:8,11 73:9
**today's**
 8:8,17,22
**told**
 28:4,15 58:21
**top**
 41:1
**topic**
 41:15
**topics**
 9:19

**tort**
 12:20
**toxic**
 12:19
**trade**
 16:22 55:21
**tradeline**
 55:20,23 56:10,12,
 22,23 57:4,17,20,21
 58:4 59:8,12,15,24,
 25 60:2,3,9,10 61:1,
 4,10
**tradelines**
 55:17 58:15,16,21
**transactions**
 14:10
**transcribed**
 24:19
**transcript**
 70:9,12 71:3
**Transunion**
 19:7
**treat**
 65:18
**treatment**
 47:21 49:2,10
**trial**
 71:18,20,24
**true**
 65:9
**trusted**
 37:6
**trusting**
 36:18 37:1
**truth**
 5:6 42:23
**truthfully**
 7:24 8:2
**Turning**
 69:22
**type**
 31:7 32:5 39:4 42:5
 66:6
**types**
 13:15 15:1 30:25
 31:18 33:25 56:14
**typically**
 8:6 35:16

---
**U**

**underlying**
 52:17
**understand**
 7:13,15,18 8:9 23:14
 33:7,10 34:7 35:19
 37:15 45:10 47:13
 51:10 58:25 66:17
 67:8
**understanding**
 25:18 26:21 34:17
 49:21 54:7 61:14,18
 62:13 63:23 64:10,
 17,23 68:23 69:7
**understands**
 65:22
**understood**
 8:14 66:21
**unique**
 30:18 31:18
**uniqueness**
 25:22
**universities**
 49:21
**university**
 50:11,12 51:25
**unreasonable**
 26:2
**unreasonably**
 72:11
**update**
 63:11 66:14,15 69:9,
 13
**updated**
 68:4
**updates**
 66:14 68:15
**USC**
 41:18
**user**
 44:22 45:2,14
**users**
 16:14

---
**V**

**varieties**
 43:13



**variety**
  11:21 14:22 16:4
  20:16 33:9 42:15
  48:18 49:10 68:12
**verification**
  36:21 49:25 51:4
**verifications**
  43:10
**verified**
  50:8
**verify**
  35:21 49:18
**vice**
  14:12
**videorecorded**
  24:17
**violated**
  72:19
**violations**
  16:5
**Virginia**
  6:7 12:21

---

**W**

**wanted**
  69:6
**Washington**
  5:17,18,20 11:3
  18:13
**watch**
  69:18
**ways**
  17:22 20:16
**websites**
  70:15
**weeks**
  22:14
**weight**
  28:12
**Wells**
  8:24 22:11,19,23
  24:5 28:8,19 30:6,13
  33:5,22 34:13,21
  35:1 36:4,13 37:12
  38:2,7 44:6 45:9
  46:6,17 48:3,13 49:7
  50:23 51:16,23 52:1,
  22 53:9,18 54:5 58:1
  65:5,11,19,25 67:7
  69:4,15 73:7

**wholly**
  57:5
**words**
  42:22 60:17
**work**
  11:20,23,25 12:25
  14:19 15:8 16:4
  17:24 20:15 64:21
  68:21
**worked**
  12:8,19 13:18 15:10
  16:6 17:10 35:20
  49:23 54:13,21 69:7
**working**
  11:16,17 14:14 17:15
  21:11 66:16
**works**
  53:8 66:11
**written**
  16:24 17:2
**wrong**
  47:7 67:15

---

**X**

**XML**
  47:6

---

**Y**

**year**
  11:4
**years**
  11:18 13:16 15:17
  16:19,20

---

**Z**

**Zip**
  25:21 29:22 30:1
  33:4 34:4,7 37:6
  47:15 50:16,19 51:3,
  5,12
**zoom**
  9:2,4 21:23 23:25
  24:2

